**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE: FIELDTURF ARTIFICIAL TURF : <br> MARKETING AND SALES PRACTICES : <br> LITIGATION : | Civil Action No. 3:17-md-2779 (MAS) (TJB) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants FieldTurf USA Inc., FieldTurf, Inc.,

FieldTurf Tarkett SAS, and Tarkett Inc.'s (collectively, "FieldTurf") motion to dismiss certain

claims in the Consolidated Amended Class Action Complaint ("Complaint") filed in this

multidistrict litigation.[1]  (ECF No. 91.) Plaintiffs: (i) Borough of Carteret ("Carteret"), State

Operated School District of the City of Newark ("Newark"), and County of Hudson ("Hudson")

(collectively, "NJ Plaintiffs"); (ii) City of Fremont ("Fremont") and Santa Ynez Valley Union

High School District ("Santa Ynez") (collectively, "CA Plaintiffs"); (iii) Levittown Union Free

School District ("Levittown" or "NY Plaintiff"); and Neshannock Township School District

---

[1] This multidistrict litigation is currently composed of the following member cases, listed with the districts where the actions were originally filed or removed: *Santa Ynez Valley Union High School District v. Fieldturf, USA, Inc., et al.*, No. 17-3947 (C.D. Cal.); *Lake Tahoe Unified School District v. Fieldturf, USA, Inc., et al.*, No. 17-4035 (E.D. Cal.); *The Paw, Inc. v. FieldTurf USA, Inc., et al.*, No. 17-4030 (D. Minn.); *Borough of Carteret, et al. v. FieldTurf USA, Inc., et al.*, No. 16-09252 (D.N.J.); *Gentile v. FieldTurf USA, Inc., et al.*, No. 17-173 (D.N.J.); *New Castle School District v. FieldTurf USA, Inc. et al.*, No. 17-13065 (W.D. Pa.); *Ranney School v. FieldTurf USA Inc., et al.*, No. 17-3414 (D.N.J.); *Lakeview Day Camp v. FieldTurf USA Inc.*, No. 17-3301 (D.N.J.); *Neshannock Township School District v. FieldTurf USA, Inc., et al.*, No. 17-4391 (W.D. Pa.); *Chaffey Joint High School District, et al. v. FieldTurf USA, Inc. et al.*, No. 17-4516 (C.D. Cal.); *Pajaro Unified School District (PVUSD) v. FieldTurf USA, Inc. et al.*, No. 17-4438 (N.D. Cal.); *Cherokee Central Schools v. FieldTurf USA, Inc. et al.*, No. 17-4405 (W.D.N.C.); *Brownsville Independent School District v. FieldTurf USA, Inc. et al.*, No. 17-4406 (S.D. Tex.); *Chaffey Joint Union High School District v. FieldTurf USA, Inc. et al.*, No. 17-4516 (C.D. Cal.); *City of Fremont v. FieldTurf USA, Inc. et al.*, No. 17-7714 (N.D. Cal.); *County of Hudson v. FieldTurf USA, Inc. et al.*, No. 17-1628 (D.N.J.); and *Borough of Little Ferry v. FieldTurf USA Inc. et al.*, No. 18-9740 (D.N.J.).  On March 16, 2018, the Township of Medford voluntarily dismissed its case without prejudice.  (ECF No. 99.)

("Neshannock" or "PA Plaintiff") (collectively, "Plaintiffs") filed opposition (ECF No. 100) and FieldTurf replied (ECF No. 112). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, FieldTurf's motion to dismiss is granted in part and denied in part.

## I.    Background[2]

Plaintiffs are school districts, a county, a borough, and a city that purchased defective FieldTurf Duraspine fields.[3] (Compl. ¶¶ 23-30.) All allege that they:

> decided to buy the Duraspine Turf Field based in part on FieldTurf's representations that the field had superior materials and design such that it had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years. . . . At the time of purchase, Plaintiff[s] did not know that the field was composed of defective and inferior materials that did not [comport with FieldTurf's] represent[ations]. Plaintiff[s]would not have purchased the Duraspine Turf Field, or would have paid less for it, had [they] known that the fields were defective and did not have the qualities and lifespan represented. Plaintiff[s] ha[ve] suffered a concrete injury as a direct and proximate result of Defendants' misconduct . . . .

(*Id.*)

### A.    FieldTurf's Product

An alternative to natural grass, artificial turf fields are designed for year-round use, in a variety of weather conditions, and for long periods of time. (Compl. ¶ 44.) Artificial turf does not require recovery time between events or the same maintenance as natural grass. (*Id.*) It

---

[2] For the purposes of this motion to dismiss, the Court accepts as true and summarizes the facts alleged in the Complaint. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[3] Carteret purchased six fields: four contracted for in September 2006 and installed in 2008; one contracted for in January 2007 and installed in May 2007; and one contracted for in 2010 and installed in 2011. (Compl. ¶ 23.) Fremont purchased two fields, one in each of 2007 and 2011. (*Id.* ¶ 24.) Hudson purchased five fields: one contracted for in 2007 and installed between 2007 and 2009; two contracted for in 2007 and installed between 2007 and 2008; and two fields contracted for in 2009 and installed between 2009 and 2010. (*Id.* ¶ 25.) Levittown purchased two fields in 2008. (*Id.* ¶ 26.) Neshannock purchased a field in 2008. (*Id.* ¶ 28.) Newark purchased four fields between late 2006 and 2010. (*Id.* ¶ 29.) Santa Ynez purchased one field in 2006. (*Id.* ¶ 30.)

consists of a minimum of three components: "(1) plastic grass blades, which are manufactured from plastic 'fiber' or 'yarn' and bundled into individual 'tufts'; (2) a backing material to which the tufts are attached; and (3) an adhesive used to secure the tufts to the backing." (*Id.* ¶ 45.) Artificial soil called "infill" may also be used, and when assembled, may be referred to as a "turf system." (*Id.*) Design and performance involve "sophisticated engineering" and "specialized knowledge" not possessed by the average consumer, and, accordingly, purchasers rely on the sellers for information about the quality and performance and cannot determine when a field is deteriorating prematurely. (*Id.* ¶ 48.)

FieldTurf "markets, manufactures, sells, and installs" these fields across the United States and is particularly known for its "infilled" fields. (*Id.* ¶¶ 49-50.) It also controls installation and ensures the fields are installed in a uniform fashion. (*Id.* ¶ 52.) In September 2005, FieldTurf entered into an agreement with Mattex Leisure Industries ("Mattex") to obtain fiber for its fields that had a "monofilament design" with a central "spine." (*Id.* ¶¶ 55-56.) FieldTurf named this fiber "Duraspine" and planned to sell Duraspine Turf fields at higher prices, as this turf was more durable and long-lasting. (*Id.* ¶ 57.)

### B.     FieldTurf's Claims and Sales

FieldTurf launched a uniform marketing campaign to disseminate the message in a consistent manner and to promote sales. (*Id.* ¶ 60.) Components of the campaign included trade publications (*id.* ¶ 63), flyers (*id.* ¶¶ 64, 65), materials given to every prospective customer (*id.* ¶ 68), and a standard sales pitch (*id.* ¶¶ 69-71).[4] Advertising and marketing materials featured clients like NFL teams and claimed Duraspine Turf fields were "the best fields money could buy." (*Id.* ¶ 60-61.) A 2006 trade publication quoted then-CEO John Gilman ("Gilman") as

---

[4] Included in the Complaint are various screenshots of marketing materials. (Compl. at 22, 23, 25, 27.)

saying his company's "breakthrough in technology" would "change the industry" and "double the expected useful life" of an artificial turf field. (*Id.* ¶ 63.) He stated that the fibers used in Duraspine Turf were "stronger," "wear more slowly," and were more resistant to "environmental agents." (*Id.*) As a result, Gilman said the Duraspine Turf fields' lifespan was "longer than the 10 years" already expected from current products. (*Id.*) Similarly, in a marketing document, featured in a national marketing campaign and distributed to all potential customers, "10 Reasons Why FieldTurf and Its MonoGrass System Should be Selected," FieldTurf stated that testing reflected that Duraspine Turf would last longer than FieldTurf's current product, which had an eight to ten-year life. (*Id.* ¶¶ 66, 68.) The document also stated that such durability was a "fact" and the field could be amortized on a "10+ year basis." (*Id.* ¶ 67.) A standard marketing pitch claimed that the Duraspine Turf "would virtually eliminate" the maintenance of natural grass and could be used year-round, lasting longer than any other product on the market. (*Id.* ¶ 69.) It claimed "FieldTurf has nothing to hide" and its comments were "[n]o marketing spin." (*Id.* ¶ 70.) Finally, FieldTurf claimed its fields were cheaper over the long term and sometimes save customers up to $1 million. (*Id.* ¶ 71.)

Although promising customers that they would probably never need to rely on a warranty, FieldTurf also provided customers with an eight-year express warranty[5] for the Duraspine Turf after contracting for purchase. (*Id.* ¶ 87.)

---

[5] The warranty stated:

> FieldTurf USA warrants that if [Duraspine Turf] proves to be defective in material or workmanship, resulting in premature wear, during normal and ordinary use of the Product for sporting activities set out below or for any other uses for which FieldTurf gives written authorization, within 8 years from the date of completion of installation, FieldTurf will, at FieldTurf's option, either repair or replace the affected area without charge, to the extent required to meet the warranty period (but no cash refunds will be made).

4

As a result, customers were induced by FieldTurf's representations, paid a premium price, and sales of the Duraspine Turf fields nearly doubled in a few years. (*Id.* ¶¶ 73, 77.) Plaintiffs were no exception, as FieldTurf made specific representations about the Duraspine Turf's quality, design, materials, durability, and lifespan, and Plaintiffs relied upon these statements in their purchase. (*Id.* ¶¶ 79-84, 86.) The fields were the most expensive in the industry. (*Id.* ¶ 75.) From late 2005 to 2012, FieldTurf sold a minimum of 1,450 of these Duraspine Turf fields for an average of $300,000 to $500,000 each, resulting in revenues of over half a billion dollars. (*Id.* ¶ 59.)

### C.   FieldTurf's Knowledge

#### 1.   Prior to Market Launch

FieldTurf knew that the Duraspine Turf was defective, unfit for its ordinary use and that its representations about Duraspine's durability and lifespan were false, as reflected by its testing and the testing performed by others. (*Id.* ¶ 100.) In early 2004, FieldTurf began to suspect that testing performed by Mattex was insufficient to determine the fiber's durability, and as a result, FieldTurf began to conduct its own testing. (*Id.* ¶ 92.) FieldTurf, however, performed the test using non-standard equipment knowing that the equipment would render inaccurate results. (*Id.*) By early 2005, FieldTurf's tests showed that the fiber "fibrillated" in one-third of the expected lifespan and FieldTurf contacted Mattex to ask about its material and methods. (*Id.* ¶ 93.) In addition, a representative from Bonar Yarns, another FieldTurf supplier, reported in a 2005 e-mail message that the Duraspine showed "poor results in the Lisport test!" (*Id.* ¶ 94.) This test is the standard industry test used by FIFA, soccer's international governing body. (*Id.*) Gilman was concerned, and in an e-mail message, questioned whether the company "erred in our over exuberance in the adoption of the monofilament yarns, specifically the Mattex yarns?" (*Id.* (Compl. ¶ 88.)

5

¶ 95.) FieldTurf's director of manufacturing, Derek Bearden, ran more tests and acknowledged on multiple occasions that the "finger coating" method employed to attach the fiber to the backing was not dependable and secure. (*Id.* ¶¶ 95, 96, 98.) In July 2005, FieldTurf's primary West Coast installer stated that FieldTurf should not carry out its Fall 2005 launch because it had "no idea whether it [Duraspine Turf] will work" and should not "rush a product to market and have it fail." (*Id.* ¶ 97.) Finally, in mid-2005, tests at a France facility revealed that the five tested samples "deteriorated 40-80%" after simulating five to six years of use. (*Id.* ¶¶ 33, 99.)

### 2. During the Period Sold

"[T]hroughout the time it sold and installed Duraspine Turf fields, FieldTurf repeatedly confirmed its awareness that Duraspine Turf was defective, lacked necessary strength, durability, and resistance and did not have the lifespan FieldTurf claimed." (*Id.* ¶ 102.) For example: (i) its operations director informed the CEO and others in 2006 that Duraspine fields installed in 2005 were already prematurely degrading (*id.* ¶ 103); and in January 2006, an employee in France observed that a field installed nine months prior was failing (*id.* ¶ 105). As a result, in December 2006, Gilman wrote to Mattex, stating, "We are seeing fields showing splitting under a year of play and have already had to replace one full-sized field due to yarn failure after only a few months of installation!" (*Id.* ¶ 106 (emphasis in original).) "[W]e know with heavy use, the fiber is coming apart." (*Id.* (emphasis in original).) In 2007, Ken Gilman, who is Gilman's son and was then a FieldTurf executive, stated in an e-mail message to the then-interim CEO that:

> [Duraspine] is nowhere near as robust or resilient as we initially thought and probably will not last that much longer than a high quality slit-film yarn . . . . In all likelihood in years 5 and 6 these Duraspine Turf fields will be matted down and fibrillating pretty heavily. . . . Our marketing claims and sales pitches need to reflect this reality.

(*Id.* ¶ 109.) He also stated the FieldTurf was promoting useless maintenance equipment which would not revitalize a field. (*Id.* ¶ 111.) When FieldTurf's counsel noted that the e-mail message was discoverable and could be used in litigation, Ken Gilman asked an IT representative whether the e-mail message could be "zapped off," the IT consultant answered in the negative and stated "[l]egally, it is not possible . . . You would be asking me . . . to commit a possible crime." (*Id.* ¶¶ 112-13.) Ken Gilman continued to try and convince FieldTurf to revise the representations in its sales and marketing representations. (*Id.* ¶¶ 114, 116, 117, 119.) Notably, one e-mail message, included as a screenshot in the Complaint, stated, among other things:

> As you know[,] our sales and marketing guys continually make claims that we can't possibly meet in the real world. This opens us up to tons of exposure from a legal standpoint. . . . On the marketing side[,] the claims made regarding the Duraspine . . . are ridiculous. Everyday[,] we are putting stuff out there that can't and won't live up to the marketing spin. We have to control this somehow!!!"

(*Id.* ¶ 114.) FieldTurf did not alter its sales and marketing claims, remove the product from the market, or inform customers of their misrepresentations. (*Id.* ¶ 120.) Ken Gilman was fired in 2008, and FieldTurf signed another exclusive supply agreement with TenCate, Mattex's successor, in or around July 2018. (*Id.* ¶¶ 120, 179.)

### 3. FieldTurf's "Finger-Coating" Method

During the manufacturing process, fibers are sown or "tufted" into a backing material in rows so that cleans can penetrate the infill material instead of the fiber. (*Id.* ¶ 122.) The manufacturer subsequently applies polyurethane to secure the fibers and prevent "tuft bind" issues. Tuft bind problems occur when the coating does not effectively lock fibers in place and they come loose from the backing. (*Id.* ¶ 123.) Tuft bind failures result in fibers laying on top of the field like mowed grass. (*Id.* ¶ 124.) Derek Bearden, then-Vice President of Manufacturing,

recommended coating the whole backing with polyurethane; however, FieldTurf utilized a "finger coating" method in which it applied polyurethane to the back of each row of fibers only. (*Id.* ¶¶ 125-26.) The remaining backing material between the rows was left uncoated. (*Id.*) Significant tuft bind failures resulted and FieldTurf received multiple complaints. (*Id.* ¶¶ 127-28.) Bearden told management that a full coating would "immediately make a significant difference." (*Id.*) Nevertheless, FieldTurf did not alter its process and instead manipulated test results to conceal the defect. (*Id.* ¶¶ 129-30.) John Rodgers, FieldTurf's Senior Research and Development Project Manager, stated that to obtain passing scores on "tuft bind pull force" tests, the company disregarded the lowest five of twenty pulls. (*Id.* ¶ 130.) Finally, Revolution Turf, FieldTurf's product that launched in 2012, at minimum, suffers from the same attachment defects of Duraspine described above. (*Id.* ¶¶ 131-32.)

### 4. FieldTurf's Infill and Safety Testing

FieldTurf marketing materials and sales presentations represented that FieldTurf used "ten pounds of infill per square foot" in installations but actually used much less, as reflected in FieldTurf's instructions to installers. (*Id.* ¶ 134.) A FieldTurf internal report stated that the "low infill phenomenon is real" (*id.* ¶ 135) and the issue decreased durability, safety, and performance (*id.* ¶ 136). The lower amount of infill increased the rate by which the fields deteriorated because fibers would not remain upright and instead laid over, exposing them to more wear. (*Id.* ¶ 137.) The end result was a "harder, sub-par" surface and not a premium product as represented. (*Id.* ¶ 138.) This practice continues today. (*Id.* ¶ 139.) In connection with this issue, FieldTurf cited to studies comparing turf to natural grass, studies it falsely represented to be "independent" but were actually funded by FieldTurf. (*Id.* ¶¶ 140-43.)

8

### D.    Consumer Complaints and FieldTurf's Response

While defects in the Duraspine Turf were not immediately apparent to customers, in 2009 and 2010, FieldTurf began receiving a distressing amount of complaints uniformly stating that the fiber on the fields was "fading, splitting, thinning and ultimately disintegrating within two to three years of installation." (*Id.* ¶¶ 144-45.)  Plaintiffs, including, for example, Levittown, Newark, and Fremont, suffered similar problems, with a Newark football coach noting "You grab it and it rips. It rips like grass." (*Id.* ¶ 146.)  FieldTurf, in response, conducted a "systematic campaign" to deceive purchasers and avoid warranties by: failing to inform customers that FieldTurf knew the fields were defective; failing to tell customers when FieldTurf representatives detected field failure; downplaying field failures observed by customers; and trying to persuade customers against enforcing their warranties. (*Id.* ¶ 147.)  Notably, FieldTurf instructed its sales and marketing teams to handle customer complaints—the same people who misled customers into buying the defective product. (*Id.*)

First, FieldTurf would deny the existence of a defect in the fields, many of which FieldTurf itself claimed were defective in its litigation against the manufacturer, discussed below, and describe problems "as an anomaly or normal wear and tear, or claim that the issues would improve over time." (*Id.* ¶¶ 149, 153.)  Then, FieldTurf would delay action, advise customers to monitor the fields, and conduct an inspection six to eight months later. (*Id.* ¶ 150.)  FieldTurf would repeat this cycle until the expiration of warranty periods. (*Id.*)  For those customers that demanded action, FieldTurf invented "FiberGuard," a clear coat of paint used on the fields; however, FieldTurf knew that the FiberGuard was ineffective. (*Id.* ¶ 151.)  Additionally, FieldTurf accelerated applications on fields in high UV areas with one to two years remaining on their warranty periods, so that defect claims would fall outside the warranty period.

(*Id.* ¶ 152.) When FieldTurf replaced a field, however, it provided more of the same defective product. (*Id.* ¶ 154.) If a customer refused to accept a replacement, FieldTurf offered either the customer an "upgrade" for an additional charge that was actually just the existing Duraspine Turf or Revolution Turf, which was still defective. (*Id.* ¶ 155.) Plaintiffs and others were subject to all of these tactics. (*Id.* ¶¶ 157-77.)

For example, in April 2013, Carteret reached out to FieldTurf about premature wear and spoke to two FieldTurf representatives, Perry DiPiazza and Andrew Schwartz, to report a warranty claim. (*Id.* ¶ 157.) The two stated that they need to conduct an inspection, which was performed five months later. (*Id.*) Over a year passed before Carteret received additional information, and only after Carteret only received a response after it sent October 2014 correspondence requesting an update. (*Id.* ¶ 158.) Almost two years after Carteret's first call to FieldTurf, DiPiazza e-mailed Carteret apologizing and promising to ease concerns; however, Carteret subsequently sent FieldTurf three letters between October 2015 and May 2016 and no further inspection was conducted. (*Id.* ¶¶ 159-60.) In June 2016, FieldTurf finally expressed "personal apologies" through its representative. (*Id.*) FieldTurf's delay tactic appeared to be an effort to allow the warranty period to expire. (*Id.* ¶ 161.) Several months after FieldTurf's apology, FieldTurf e-mailed Carteret three proposals "that would require it to pay thousands of dollars in repair and replacement costs." (*Id.*)

## E. FieldTurf's Lawsuit Against TenCate and the NJ Advance Media Investigation

On March 1, 2011, FieldTurf sued TenCate, Mattex's successor and supplier of the fiber used in the Duraspine Fields sold to Plaintiffs and the putative class members. (*Id.* ¶ 179.) To bring its case, FieldTurf admitted that the fiber used was "inferior" and "defective" in its design and composition. (*Id.* ¶ 180.) According to FieldTurf, the representations TenCate/Mattex made

about the nature of the fiber were false and misleading—and essentially identical to the representations made by FieldTurf itself. (*Id.*) FieldTurf admitted that: (i) the fiber was cheap, defective, less durable, and lacked sufficient UV stabilizers; (ii) the defects were due to the inferior materials Mattex/Tencate used; and (iii) the manufacturing process diminished the fiber's quality. (*Id.* ¶ 181.) FieldTurf's experts opined that: (i) scientific testing demonstrated that the fiber showed signs of premature physical and chemical degradation and had insufficient amounts of UV protection; and (ii) the general deterioration confirmed that the fiber was defective. (*Id.* ¶¶ 182-83.) Finally, "FieldTurf's CEO, Eric Daliere, testified that FieldTurf continued to sell, install, and profit from Duraspine Turf fields despite knowing they were defective." (*Id.* ¶ 184.)

NJ Advance Media conducted an exhaustive six-month investigation of these events, reviewing 5,000 pages of production from forty document requests, interviewing coaches, officials, and current FieldTurf employees, and inspecting fifty fields in New Jersey. (*Id.* ¶ 186.) It also enlisted the University of Michigan's Breaker Space Lab to test Duraspine Turf fibers from three fields in New Jersey. (*Id.*) In December 2016, NJ Advance Media published its results. (*Id.*) Testing confirmed that the turf's tensile strength failed to meet both industry and FieldTurf's own standards.[6] (*Id.* ¶ 187.) The investigation concluded:

- FieldTurf knew its Duraspine Turf fields were defective. For most of the time they sold the fields, which cost at least $300,000 to $500,000 each, executives were aware the turf was deteriorating faster than expected and might not last a decade or more as promised.

---

[6] "[N]ew fibers should withstand at least 3.6 lbs. of force and lose no more than 50% of tensile strength after eight years, *i.e.*, 1.8 lbs. of force. The lab tested fibers collected from low-traffic areas of three Duraspine Turf fields installed in New Jersey in 2008. All three samples showed tensile strength well below 1.8 lbs. of force." (*Id.* ¶ 187.)

- They misled their customers. Despite candid, internal email discussions about their overblown sales pitches, executives never changed their marketing campaign for Duraspine Turf fields.

- They have and continue to keep quiet about their lies. From the time fields began to fail in 2006 until today, executives have never told most customers about Duraspine Turf's problems or how to identify signs it was prematurely falling apart.

- FieldTurf officials slow-footed warranty claims and told customers the deterioration was normal, or that their fields needed more maintenance, or the problems would get better. Further, to this day, in testimony before governmental bodies, and in publicly released statements, FieldTurf continues to publicly deny there was a widespread defect with its Duraspine Turf products.

(*Id.* ¶ 188.)

## II.    Legal Standard[7]

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563

---

[7] In its moving brief, FieldTurf discussed choice of law issues and asserted that: (i) the procedural law of the transferee district, the District of New Jersey, applies; and (ii) applying the choice of law rules in the states in which the actions were originally filed—here, New Jersey, Pennsylvania, and California—Plaintiffs' claims are substantively assessed under the laws of each of their home states. (FieldTurf's Moving Br. ("FT's Moving Br.") 10-11, ECF No. 91-1.) Plaintiffs do not argue to the contrary in their opposition. (*See generally* Pls.' Opp'n Br., ECF No. 100.) The Court agrees with FieldTurf's analysis and, accordingly, applies New Jersey law to the NJ Plaintiffs' claims, New York law to Levittown's claims, Pennsylvania law to Neshannock's claims, and California law to the CA Plaintiffs' claims.

12

(3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must "[review] the complaint to strike conclusory allegations[.]" *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

Finally, some of Plaintiffs' claims allege fraud, and those claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 301 n.9 (3d Cir. 2011); *Frederico v. Home Depot*, 507 F.3d 188, 202-03 (3d Cir. 2007).

## III. Discussion

### A. Claims Under Statutes of Forty-Three Jurisdictions Where There is No Named Plaintiff

"[A] class representative *must be part of the class* and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)) (emphasis added); *see also Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 360 (3d Cir. 2013) ("It is axiomatic that the lead plaintiff must fit the class definition"). The Court acknowledges

13

disagreement among the courts regarding whether, prior to class certification, named plaintiffs must demonstrate that they have standing to assert all claims in the class action complaint "or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process[.]" *McGuire v. BMW of N. Am., LLC*, No. 13-7356, 2014 WL 2566132, at \*5 (D.N.J. June 6, 2014) (quoting *In Re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at \*8 (D.N.J. Oct. 20, 2011)).

Here, Plaintiffs bring claims for fraud, fraudulent concealment, fraud in the inducement, and unjust enrichment/quasicontract (Compl. ¶¶ 219-64) on behalf of themselves and a nationwide class of:

> [a]ll persons or entities in the United States and its territories who purchased one or more Duraspine Turf fields for their own use and not for resale. Excluded from the Class are FieldTurf, or its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees. Also excluded from the Class are authorized Duraspine Turf field installers.

(Comp. ¶ 191.)

In addition, Plaintiffs seek to bring claims for breach of express warranty, breach of implied warranties, and breach of various consumer protection laws and to represent state classes defined as: "[a]ll persons or entities who purchased one or more Duraspine Turf fields for their own use and not for resale within [a specific state] or who purchased one or more Duraspine Turf fields for their own use and not for resale and reside in [a specific state]." (*Id.* ¶ 192.)

FieldTurf argues that Plaintiffs lack standing to bring claims under the laws of states in which they do not reside, no fields are located, and no injuries are alleged to have occurred. (FT's Moving Br. 11-13.) Plaintiffs counter that they undisputedly possess Article III standing

and that FieldTurf actually challenges whether Plaintiffs can represent absent class members—a question to be addressed in the Rule 23 class certification analysis, not on a motion to dismiss. (Pls.' Opp'n Br. 7-11.) Further, Plaintiffs note that FieldTurf clearly sold its products throughout the country and if Plaintiffs here can recover on their claims, many customers in other states can also recover under similar laws. (*Id.* at 7.) On reply, FieldTurf notes that the state classes are defined as "[a]ll persons or entities who purchased one or more Duraspine Turf fields . . . within [the State] or who purchased one or more Duraspine Turf fields . . . and reside in [the State]" and Plaintiffs are not members of the forty-three state classes at issue and, therefore, those classes can never be certified. (FieldTurf's Reply Br. ("FT's Reply Br.") 1-2, ECF No. 112). FieldTurf asserts that the case law Plaintiffs offer in opposition is inapplicable, because those cases involve plaintiffs that purport to represent and *be a member* of a single class involving claims under many states' laws. (*Id.* at 3.)

The Court defers consideration of standing to pursue claims on behalf of absent class members of the nationwide class and deems the inquiry premature and more appropriate for the class certification analysis. The Court agrees with the rationale of one contingent of courts, that "the fact that the named Plaintiffs may not have individual standing to allege violations of consumer protection laws in states other than those in which they [were injured] is immaterial," because "[t]he issue . . . is one of predominance[—]whether questions of law or fact common to class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. Mar. 18, 2009) (citing Fed. R. Civ. P. 23 (b)(3)); *In re Liquid Aluminum Sulfate Antitrust Litig*, No. 16-md-2687, 2017 U.S. Dist. LEXIS 115294, at \*83-84 (D.N.J. July 20, 2017). Here, the question of whether Plaintiffs have standing to bring claims for violations of laws of other states only arises if the Court certifies the

nationwide class. Accordingly, FieldTurf's motion to dismiss claims brought on behalf of the nationwide class is denied on this ground.

From the face of the Complaint, however, the named plaintiffs cannot represent any putative state subclasses of which they are not a member. Additionally, FieldTurf is correct in its assessment that the case law Plaintiffs offer involves plaintiffs that purport to represent and *be a member* of a single class involving claims under many states' laws. Accordingly, FieldTurf's motion to dismiss the state subclasses of which no Plaintiff is a member (*i.e.*, other than the New York, New Jersey, Pennsylvania, and California subclasses) is granted without prejudice and Plaintiffs are granted leave to amend.

### B.    Consumer Protection Claims

FieldTurf asserts that the NJ Plaintiffs, NY Plaintiff, and CA Plaintiffs do not adequately allege state consumer fraud claims because they are insufficiently pled or barred by the statute of limitations. (FT's Moving Br. 13.) The Court will examine each, in turn.

### 1.    NJ Plaintiffs' Claims Under the New Jersey Consumer Fraud Act ("NJCFA")

To state a claim under the NJCFA, a plaintiff must allege three elements: (1) the defendant's unlawful conduct;[8] (2) the plaintiff's ascertainable loss; and (3) a causal relationship between the two. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*,

---

[8] The NJCFA defines "unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[.]

N.J.S.A. § 56:8-2. "Merchandise" is a broad term that includes "goods," "commodities," and "services of anything offered." N.J.S.A. § 56:8-(c).

192 N.J. 372, 389 (N.J. 2007); *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007). There are three general categories of unlawful conduct: affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8-2, 56:8-4. *Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 648 (D.N.J. 2013) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994)). Finally, when bringing an NJCFA claim, plaintiffs must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Castro v. Sovran Self Storage, Inc.*, 114 F. Supp. 3d 204, 219 n.12 (D.N.J. 2015); Fed. R. Civ. P. 9(b). "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223-34 (3d Cir. 2004)).

### a. Applicability of the NJCFA

First, FieldTurf argues that the NJ Plaintiffs cannot invoke the protections of the NJCFA because they are not "consumers" and the purchased fields are not "merchandise." (FT's Moving Br. 14.) FieldTurf states that the NJCFA does not apply to "transactions involving sophisticated institutional buyers of products that are not sold to the general public and are subject to individualized specifications and negotiations" and the fields at issue here are worth hundreds of thousands of dollars and sold to a small group of sophisticated customers. (FT's Moving Br. 14-15.) Despite Plaintiffs' assertion that the Court's analysis turns on whether the fields were sold to the public at large, FieldTurf asserts that the Complaint fails to make this allegation and instead alleges that specialized products were sold to "municipalities, school districts, universities, and athletic organizations." (FT's Reply Br. 112 (quoting Compl. ¶ 259).) Plaintiffs in opposition assert that: (i) the NJCFA is broadly construed and protective; (ii) the NJCFA can apply to expensive products purchased by knowledgeable buyers; and (iii) the proper

17

inquiry for the Court is whether a product at issue was sold to the public at large. (Pls.' Opp'n Br. 12-14.)

The Court finds that FieldTurf has not carried its burden to demonstrate that based on the Complaint's allegations, the NJCFA does not apply to the sale of the fields. In support of its argument, FieldTurf cites cases involving products that, based on the facts as pled, appear unlike the fields at issue. (*See* FT's Moving Br. 14-15 (citing *Boc Grp. v. Lummus Crest*, 597 A.2d 1109, 1109-10 (N.J. Super. Ct. Law Div. 1990) (case regarding "the design, engineering and operation of a plant in Texas intended to manufacture needle coke, which is used to produce graphite electrodes"); *Khan v. Conventus Inter-Ins. Exch.*, 113 A.3d 803, 806 (N.J. Super. Ct. Law Div. 2013) (medical malpractice insurance); *Centrum Fin. Servs., Inc. v. Chicago Title Ins. Co.*, No. 09-3300, 2010 WL 936201, at *4 (D.N.J. Mar. 12, 2010) (title insurance policy); *Princeton Healthcare Sys. v. Netsmart N.Y., Inc.*, 29 A.3d 361, 365 (N.J. Super. Ct. App. Div. 2011) ("complex computer system"). Here, the NJ Plaintiffs are public entities—a school district, borough, and county (Compl. ¶¶ 23, 25, 29)—and there is an inherently public undertone to these transactions. Plaintiffs allege that "[b]ecause so many of these consumers were public and/or taxpayer funded entities, FieldTurf's wrongful acts directly impacted the public interest in honest dealings with such consumers and in ensuring that public funds and taxpayer dollars are not wasted on defective, inferior, fraudulent goods." (*Id.* ¶ 178; *see also id.* ¶ 138 (alleging the fields were "far from the 'premium' product FieldTurf marketed . . . and, in many instances, taxpayers, paid for.").) Accordingly, the Court declines to bar the NJ Plaintiffs' NJCFA claims on this basis and as a matter of law at this stage of the proceedings. The Court, therefore, denies FieldTurf's motion to dismiss the NJ Plaintiffs' NJCFA claims on this ground.

### b. "Ascertainable Loss"

Second, FieldTurf claims that the NJ Plaintiffs have not alleged an "ascertainable loss." (FT's Moving Br. 16.) FieldTurf asserts that an alleged defect covered by an express warranty cannot constitute an ascertainable loss under the NJCFA and instead, a plaintiff must seek redress under the warranty. (*Id.* at 16-17.) According to FieldTurf, Plaintiffs fail to allege any defect that is not covered by FieldTurf's warranty. (*Id.* at 17.) Plaintiffs, however, assert that a written warranty does not bar the finding of ascertainable loss under the NJCFA. (Pls.' Opp'n Br. 16.) Plaintiffs assert that an ascertainable loss is simply receiving less than what was promised, which was the case here where the fields did not conform to FieldTurf's representations. (*Id.*) Further, Plaintiffs contend that a breach of warranty claim does not preclude an NJCFA claim if it is brought in the alternative, when the warranty is allegedly ineffective. (*Id.*) FieldTurf, on reply, asserts that Plaintiffs cite authority standing for the proposition that an NJCFA claim can only arise where the alleged breach of warranty is unconscionable and the NJ Plaintiffs' allegations that FieldTurf unreasonably delayed responding to warranty claims or denied a claim does not rise to unconscionability. (FT's Reply Br. 5-6.)

Generally, an ascertainable loss under the NJCFA: (i) "is one that is quantifiable or measurable, not hypothetical or illusory." *Annecharico v. Raymour & Flanigan*, No. 16-1652, 2016 WL 7015615, at *7 (D.N.J. Nov. 30, 2016) (internal quotation marks and citations omitted) (citing *D'Agostino v. Maldonado*, 78 A.3d 527, 537 (N.J. 2013)); and (ii) "occurs when a consumer receives less than what was promised." *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 335 (D.N.J. 2014) (quotations omitted) (citing *Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Super. Ct. App. Div. 2002)).

Here, the Court finds that FieldTurf has failed to carry its burden to demonstrate that Plaintiffs failed to allege ascertainable loss. FieldTurf relies heavily on an unreported case from this district, *Glass v. BMW of North Am., LLC*, 2011 WL 6887721, which interpreted a Supreme Court of New Jersey decision, *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783 (N.J. 2005). *Thiedemann* states that "defects that arise and are addressed by warranty, *at no cost to the consumer*, do not provide the predicate 'loss' that the [NJ]CFA expressly requires[.]" *Id.* at 794 (emphasis added). The *Thiedemann* plaintiffs' "problems caused by the defective sensors did not result in any out-of-pocket monetary loss[, a]ll repairs were performed by defendant under warranty, at no cost to [plaintiffs], and the loaner vehicles were provided during periods when [their] car was being repaired." *Id.* Moreover, the New Jersey Supreme Court has described *Thiedemann* using language suggesting that cost to the consumer is a factor in the determination of ascertainable loss. *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 750 (N.J. 2009) (citing *Thiedemann*, 872 A.2d at 794)) ("We have held that a consumer who had repairs to a vehicle performed under warranty at no cost did not sustain such a loss.")

In this case, each of the NJ Plaintiffs alleges it spent thousands of dollars in connection with repair and/or replacement of its fields. (Compl. ¶¶ 161, 163, 169.) Finally, Plaintiffs assert their warranty claims in the alternative. (Compl. 81 n.9.) Accordingly, for the purpose of this motion, the Court finds Plaintiffs' allegations of ascertainable loss sufficient. *See Miller v. Chrysler Grp. LLC*, No. 12-760, 2014 U.S. Dist. LEXIS 90314, at *21-22 (quoting *Thiedemann*, 872 A.2d at 792) (noting that the New Jersey Supreme Court has held that "either out-of-pocket loss or a demonstration of loss in value will suffice" to create an issue of fact related to ascertainable loss and finding allegations sufficient to withstand a motion to dismiss).

#### c.     Hudson's NJCFA Claim

Finally, FieldTurf alleges that Hudson has not sufficiently alleged: (i) "unlawful conduct" pursuant to Rule 9(b) and, instead, asserts "generic and conclusory boilerplate allegations" without mention of the date, time or place of the misrepresentation or the persons involved (FT's Moving Br. 17-18, FT's Reply Br. 6); and (ii) a causal connection between a misrepresentation and the alleged loss, as misrepresentations made to the public and not to a plaintiff are insufficient (FT's Moving Br. 18-19, FT's Reply Br. 6). Plaintiffs contend that FieldTurf is sufficiently on notice of the unlawful conduct at issue because it sued TenCate regarding defects, its experts testified to such defects, and FieldTurf's executives knew that the company was misleading customers and, consequently, that FieldTurf was exposed to fraud claims. (Pls.' Opp'n Br. 17.) Plaintiffs assert that they have identified the who, what and when of the fraud: FieldTurf, its multitude of misrepresentations and omissions about the Duraspine Turf, and the date of Hudson's purchase of the fields. (*Id.* at 18.) Plaintiffs further claim that Hudson has adequately alleged that it would not have purchased or would have paid a lower price for the fields had it known the truth about the product. (*Id.*)

To satisfy Rule 9(b), "a plaintiff must plead or allege the date, time and place of the alleged fraud *or otherwise inject precision or some measure of substantiation into a fraud allegation.*" *Frederico,* 507 F.3d at 200 (emphasis added). The Court declines to "require specificity just for specificity's sake" and finds that, given the highly unusual nature of the facts of this case, which, as pled in the Complaint, involve FieldTurf's own lawsuit against its manufacturer and an extensive media investigation, FieldTurf is sufficiently on notice of the misconduct alleged. *Smajlaj v. Campbell Soup Co.,* 782 F. Supp. 2d 84, 104 (D.N.J. 2011). Here, Plaintiffs allege that Hudson made its purchases based partially "on FieldTurf's

representations to the market throughout the 2007-2009 period that the fields had superior materials and design such that they had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years." (Compl. ¶ 86.) Additionally, "Mr. DiPiazza served as FieldTurf's representative to Hudson in the sales process and thereafter." (*Id.*)  Read in conjunction with the numerous allegations in the Complaint that detail FieldTurf's national marketing campaign (*see generally id.* ¶¶ 60-71), the Court finds that Hudson has adequately alleged a misrepresentation.

Finally, the Court finds that Hudson has adequately alleged causation. *See, e.g., Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 501 (D.N.J. 2009) (finding adequate allegations that plaintiffs would not have purchased the items at issue if truth was disclosed).  Plaintiffs allege that Hudson based its decision to purchase the fields "in part on FieldTurf's representations that the fields had superior materials and design such that they had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years" and "claimed comparative cost savings of Duraspine Turf fields." (Compl. ¶ 25.) Plaintiffs further allege that at the time of purchase, Hudson did not know the fields did not live up to these representations and Hudson would not have purchased the Duraspine Turf fields, or would have paid less for them, had it known that the fields were defective and did not have the qualities and lifespan represented. (*Id.*)  The Court finds that Hudson has adequately raised its fraud allegation here, and FieldTurf's motion to dismiss on this ground is denied.

### 2. Levittown's Claims for Consumer Protection and False Advertising Under New York General Business Law Sections 349 and 350

New York General Business Law § 349 and § 350 prohibit "deceptive acts or practices" and "false advertising" in the conduct of any business, trade or commerce or in the furnishing of any service in New York state. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107,

124 (2d Cir. 2017) (quoting N.Y. Gen. Bus. Law § 349(a)); *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 547 (S.D.N.Y. 2014) (quoting N.Y. Gen. Bus. Law § 350). "To successfully assert a claim under either section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)) (internal quotation marks omitted).

### a.    Statute of Limitations

FieldTurf asserts that: (i) even if plaintiffs allege fraud, a three-year statute of limitations applies and began to run on the date of the alleged injury, which can be no later than the 2008 sale of allegedly defective goods (FT's Moving Br. 20; FT's Reply Br. 7); and (ii) Levittown has not pled allegations sufficient to toll the limitations period based on equitable estoppel because (a) merely pleading that a defendant failed to disclose the wrong is insufficient (FT's Moving Br. 20-21) and (b) Levittown does not and cannot allege due diligence in pursuing its suit or FieldTurf's acts that prevented it from filing suit (FT's Reply Br. 8). In opposition, Plaintiffs assert that Levittown's claims are timely because: (i) a six-year statute of limitations applies to fraud claims (Pls.' Opp'n Br. 19); (ii) Levittown's claims accrued in 2016 when the fields failed because a claim premised on misrepresentations regarding future performance does not accrue until such performance fails (*id.* at 20); and (iii) FieldTurf's active concealment before and after the sale tolled the limitations period because Levittown was induced by fraud, misrepresentations or deception to refrain from timely filing an action (*id.* at 21).

### i.    Accrual of the Claims

A statute of limitations defense may "be raised by a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)). "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)). Here, the Court finds that based on the facts pled and briefing provided, Plaintiffs present at least a colorable argument based on the language of a New York Court of Appeals decision that Levittown's injury could have occurred in 2016 when it determined its fields needed to be replaced. *See Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (quoting *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 211 (N.Y. 2001)). The Court acknowledges that FieldTurf provided case law from New York federal district courts in support of its contention; however, because Plaintiffs' argument is at least plausibly valid, the Court finds that FieldTurf has not carried its burden to demonstrate that Levittown's claim is barred as a matter of law, as "the bar is not apparent on the face of the complaint." *Robinson*, 313 F.3d at 135.

### ii.    Equitable Estoppel

Equitable estoppel prevents a defendant from asserting a statute of limitations defense "'where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.'" *Putter v. N. Shore Univ. Hosp.*, 858 N.E.2d 1140, 1142 (N.Y. 2006) (quoting *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006). "A plaintiff seeking to apply the doctrine of equitable estoppel must 'establish

24

that subsequent and specific actions by defendants somehow kept [it] from timely bringing suit.'" *Id.* "Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant." *Id.* Here, in light of the significant facts pled that allege an overarching "deny-and-delay" scheme (*see generally* Compl. ¶¶ 146 -78), the Court declines to find that Levittown has failed to plead specific misrepresentations made that prevented it from filing suit and is entitled to some discovery on this issue. Further consideration of this issue may be appropriately requested at a later stage of the proceedings.

### b. Sufficiency of the Pleadings

FieldTurf asserts that because it sold the fields to only business entities, both § 349 and § 350 do not apply unless plaintiffs show that the same activity was also directed at non-business consumers. (FT's Moving Br. 21.) FieldTurf characterizes its sale to Levittown as a "private transaction" without "ramifications for the public at large." (FT's Reply Br. 8.) According to FieldTurf, to allege consumer-oriented conduct, Plaintiffs must state that the deceptive acts are standardized and not rooted in a private dispute with individualized allegations. (*Id.*) FieldTurf: (i) characterizes Levittown as a sophisticated entity; and (ii) claims that Levittown does not allege that individual consumers were harmed, that it was treated similar to FieldTurf's non-business customers, or that the public interest is implicated here. (FT's Moving Br. 22; FT's Reply Br. 8.)

Plaintiffs claim that their allegations as to Levittown are sufficient because the critical question is whether the matter affects the public interest in New York, and a municipality can bring a claim under the statutes at issue. (Pls.' Opp'n Br. 22.) Further, even if Levittown was a "business entity," Plaintiffs argue that a business entity may sue if the deceptive practices

25

possibly affected similarly situated customers or the public interest; pleading a widespread or standardized practice is not required. (*Id.* at 23.)

For similar reasons as stated in Section III.B.1.a., the Court finds that FieldTurf has not met its burden to show that Levittown, on these facts, is a business entity for the purposes of § 349 and § 350, and accordingly, Levittown may not be required to plead the additional facts FieldTurf claims are necessary. FieldTurf asserts that Levittown: (i) is a school district serving five regions and multiple schools; (ii) purchased its fields for two high schools; (iii) alleged that the cost to replace the fields would be $2 million; and (iv) the parties engaged in a formal bidding process. (FT's Moving Br. 22.) These facts, allowing all favorable inferences to the Plaintiffs, actually make Levittown appear to be different than a business.

Moreover, even if Levittown is considered to be a business, while "courts have stated consistently that unique private transactions between sophisticated business parties do not give rise to liability under the statute[,]" a business may bring a claim under the statute "if it is harmed by consumer-oriented conduct." *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 301-02 (E.D.N.Y. 2010). Courts have construed the term "consumer-oriented conduct" liberally. *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002). "A defendant engages in 'consumer-oriented' activity if his actions cause any 'consumer injury or harm to the public interest.'" *Id.* (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)). "The 'critical question', then, 'is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer . . . .'" *Id.* (quoting *Schnabolk*, 65 F.3d at 264) (alterations in original). Accordingly, at this stage, because Plaintiffs have plausibly alleged that Levittown is different from a business entity and that the matter affects the public interest (*see* Compl. ¶ 26 ("Levittown . . . is a school district . . .); ¶ 138 (alleging the fields were

26

"far from the 'premium' product FieldTurf marketed . . . and, in many instances, taxpayers, paid for."); ¶ 146a (describing effects on games and practices); ¶ 178 (alleging that "many of those consumers were public and/or taxpayer funded entities" and "FieldTurf's wrongful acts directly impacted the public interest in honest dealing with such consumer and in ensuring that public funds and taxpayer dollars are not wasted on defective, inferior, and fraudulent goods.")), the Court declines to dismiss Levittown's claims pursuant to § 349 and § 350 at this time.

### 3. CA Plaintiffs' False Advertising Claims and Unlawful, Unfair, or Fraudulent Business Acts Claims

#### a. Statute of Limitations

FieldTurf asserts that the CA Plaintiffs' false advertising claims are subject to a three-year statute of limitations that runs from the dates the fields were purchased in 2006, 2007, and 2011. (FT's Moving Br. 23.) Specifically, FieldTurf claims that Santa Ynez and Fremont alleged discovery in 2011, and Santa Ynez was told about FieldTurf's pending litigation during that same year, and had knowledge of enough facts to have filed a claim. (FT's Reply Br. 9.) The CA Plaintiffs did not, according to FieldTurf, toll the statute of limitations because they failed to allege required facts regarding the time and manner of discovery of the problem and their inability to uncover the issue, despite due diligence, before the date of discovery. (FT's Moving Br. 23-24.) As to the unfair competition law claims, FieldTurf asserts that a four-year statute of limitations governs and began to run on the date the cause of action accrued, which was on the dates of purchase, not on the dates of discovery. (*Id.* at 24-25.)

Plaintiffs, in opposition, assert that either the discovery rule or fraudulent concealment tolls the statute of limitations for all the CA Plaintiffs' claims. (Pls.' Opp'n Br. 24.) As an initial matter, Plaintiffs note that FieldTurf acknowledges that the discovery rule applies to Plaintiffs' false advertising claims and the CA Plaintiffs' Unfair Competition Law claims can be equitably

tolled by the discovery rule as well, as FieldTurf relies on a case that is no longer good law. (*Id.* at 24-25.) Second, Plaintiffs argue that the discovery rule operates here because "as a result of FieldTurf's continuing course of lies," Plaintiffs did not realize that the breakdown in their fields were due to known defects until 2016. (*Id.*) Third, Plaintiffs argue they have pled fraudulent concealment because they pled when and the circumstances under which the fraud was discovered, and that the CA Plaintiffs were not at fault for their failure to discover the fraud or had no knowledge of the facts. (*Id.* at 26.) Finally, Plaintiffs argue that FieldTurf is estopped from asserting a statute of limitations defense as a result of misrepresentations and concealment before and after the sale. (*Id.* at 27.)

### i.     Discovery Rule

"In California, the discovery rule postpones accrual of a claim until the plaintiff discovers, or has reason to discover, the cause of action." *Plumlee v. Pfizer, Inc.*, No. 13-414, 2014 WL 695024, at \*8 (N.D. Cal. Feb. 21, 2014) (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008)) (internal quotations omitted). "A plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Id.* (quoting *E-Fab, Inc. v. Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1319 (Cal. Ct. App. 2007)) (internal quotations and citation omitted); *see also Clemens*, 534 F.3d at 1024 (quoting *Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 129 (Cal. Ct. App. 1975)) ("A plaintiff must affirmatively excuse his failure to discover the fraud . . . by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry.").

Here, the parties agree that the discovery rule applies to False Advertising Law claims but disagree as to whether it also applies to Unfair Competition Law claims. The Court finds that Plaintiffs have raised sufficient argument that the California Supreme Court applies the discovery rule to the Unfair Competition Law and the case that FieldTurf relies upon has been characterized by other California courts as incorrect. *See Plumlee*, 2014 WL 695024, at *8 (citing *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1131 (C.D. Cal. 2010) and *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1196 (Cal. 2013)). FieldTurf fails to adequately rebut this argument on reply, merely stating that Plaintiffs have not cited a case where the statute of limitations is tolled by the discovery rule. (FT's Reply Br. 9.) The Court finds that FieldTurf has not carried its burden to demonstrate that the discovery rule does not apply.

Viewing the facts pled most favorably to Plaintiffs, the Court finds that the application of the discovery rule has been adequately pled. Plaintiffs allege the time and manner of discovery. (*See, e.g.*, Compl. ¶ 206 ("Indeed, it took NJ Advance Media six months of in-depth investigation, analyzing 5,000 pages of production from 40 document requests, interviewing dozens of coaches, officials, and current and former FieldTurf employees, examining 50 fields in New Jersey, and commissioning the services of an independent testing laboratory, the University of Michigan's Breaker Space Lab, to test turf fibers from three different Duraspine Turf fields in New Jersey even to begin to uncover the breadth of FieldTurf's fraudulent scheme."); ¶ 209 ("Plaintiffs and Class members had no realistic ability to discover the omissions or fraudulent nature of the misrepresentations until at least December 2016, when NJ Advance Media published the results of its investigation.").)

Plaintiffs also allege that the CA Plaintiffs could not have discovered the facts earlier, despite reasonable diligence. (*See, e.g., id.* ¶ 203 ("Plaintiff[s] and class members had no way of

knowing about the defects in Duraspine Turf and the other information concealed by FieldTurf. FieldTurf systematically lied to Plaintiff[s] and Class Members concerning the qualities of Duraspine Turf. When problems were discovered, FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance. In addition, FieldTurf advised Plaintiff[s] and Class Members that over time, the problems they were experiencing, would diminish."); ¶¶ 164, 170-73, 201-10.) Fremont alleges that despite contacting FieldTurf regarding a field's condition in March 2011 and having FieldTurf representatives inspect the field, FieldTurf "denied that the field deterioration was unusual or excessive" and "instead advised Fremont that the field was in normal condition and had enough remaining blades, assuring Fremont that the loss of fiber" was "normal wear and tear." (*Id.* ¶ 164.) Santa Ynez alleges that it knew of its first-installed field's problems and the "pending litigation with the manufacturer of the earlier version of Duraspine used on [its then-]current field;" however, it also alleges that FieldTurf replaced that field in 2012 and represented that the replacement was an improved version that did not suffer from the same issues, when, in fact, the problems remained. (*Id.* ¶¶ 170-73.)

## ii. Fraudulent Concealment & Equitable Estoppel

A plaintiff may toll the statute of limitations under the doctrine of fraudulent concealment by alleging a defendant's "affirmative deceptive conduct," not merely "nondisclosure." *Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1131 (C.D. Cal. 2010); *see also Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1100 (C.D. Cal. 2008) ("A plaintiff alleging fraudulent concealment must establish that his failure to have notice of his claim was the result of the affirmative conduct by the defendant.") (citation omitted). As to equitable estoppel, "'four elements must be present in order to apply the doctrine . . . : (1) the party to be estopped must be

30

apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.'" *Honeywell v. Workers' Comp. Appeals Bd.*, 35 Cal. 4th 24, 37 (Cal. 2005) (quoting *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 489 (Cal. 1970)).

For similar reasons as discussed above in the section regarding the discovery rule, Plaintiffs have pled fraudulent concealment and equitable estoppel here. (*See, e.g.*, Compl. ¶¶ 164, 170-73, 211, 212 ("FieldTurf knowingly manufactured, marketed, sold, and installed Duraspine Turf fields well after it knew, or had reason to know, the fields were defective in their composition, design, engineering, and installation, and yet FieldTurf never amended or updated its marketing, promotional, or sales material used universally by FieldTurf and provided to Plaintiffs and Class members."), 213-14.)

### b.    Santa Ynez's Claim for False Advertising

California's false advertising law

> makes it "unlawful for any person, . . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatsoever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (Cal. 2002) (quoting Cal. Bus. & Prof. Code § 17500).

FieldTurf argues that Santa Ynez cannot bring a claim for false advertising because it does not allege that it viewed any advertising or marketing materials. (FT's Moving Br. 25.) Plaintiffs, in opposition, assert that a plaintiff's actual reliance on a misrepresentation can be inferred, so all that must be alleged is that a misrepresentation was made and that but for the

misrepresentation, a plaintiff would not have made a purchase. (Pls.' Opp'n Br. 28.) Here, Plaintiffs allege misrepresentations made to Santa Ynez by a FieldTurf representative. (Compl. ¶ 81 ("Likewise, in the Fall of 2005, FieldTurf's Regional Sales Representative, Tim Coury, told Santa Ynez's Athletic Director, Ken Fredrickson, that the Duraspine Turf product had a useful life of 10+ years, and would last beyond the eight year warranty period, discussed below.").) The Complaint, however, also alleges that "[t]he '10 Reasons Why' document was part of a national marketing campaign *distributed to all potential customers*. FieldTurf specifically intended for customers to rely on the information in the document, as well as information in its other sales and marketing materials." (*Id.* ¶ 68) (emphasis added). Construing the Complaint on a motion to dismiss and on these unique facts, the Court finds that Santa Ynez has sufficiently pled a claim for false advertising and declines to dismiss the claim.

## C. New Jersey, New York, and Pennsylvania Fraudulent Concealment, Fraud, and Fraud in the Inducement Claims

FieldTurf argues that the NJ, NY, and PA Plaintiffs have failed to adequately allege a duty to disclose under state common law, requiring dismissal of the fraudulent concealment claims, as well as the fraud and fraud in the inducement claims to the extent that they are premised on an omission. (FT's Moving Br. 26, 28.) FieldTurf asserts that Plaintiffs failed to allege the type of relationship between the parties that would create a duty of disclosure. (*Id.* at 27.)

### 1. New Jersey

Under New Jersey law, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, *unless such disclosure is necessary to make a previous statement true* or the parties share a 'special relationship.'" *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) (citing *Berman v. Gurwicz*, 458 A.2d 1311, 1313

(N.J. Super. Ct. Chan. Div. 1981)) (emphasis added). FieldTurf argues that: (i) Plaintiffs have not alleged any facts suggesting a special relationship exists (FT's Moving Br. 28); and (ii) in opposition, Plaintiffs admit that they base their claims on affirmative misrepresentations which, unlike partial disclosures, do not result in a duty to disclose (FT's Reply Br. 11-12). Plaintiffs assert that New Jersey law imposes a duty to disclose when such disclosure is required to make an earlier statement true. (Pls.' Opp'n Br. 30-31.)

The Court finds that FieldTurf has not carried its burden to show that there is no duty to disclose on these facts. The Court does not agree with FieldTurf's conclusion that Plaintiffs conceded that their claims rest solely on misrepresentations. In addition to highlighting various alleged misrepresentations, Plaintiffs' opposition points to allegations that Plaintiffs claim to be omissions. (Pls.' Opp'n Br. 29 (citing Compl. ¶ 120 ("FieldTurf did not revise its sales and marketing claims, let alone pull the Duraspine Turf products from the market or tell any customers that the fields 'cannot possibly technically' meet FieldTurf's claims . . . ."), ¶ 234 ("Defendants fraudulently concealed and suppressed material facts regarding the defective Duraspine Turf fields. Despite advertising these products as having a 10-plus-year lifespan, Defendant knew when it marketed, sold, and installed the fields that Duraspine Turf fields were inferior in composition and design and did not have the superior qualities of UV and wear resistance and fiber memory Defendants represented, nor the lifespan Defendants claimed. Defendants failed to disclose these facts to consumers at the time they marketed, sold, and installed the fields.").) FieldTurf cites to a case from the District of New Jersey on reply that, according to FieldTurf, implicitly holds that a manufacturer's statement that cars would be defect-free constitutes an affirmative misrepresentation, not a partial disclosure, and does not

create a duty to disclose. (*See id.* 11-12.) On a motion to dismiss under these distinguishable, unique facts in the present matter, the Court declines to adopt FieldTurf's position at this time.

### 2. New York and Pennsylvania

In the context of a fraudulent concealment claim under New York law, "the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement, or 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Under Pennsylvania law, "[a]bsent a duty to speak or disclose, the concealment of certain facts cannot constitute fraud." *Protica, Inc. v. iSatori Techs., LLC*, No. 11-1105, 2012 WL 1071223, at *5 (E.D. Pa. Mar. 29, 2012) (citing *WP 851 Assocs., L.P. v. Wachovia Bank, N.A.*, No. 07-2374, 2008 WL 114992, at *6 (E.D. Pa. Jan. 11, 2008). "[A] duty to disclose does not typically arise unless there is a confidential or fiduciary relationship between the parties.'" *Id.* Such a confidential or fiduciary relationship arises in certain situations, such as:

> where there is an agreement between the parties; as a result of one party's reliance on the other's representations, *if one party is the only source of information to the other party or the problems are not discoverable by other reasonable means; when disclosure is necessary to prevent an ambiguous or partial statement from being misleading*; where subsequently acquired knowledge makes a previous representation false; or *where the undisclosed fact is basic to the transaction.*

*Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 783 (E.D. Pa. 2008) (emphasis added) (citation omitted). "The duty to speak does not arise where 'both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts.'" *Id.* (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 612 (3d Cir. 1995)).

As to Levittown, FieldTurf argues that Levittown: (i) has not alleged any facts to support the existence of a duty, merely the legal conclusion that FieldTurf was under a duty to disclose

the nature of the Duraspine fields (FT's Moving Br. 29); and (ii) failed to plead a partial or ambiguous statement or that FieldTurf withheld the essence of the transaction (FT's Reply Br. 12). As to Neshannock, FieldTurf asserts that no allegations suggest a fiduciary, fiduciary-like, or confidential relationship. (FT's Moving Br. 30.) Plaintiffs argue that the Complaint contains ample allegations of FieldTurf's calculated misleading conduct, despite knowing that its representations were false, and "[h]aving spoken (indeed, lied), FieldTurf had a duty to tell the whole truth." (Pls.' Opp'n Br. 32-33.) Plaintiffs reiterate that they are largely towns and schools that relied on FieldTurf's knowledge regarding the specifications of the Duraspine Turf. Here, the Court finds that both Levittown and Neshannock have alleged an independent duty.

The Court finds that, as to Levittown, Plaintiffs adequately alleged that FieldTurf made partial or ambiguous statements and that FieldTurf possesses "superior knowledge" and knows that Levittown acted on the basis of mistaken knowledge. (*See, e.g.*, Compl. ¶ 48 ("The design and performance of an artificial turf field involves sophisticated engineering and specialized knowledge beyond the ken of the average consumer, be it a school, a recreation department, or an individual small business owner. As a result, purchasers (including Plaintiffs and the Class members here) necessarily rely on the sellers of the fields (including FieldTurf) for complete and accurate information on the quality and expected performance of the fields. Similarly, the average purchaser does not possess the expertise to pick up on signs that a field is degrading prematurely."); ¶ 149 ("Step one in the process was to deny to the existence of any known defect. FieldTurf abused its discretion under the warranties and, relying on its industry expertise, took advantage of Plaintiffs and Class members' inability to detect field failures.").) For similar reasons, the Court finds that Plaintiffs have adequately alleged a duty with respect to Neshannock.

### 3. Hudson's and Neshannock's Fraud Claims

As to Hudson, FieldTurf argues that a misrepresentation has not been adequately pled because: (i) there are no allegations that Hudson actually possessed, read or saw marketing or advertising materials; and (ii) relies on conclusory allegations and bases its fraud claim on FieldTurf's "representations to the market" from 2007 to 2009, which is insufficient under Rule 9. (FT's Moving Br. 31-32.) Plaintiffs contend that FieldTurf requests specificity for its own sake and that general allegations of reliance are sufficient. (Pls.' Opp'n Br. 33-34.) Based on the reasoning set forth in Section III.B.1.c. denying dismissal of Hudson's NJCFA claim, the Court declines to dismiss Hudson's fraud claim on this ground.

As to Neshannock, FieldTurf argues that the "gist of the action" doctrine bars Neshannock's fraud claims because its breach of contract claim is premised on the same allegations. (FT's Moving Br. 32-33.) The Complaint alleges that in 2015, Neshannock observed deterioration of the field, complained to FieldTurf, FieldTurf repaired the field, and the same issues arose weeks later. (*Id.* at 34.) According to FieldTurf, this claim is grounded in the warranty claim. (*Id.*) Plaintiffs assert that a plaintiff may plead both tort and contract claims, the existence of a contract does not per se bar tort claims, especially here, where Plaintiffs' warranty claims are brought in the alternative and Plaintiffs assert fraud claims challenging the underlying contracts and warranties. (Pls.' Opp'n Br. 35.)

The gist of the action doctrine "ensure[s] that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 99 (Pa. 2014). The "critical determinative factor in determining whether a claim is a tort or breach of contract claim is 'the nature of the duty alleged to have been breached." *Id.* at 112 (internal quotations and citation omitted). The Court, however, finds that because Neshannock's warranty

claims are pled in the alternative, and Plaintiffs specifically brought such claims "without waiver of Plaintiffs' claims that any warranty or contract cannot be enforced by the Defendants" (Comp. 81-82 n.9), at the motion to dismiss stage, Neshannock's fraud claims may proceed. *See, e.g., Mill Run Assocs. v. Locke Prop. Co.*, 282 F. Supp. 2d 278, 291-91 (E.D. Pa. 2003) (denying motion to dismiss fraud in the inducement claim where a counterclaim "contains both contract and tort claims, which are pleaded in the alternative[,] [which] is permissible under Federal Rule of Civil Procedure Rule 8(e)."); *see also Turuvekere v. ContinuServe, LLC*, No. 12-5158, 2012 WL 5961957, at \*4 (E.D. Pa. Nov. 28, 2012) (quoting *Weber Display & Packaging v. Providence Wash. Ins. Co.*, No. 02-7792, 2003 WL 329141, at \*4 (E.D. Pa. Feb. 10, 2013)) ("'Courts have cautioned against deciding whether the gist of an action is in contract or tort at the motion to dismiss stage of a proceeding.'").

### D.    Warranty Claims

#### 1.    NJ Plaintiffs' Claims for Breach of Implied Warranty

FieldTurf argues that the NJ Plaintiffs' claims for breach of the implied warranty of merchantability and fitness for a particular purpose are untimely and inadequately pled. (FT's Moving Br. 35.) FieldTurf asserts that the four-year statute of limitations in New Jersey's Uniform Commercial Code governs the transaction, and the claims accrued on the delivery of the fields. (*Id.* at 35.) The latest an NJ Plaintiff purchased a field was more than six years before Plaintiffs asserted their claims. Additionally, the NJ Plaintiffs, according to FieldTurf, have not pled that they were unable to use the fields for the purpose for which they were purchased, *i.e.*, playing sports. (*Id.* at 36-37.) FieldTurf further claims that Plaintiffs have not pled fraudulent concealment and have not pled that they exercised due diligence in uncovering information that would have permitted them to file suit. (FT's Reply Br. 14.) In opposition, Plaintiffs assert that

they have adequately pled equitable tolling of the statute of limitations based on FieldTurf's fraudulent concealment and "deny-and-delay" scheme. (Pls.' Opp'n Br. 35-36.)

### a.    Fraudulent Concealment

To plead fraudulent concealment that tolls the statute of limitations, a plaintiff must allege "'(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiff's failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence.'" *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160, at *14 (D.N.J. May 8, 2017) (quoting *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008)). The Court finds that each of these elements is adequately pled here. (*See, e.g., id.* ¶ 203 ("Plaintiff[s] and class members had no way of knowing about the defects in Duraspine Turf and the other information concealed by FieldTurf.    FieldTurf systematically lied to Plaintiff and Class Members concerning the qualities of Duraspine Turf. When problems were discovered, FieldTurf claimed there was no defect, and provided other reasons for the rapid deterioration in FieldTurf's products, like poor maintenance. In addition, FieldTurf advised Plaintiff and Class Members that over time, the problems they were experiencing, would diminish."); ¶¶ 157-61 (describing three years of delay tactics FieldTurf employed in its dealings with Carteret);          ¶¶ 162-63 (describing that Hudson reached out to FieldTurf stating it was "stunned at how rapidly the fibers had deteriorated" and that "[t]he turf in some areas were worn right down to the fabric backing," but received no response); ¶ 146b (stating that "[o]n information and belief, from the date of installation through 2016, more than fifty repairs were required on Newark's Shabazz Field alone"); ¶ 168 (alleging that on August 5, 2015, FieldTurf denied warranty coverage for any future repairs to Newark's Shabazz High and Schools Stadium fields" because sufficient

maintenance had not been performed, as Newark had not hired a specific vendor to perform the maintenance); *see also* ¶¶ 201-10.) *See, e.g., In re Volkswagen*, 2017 WL 1902160, at \*4 (holding that similar allegations adequately pled fraudulent concealment).

### b.    Sufficiency of the Pleadings

"Pursuant to the implied warranty of merchantability, a merchant warrants that goods sold are fit for the ordinary purposes for which the goods are used." *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2008 WL 4126264, at \*19 (D.N.J. Sept. 3, 2008) (citing N.J.S.A. § 12A:2-314). FieldTurf claims that the ordinary purpose for which the fields were used was playing sports; however, the NJ Plaintiffs assert that their purpose was more significant. (Pls.' Opp'n Br. 39.)

The Court finds that FieldTurf has not carried its burden to demonstrate that the NJ Plaintiffs have failed to plead claims for breach of the implied warranty. The Court agrees with Plaintiffs that based on the facts pled, Plaintiffs have adequately alleged that the fields failed to serve their ordinary purpose. First, Plaintiffs allege that the fields failed to meet industry standards and deteriorated prematurely. (*See, e.g.*, Compl. ¶ 94 ("In the Spring of 2005, FieldTurf learned of more evidence confirming major problems with the fiber's durability. Bonar Yarns, another FieldTurf supplier, reported that the fiber showed 'poor results' on a standard industry test called the Lisport test, used by FIFA (the world-wide governing body for soccer)."); ¶ 187 ("The Breaker Space Lab tests confirmed the tensile strength of the turf to be well below industry standards, and FieldTurf's own standards."); *see also* ¶¶ 16-20, 145-46, 167-70, 189).) Second, Plaintiffs alleged that they were promised fields not simply for playing sports, but with "endurance, good aesthetics, and low maintenance." (Pls.' Opp'n Br. 39; *see, e.g.*, Compl. ¶ 61 ("In its advertising and marketing of Duraspine Turf fields, FieldTurf showcased high-profile

clients (such as NFL teams) and touted its Duraspine Turf fields as being the best fields money could buy."); ¶ 62 ("In 2006, FieldTurf's then-CEO John Gilman claimed in a trade publication that, among other things, his company's 'breakthrough in technology' would 'change the industry,' as Duraspine Turf 'will double the expected useful life' of an artificial turf field."); *see also* ¶¶ 79-80, 86.) Finally, Plaintiffs alleged that the fields failed to meet the expectations. (*See, e.g., id.* ¶¶ 146a, 161, 163, 169.)

### 2. Levittown's Claims for Breach of the Express and Implied Warranty

FieldTurf asserts that Levittown's claims for breach of the express and implied warranty are time barred, as the four-year statute of limitations prescribed by the Uniform Commercial Code began to run from the date of delivery of the fields. (FT's Moving Br. 37.) FieldTurf characterizes the written warranty at issue as a repair and replace warranty, not a warranty of future performance that guarantees a product will function for a certain period. (*Id.* at 37-39.) Plaintiffs assert that, similar to the NJ Plaintiffs, they have properly pled Levittown's fraudulent concealment, resulting in equitable tolling of the statute of limitations. (Pls.' Opp'n Br. 35-36.) Further, Plaintiffs argue that they alleged that FieldTurf made warranties of future performance outside of the written warranty, including that the fields had a lifespan of ten or more years and those claims accrue when the breach was discovered. (*Id.* at 37.) On reply, FieldTurf asserts that where an express written warranty exists, evidence of additional oral warranties is not permitted, and the cases Plaintiffs cite are distinguishable because they involve situations without a written warranty at all. (FT's Reply Br. 15.)

As stated in Section III.B.2.a.ii. above, the Court finds that Levittown has pled sufficient facts to establish equitable tolling of the statute of limitations. Additionally, at this juncture, the Court declines to bar Levittown from bringing an express warranty claim based on an alleged

future performance warranty created by FieldTurf's oral misrepresentations, as Plaintiffs assert fraud claims challenging the underlying warranties and have asserted warranty claims in the alternative.

### 3.    Neshannock's Claims for Breach of Express and Implied Warranties

"Under Pennsylvania law, '[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.'" *Morello v. Kenco Toyota Lift*, 142 F. Supp. 3d 378, 387 (E.D. Pa. 2015) (quoting 13 Pa.C.S.A. § 2312(a)(1)).

FieldTurf asserts that Neshannock fails to allege any of the elements required to state a claim for a breach of FieldTurf's warranty. (FT's Moving Br. 39.) According to FieldTurf, Neshannock only alleges that it complained about the condition of the field, FieldTurf groomed the turf, and the problems reoccurred; however, it does not allege it notified FieldTurf of the problem or that FieldTurf rejected a warranty claim or declined to fix or replace the field. (*Id.* at 40.) FieldTurf further contends that Plaintiffs merely cite to general allegations (in support of their arguments regarding both express and implied warranties), but none relate to Neshannock's fields. (FT's Reply Br. 16.) In opposition, Plaintiffs assert that this claim is based on statements FieldTurf made in its marketing and sales campaign. (Pls.' Opp'n Br. 39.)

Pursuant to FieldTurf's characterization of the elements required to state a claim— asserting that a plaintiff must plead a warranty, reliance, breach, proximate cause and damages (FT's Moving Br. 39 (citing *Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 394, (M.D. Pa. 2004)), the Court finds that Plaintiffs have sufficiently done so. Plaintiffs allege a warranty (*see, e.g.*, Compl. ¶ 84 ("FieldTurf also represented in its marketing materials given to Neshannock in or around Spring 2008 that the expected useful life of Duraspine Turf was 10+ years, which was

41

supported by '10 Year Cost Analysis FieldTurf v. Natural Grass' marketing brochure provided to Neshannock, and that Duraspine Turf had durability and longevity superior to its competitors' turf products.")); reliance *(see, e.g., id.* ¶ 28 (Neshannock "decided to buy the Duraspine Turf Field based in part on FieldTurf's representations that the field had superior materials and design such that it had greater durability and resistance to wear, matting, and UV than competing products and a useful lifespan of more than 10 years. These representations, along with the claimed comparative cost savings of the Duraspine Turf Field, were among the primary reasons Plaintiff[s] chose the Duraspine Turf Field.")); breach *(see, e.g., id.* ¶¶ 28, 60-71, 167); causation *(see, e.g., id.* ¶ 28) and damages *(see, e.g., id.* ¶ 167).

Section 2314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa. Cons. Stat. § 2314(a). To be "merchantable," goods must "have an inherent soundness which makes them suitable for the purpose for which they are designed, . . . be free from significant defects, . . . perform in the way that goods of that kind should perform, and . . . be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Gall v. Allegheny Cty. Health Dep't*, 555 A.2d 786, 789-90 (Pa. 1989).

"The UCC implies a warranty of fitness for a particular purpose when 'the seller at the time of contracting has reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods.'" *Visual Communs., Inc. v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 611 F. Supp. 2d 465, 470-71 (quoting 13 Pa. Cons. Stat. Ann. § 2315). "A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business[.]" *Id.* (quoting *Gall*, 555 A.2d at 790).

As to the implied warranty claims, FieldTurf contends that allegations that part of Neshannock's fields were wearing down seven and a half years after installation is not sufficient and there are no allegations that the field was not fit for the purpose for which it intended. (FT's Moving Br. 41.) Conversely, Plaintiffs assert that they have alleged the fields' intended use was for "outdoor, year-round . . . extensive athletic and other activities" and were failing earlier than other artificial turf products; therefore, Plaintiffs have alleged that the defective fields cannot be merchantable or fit for their ordinary purpose. (Pls.' Opp'n Br. 40-41.) For similar reasons as stated in Section III.D.1.b., the Court finds that FieldTurf has not carried its burden to demonstrate that Neshannock has failed to state a claim for a breach of the implied warranties under Pennsylvania law.

### 4.    CA Plaintiffs' Claims for Breach of the Implied Warranty

FieldTurf argues that the CA Plaintiffs' claims for breach of the implied warranty are untimely because the four-year statute of limitations began to run when the fields were delivered. (FT's Moving Br. 41.) Plaintiffs counter that these warranty claims are timely because: (i) a cause of action accrues on delivery of conforming goods, and here, the fields were never conforming; (ii) the statute of limitations was tolled during the eight-year express warranty period because a breach of future performance warranty occurs when performance fails; and (ii) fraudulent concealment and the discovery rule toll the statute of limitations. (Pls.' Opp'n Br. 41.) On reply, FieldTurf notes that: (i) the CA Plaintiffs did not allege that they took issue with the fields on delivery; therefore, the fields are conforming goods for the purposes of the statute; and (ii) the majority of California courts reject Plaintiffs' argument regarding tolling of the statute of limitations. (FT's Reply Br. 16-17.)

As an initial matter, the Court agrees with FieldTurf that Plaintiffs have provided no support for their contention that the goods are "nonconforming" simply because they were allegedly defective on delivery. The Court is unpersuaded by this argument. Next, the Court recognizes that multiple California courts decline to apply the future performance exception to implied warranty claims.[9] Nevertheless, based on similar reasoning as discussed in Section III.B.3.a.ii., the Court finds that the CA Plaintiffs have adequately alleged that fraudulent concealment and the discovery rule apply here to toll the statute of limitations.

### 5. Unjust Enrichment Claims

FieldTurf argues for dismissal of Plaintiffs' unjust enrichment claims, declaring that Plaintiffs cannot assert unjust enrichment claims when valid contracts exist on this issue. (FT's Moving Br. 42.) In other words, alleging breach of the express warranty allegedly precludes an unjust enrichment claim. (*Id.* at 42-43.) Plaintiffs, in opposition, state that the unjust enrichment and warranty claims are pled in the alternative because FieldTurf's behavior may cause the warranties to be unenforceable. (Pls.' Opp'n Br. 42.) Accordingly, Plaintiffs state that it is premature to determine which claim survives. (*Id.*) The Court agrees with Plaintiffs and finds

---

[9] The future performance exception of the California Commercial Code provides:

> A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Cal. Com. Code § 2725(2). The California Court of Appeal has held that this exception "must be narrowly construed" and "applies only when the seller has *expressly agreed* to warrant its product for a specific and defined period of time." *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 16 (Cal. Ct. App. 2008) (emphasis in original). "[B]ecause an implied warranty is one that arises by operation of law rather than by an express agreement of the parties, courts have consistently held [that] it is not a warranty that explicitly extends to future performance of the goods." *Philips v. Ford Motor Co.*, No. 14-2989, 2016 U.S. Dist. LEXIS 58954, at *41 (N.D. Cal. 2016) (quoting *Cardinal Health 301, Inc.*, 87 Cal. Rptr. 3d at 19-20).

that the two types of claims at issue were adequately pled in the alternative, and the Court will not rule as to which survives on a motion to dismiss. (*See* Compl. ¶ 256.)

## IV.    Conclusion

For the reasons set forth above, FieldTurf's motion to dismiss is granted in part and denied in part. An Order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Date: August 31, 2018