**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: FIELDTURF ARTIFICIAL TURF MARKETING AND SALES PRACTICES LITIGATION | Civil Action No. 17-2779 (MAS) (TJB)<br><br>**MEMORANDUM OPINION**<br>**(Under temporary seal)** |

**SHIPP, District Judge**

This matter comes before the Court on several motions: First is a Motion for Class Certification, Appointment of Class Counsel, and Appointment of Class Representatives by the following Plaintiffs: (i) Borough of Carteret ("Carteret"), State Operated School District of the City of Newark ("Newark"), and County of Hudson ("Hudson") (collectively, "NJ Plaintiffs"); (ii) City of Fremont ("Fremont") and Santa Ynez Valley Union High School District ("Santa Ynez") (collectively, "CA Plaintiffs"); (iii) Levittown Union Free School District ("Levittown" or "NY Plaintiff"); and Neshannock Township School District ("Neshannock" or "PA Plaintiff") (collectively as a group, "Plaintiffs"). (ECF No. 211.) Defendants FieldTurf USA Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc. (collectively, "FieldTurf") opposed (ECF No. 228), and Plaintiffs replied (ECF No. 247). FieldTurf filed a Motion for Leave to File a Sur-Reply. (ECF No. 250.) Plaintiffs opposed (ECF No. 252), and FieldTurf replied (ECF No. 261). Next is FieldTurf's Motion to Exclude the testimony of Dr. Gustaaf Schoukens. (ECF No. 234.) Plaintiffs opposed (ECF No. 245), and FieldTurf replied (ECF No. 253). Finally, FieldTurf filed a Motion to Exclude the expert opinions of Dr. Stephen F. Hamilton. (ECF No. 235.) Plaintiffs opposed (ECF No. 246), and FieldTurf replied (ECF No. 254). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1.

## I.    **BACKGROUND**

The Court presumes that the parties are familiar with the factual background and only sets out the facts relevant to the motions currently before the Court. *In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, No. 17-2779, 2018 WL 4188459, at *1 (D.N.J. Aug. 31, 2018), ECF No. 117. FieldTurf markets, manufactures, sells, and installs artificial turf across the United States. (*See generally* Am. Compl., ECF No. 69.) Plaintiffs filed this putative class action, alleging that FieldTurf hid design defects in its Duraspine artificial turf ("Duraspine") that negatively impacted the durability of the turf fields. (*See generally* Pls.' Moving Br., ECF No. 212.) To market Duraspine, FieldTurf claimed that it engineered Duraspine to be durable and that it would last aesthetically for ten or more years under normal use.[1] (*Id.* at 16.) But according to Plaintiffs, FieldTurf's representations turned out to be false. The truth, Plaintiffs assert, is that FieldTurf was aware as early as 2005 that Duraspine had inherent design defects that caused it to deteriorate much sooner than FieldTurf represented to purchasers. (*Id.* at 5-6.) Plaintiffs claim that FieldTurf strategized to conceal Duraspine's defects and continued to market the turf as a durable and resilient product instead of informing purchasers that Duraspine would not last as long as it initially expected.[2] (*Id.* at 18.)

Plaintiffs bring this class action on behalf of themselves and all Duraspine purchasers, and now move to certify four types of claims: fraudulent concealment, statutory consumer fraud,

---

[1] The parties agree that normal use of artificial turf is approximately 3,000 hours per year. (Pls.' Moving Br. 9; Defs.' Opp'n Br. 18, ECF No. 228.)

[2] Earlier in this litigation, Plaintiffs also claimed that FieldTurf was defective because of "tuft bind" issues during the manufacturing process. (Am. Compl. ¶¶ 122-132.) That allegation has since been abandoned.

implied warranty, and unjust enrichment.[3] (ECF No. 211.) FieldTurf opposed Plaintiffs' Motion and filed motions to exclude the opinions of two of Plaintiffs' experts, Dr. Gustaaf Schoukens ("Dr. Schoukens") and Dr. Stephen Hamilton ("Dr. Hamilton").[4] (ECF Nos. 234, 235.)

## II.   **MOTIONS TO EXCLUDE**

### A.   **Legal Standard**

For the purposes of class certification, courts may need to consider the expert opinions offered to support or oppose class certification. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008), *as amended* (Jan. 16, 2009). Where an expert opinion is necessary to class certification and a party challenges that expert's opinion, the court's duty requires that it analyze whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), before analyzing whether Rule 23's requirements have been met. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 188 (3d Cir. 2015).

---

[3] Plaintiffs seek certification of a nationwide class of purchasers of Duraspine Turf from 2005 through 2012 for the fraudulent concealment and unjust enrichment claims (or New Jersey, New York, Pennsylvania and California subclasses in the alternative), New Jersey, New York, and California subclasses for the statutory consumer fraud claims, and New Jersey, New York, Pennsylvania, and California subclasses for the implied warranty claims. (*Id.*)

[4] FieldTurf also filed a motion for leave to file a sur-reply. (ECF No. 250.) FieldTurf argues that in their reply, Plaintiffs raised two new arguments that did not appear in the motion for class certification. (*Id.* at 1.) "[T]he Court typically will not consider sur-replies that parties have filed without seeking and receiving leave to do so." *Norkunas v. S. Pa. Transp. Auth.*, No. 19-627, 2019 WL 6337913, at *2 n.3 (D.N.J. Nov. 27, 2019) (citing *Young v. United States*, 152 F. Supp. 3d 337, 352 (D.N.J. 2015)). "[A] sur-reply is meant only to address new issues raised by the opposing party for the first time in a reply brief. It is not meant to be used as a vehicle for providing the Court with arguments that could have been included in the earlier opposition brief." *Zahl v. Loc. 641 Teamsters Welfare Fund*, No. 09-1100, 2010 WL 3724520, at *3 (D.N.J. Sept. 14, 2010) (internal citations and quotations omitted). Because FieldTurf properly sought this Court's permission under Local Civil Rule 7.1(d)(6), and because the Court finds good cause to consider FieldTurf's sur-reply as it relates to Plaintiffs' trial plan, FieldTurf's Motion for leave to file a sur-reply is granted.

As established under *Daubert*, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" in deciding whether that testimony is admissible. *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (applying *Daubert* standard to all expert testimony). To accomplish that duty, courts must evaluate three factors in deciding whether to admit the testimony, including whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, *i.e.*, "fit." *See United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010); Fed. R. Evid. 702.

Particularly relevant here, in determining whether proposed expert testimony is reliable, the trial court should examine:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994); *see also Schneider ex rel Estate of Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003). Each step of the expert's analysis must be reliable, including "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (internal quotation marks omitted) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

The party offering the expert testimony must prove these three requirements by a preponderance of the evidence. *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)). But proponents of expert testimony need not

"prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal quotation marks omitted) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744). Reliability is the touchstone.

The district court, exercising its discretion, serves as a gatekeeper to prevent expert testimony that falls short of these requirements from reaching the jury. *Daubert*, 509 U.S. at 592-95. Nevertheless, the "basic standard of relevance . . . is a liberal one." *Id.* at 587. Within the principles outlined above, the Court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (internal citation omitted) (emphasis in original).

FieldTurf contends that this Court should exclude the opinions of Plaintiffs' experts, Dr. Schoukens and Dr. Hamilton. The Court considers each motion in turn.

### B.    FieldTurf's Motion to Exclude the Opinions of Dr. Schoukens

FieldTurf challenges Plaintiffs' defect expert, Dr. Schoukens, under *Daubert's* reliability requirement. (*See generally* Defs.' Mot. to Exclude Schoukens, ECF No. 234-1.) In his declaration and deposition testimony, Dr. Schoukens draws his conclusions from two relevant observations. The first is that Duraspine's fibers have a fatally flawed geometry. (Schoukens Decl. ¶ 3, ECF No. 217-3.) According to Dr. Schoukens, FieldTurf designed the fiber with a thicker, rounded central "spine" and much thinner "wings" on each side. (*Id.* ¶ 32.) These wings are rectangular in shape and contain an arched profile. (*Id.* ¶ 3.) This design makes the fiber susceptible to layover, matting, splitting and separation of the wings from the spine. (*Id.*) According to Dr. Schoukens, the thinness of the wings results in less pliant and more brittle fibers, meaning that they were torn or sheared off the spine with little resistance. (*Id.*)

The second observation is that Duraspine was manufactured with polymers that are unsuitable for long-term athletic use in artificial turf. Dr. Schoukens observed that most of Duraspine's fibers were made with a C4 Linear Low-Density Polyethylene ("LLDPE"). (*Id.* ¶ 32.) According to Dr. Schoukens, this polymer is unsuitable for community fields because it is relatively weak, easily torn, and not amenable to regular athletic use for more than a few years. (*Id.*) This is because C4-LLDPE has "low memory" and is relatively weak and susceptible to tearing and fibrillation (i.e. layover and matting of the turf). (*Id.* ¶ 44.) By comparison, within this particular family of polymers, C4-LLDPE has the lowest resistance to splitting and bending and can be correlated with the fast degradation of the mechanical properties of Duraspine fibers.[5] (*Id.* ¶ 35.)

From these observations, Dr. Schoukens concluded that the fibers used in Duraspine were inappropriate for either school or community sports fields because all Duraspine fields would experience substantial loss of resilience, resulting in fibrillation as well as substantial deterioration of the physical integrity of the fibers within the first four to six years of use.[6] The Court first begins with reviewing Dr. Schouken's qualifications and then addresses whether his opinions are reliable.

### 1.    Qualifications

Dr. Schoukens received a degree in Chemical Engineering from the Catholic University of Leuven (K.U. Leuven) in Belgium and also obtained his Ph.D from the same university. (Schoukens Decl. ¶ 11.) Dr. Schoukens's experience with polymers spans more than four decades.

---

[5] Dr. Schoukens also concluded that: (1) FieldTurf's manufacturing processes further weakened the fiber and (2) a failure to adequately protect the fiber from the effects of UV radiation contributed to the inherent weakness of Duraspine. (*See* Schoukens Decl. ¶ 2; Gotro Dep. Tr. 28:4-8 ("Well, in general, materials that are called polyolefins, which include polyethylene and polypropylene, those polymers, when exposed to the sun, can undergo degradation").)

[6] Dr. Schoukens admits that while all artificial turf fibers will layover and fibrillate, "the important question is timing." (*Id.* ¶ 91.)

From 1978 to 2004, Dr. Schoukens was a senior researcher for two private companies, specializing in polymerization and polymer processing. (*Id.* ¶ 12.) In 1994, Dr. Schoukens began teaching "polymer processing" as a part-time lecturer at Ghent University. (*Id.* ¶ 13.) From 2004 through 2014, he was a full-time professor at the same university, where he taught polymer technology, including polymerization processes. (*Id.*) Currently, Dr. Schoukens researches, advises, and consults in the general field of polymer processing, with a particular concentration on polymers used in artificial turf primarily for sports applications. (*Id.* ¶ 14.)

Dr. Schoukens also has experience with the mechanical properties of monofilaments used for artificial turf applications, including "testing for resilience and durability." (Schoukens Rebuttal Decl. ¶ 6, ECF No. 245-1.) According to the report, Dr. Schoukens developed testing methods and devices for examining mechanical qualities of turf fibers and co-authored articles and a textbook chapter on the mechanical aspects of turf fibers. (*Id.* ¶ 8.) Dr. Schoukens is also the founder of the European Research Centre for Artificial Turf (ERCAT) at the University of Ghent. (*Id.* ¶ 10.) Fittingly, Dr. Schoukens also advised Desso, another turf manufacturer, on the chemical and physical-mechanical design and qualities of turfs that it developed. (*Id.* ¶ 11.)

In sum, Dr. Schoukens has 15 years of research and practical experience concerning the chemical and mechanical properties of monofilaments used in artificial turf products. Given Dr. Schoukens's extensive experience studying polymers and their chemical and mechanical

properties, the Court concludes that he satisfies the qualification prong as an expert on the matters at hand.[7]

### 2.    Whether Dr. Schoukens's Opinions Are Reliable

FieldTurf sets forth several reasons why Dr. Schoukens's opinions should be excluded, including that: (1) his opinion that Duraspine will degrade within four to six years is not the product of a reliable methodology; (2) Dr. Schoukens relies on a biased, incomplete record to support his theory that Duraspine's fiber geometry was defective; (3) his opinions should not apply to football and baseball fields; and (4) Dr. Schoukens's polymer theory, to the extent it is still being offered, is inadmissible. (*See generally* Defs.' Mot. to Exclude Schoukens.)

Plaintiffs argue that Dr. Schoukens's declaration and testimony meet the Third Circuit's liberal policy of admissibility. (Pls.' Opp'n to Mot. to Excl. Schoukens 4, ECF No. 245.) Most importantly, Plaintiffs argue that Dr. Schoukens's opinions are based on testing, secondary analyses, data, and business records. (*Id.*) Plaintiffs point to the historical testing and analyses of Duraspine and Duraspine Pro over the years as ample basis to form Dr. Schoukens's opinions.[8]

---

[7] Although FieldTurf does not explicitly move to exclude Dr. Schoukens on the basis that he is unqualified, in its motion to exclude his testimony, FieldTurf repeatedly references Dr. Schoukens's lack of qualifications. (Defs.' Mot. to Exclude Schoukens 4 (Dr. Schoukens "has neither the training nor specialized knowledge that could even potentially justify" dismissal of certain types of relevant testing).) This contention, however, ignores that Dr. Schoukens has extensive experience with the mechanical properties of monofilaments and their use in artificial turf products. (Schoukens Decl. 3.) In fact, FieldTurf discusses several of Dr. Schoukens's publications concerning analysis and testing of the mechanical properties of artificial turf fibers. (*See* Defs.' Mot. to Exclude 14.)

[8] FieldTurf argues that the testing Pennsylvania State University performed on Duraspine Pro is improper to project to the performance of all Duraspine fibers as Duraspine Pro was made from a different fiber. (*See* Defs.' Mot. to Exclude Schoukens 23, ECF No. 234.) Still, the Court finds that Dr. Schoukens reliably explains his analysis for this purpose in that the products have the same geometry. (Schoukens Decl. ¶ 35(b).)

8

After reviewing the relevant submissions, the Court determines that Dr. Schoukens's declaration and opinions are admissible in part.

Although Dr. Schoukens is qualified to comment on whether Duraspine was suitable for Plaintiffs' use, the Court concludes that his opinions asserting that all Duraspine turf will degrade within four to six years is the product of an insufficient methodology and is therefore unreliable. Regarding Dr. Schoukens's determination that Duraspine was defectively designed, Dr. Schoukens explains that he reviewed and relied on testing and analysis performed on Duraspine by FieldTurf and others.[9] That testing included:

- FieldTurf's wear-testing from 2004-2006 using FieldTurf's Mad Max machine
- Bonar Yarn's 2005 report that included its Lisport testing
- Tarkett's 2005 fiber development test
- Tencate's 2009 wear testing
- Penn State University's 2011 wear testing of Duraspine Pro

(Schoukens Decl. ¶¶ 65-112.) Although Dr. Schoukens did not perform his own testing to form his opinion on Duraspine's geometry, that alone is not enough to exclude his opinions. *See, e.g., Pineda v. Ford Motor Co.*, 520 F.3d 237, 248-49 (3d Cir. 2008) (holding that expert's failure to test the effectiveness of his proposed warning or compare it to warnings used by other manufacturers did not render his opinions inadmissible under *Daubert*); *Altieri v. State Farm & Cas. Co.*, No. 09-2342, 2011 WL 1883054, at *3 (E.D. Pa. May 17, 2011) (finding that the

_____

[9] Lisport testing consists of the following:

> two heavy rollers located in a trolley frame on which 145 studs are mounted to each roller, in low frequency sine wave pattern, to ensure a uniform wear pattern across the sample. The sample is mounted in a tray that moves from side to side, whilst at the same time the trolley is pulled over the sample at a specified velocity. This causes the two rollers to rotate, and as they are linked via a chain mounted to different sized sprockets, this causes one to rotate 40% faster than the other, causing slippage.

(Cox Decl. 8, ECF No. 230-9.)

shortcomings of an expert's report (lack of testing, scientific information or mathematical equations) "go to the credibility, not the admissibility of his opinion").

FieldTurf argues that Plaintiffs attempt to impermissibly filter evidence already in the record through Dr. Schoukens's declaration because he did nothing to "independently verify the testing protocol or results" (Defs.' Mot. to Exclude Schoukens 21), but the Court disagrees. Experts are allowed to draw conclusions from discovery and are not required to do their own testing, though doing so could certainly strengthen expert testimony. Dr. Schoukens utilizes his own observations and experience with artificial turf to conclude that based on the discovery produced in this action—including testing, data, and statements—Duraspine has an inherently defective geometry and was made using an unsuitable polymer. At this stage, that is enough to find Dr. Schoukens's supposition that Duraspine was less durable than FieldTurf represented reliable. *See Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) ("[T]he role of the District Court is simply to evaluate whether the *methodology* utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier in fact." (emphasis in original)).

Regarding Dr. Schoukens's conclusion that Duraspine will degrade within four to six years, however, the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Sakolsky v. Genie Indus.*, No. 15-6893, 2021 WL 3661398, at \*8 (D.N.J. Aug. 18, 2021), *appeal dismissed*, No. 21-2755, 2021 WL 7617668 (3d Cir. Nov. 2, 2021). Dr. Schoukens's declaration casts a wide brush that all Duraspine will degrade within a maximum of six years. But the Court finds this temporal framework's application to the entire class unreliable. Simply put, Dr. Schoukens does not demonstrate that his temporal conclusion is the product of a reliable methodology.

Fatal to his analysis, Dr. Schoukens does not explain how he arrives at the conclusion that all Duraspine products will degrade within four to six years. Indeed, Dr. Schoukens readily admitted that it is "difficult to give an exact value" on when Duraspine will degrade. (Schoukens Dep. Tr. 185:19-21, ECF No. 234-4.) Even when Dr. Schoukens was specifically asked for a percentage of fibers that would lose resilience within the four-to-six-year period, he could only conclude that "it's certainly a . . . relatively high percentage" but "[i]t's not possible to give an exact value." (Schoukens Dep. Tr. 179:7-22, ECF No. 230-7.) Making his conclusion more unreliable, and arguably even undermining his ultimate conclusion concerning Duraspine's defect, he also readily admitted that he could not identify any other monofilament, like Duraspine, that would stay erect longer than four years. (Schoukens Dep. Tr. 228:11-16, ECF No. 230-7.) All in all, the Court is left to conclude that Dr. Schoukens's assertion that Duraspine will degrade in four to six years is little more than a methodology-free guesstimate.

Dr. Schoukens also provides no support for his conclusion that the testing he relies on has ever been used to measure whether artificial turf is suitable for sports such as football or baseball, let alone that reliable information exists to make temporal conclusions as to how the testing translates to hours and years of use for those sports. FieldTurf contends, and Plaintiffs do not dispute, that artificial turf testing such as Lisport testing was created in conjunction with developing industry standards primarily for soccer fields.[10] (*See, e.g., id.* 291:15-22; 273:11-17.) While certain bodies like the International Federation of Association Football ("FIFA") may have their own measures of how many Lisport cycles equate to one year of use, still, there appears to

---

[10] "Those standards, known as the FIFA Quality Concept for Artificial Turf [the 'FIFA Standards'], apply to artificial turf systems and to their component fibers, and are considered the 'industry standard' for quality in the artificial turf industry." (Defs.' Mot. to Exclude Schoukens 4.)

be no agreed-on measure of how Lisport cycles translate to hours of wear on soccer fields.[11] (*See* Cox Decl. 7.) Moreover, very few other sports have adopted Lisport testing, and the parties set forth no other evidence that any other governing sports body has attempted to develop a standard for measuring how long an artificial turf will last under that sport's playing conditions.[12] Although Dr. Schoukens asserts that testing such as Lisport cycles can be used for other sports like football and baseball, he provides no methodology to support his assertion.[13] *See Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc.*, No. 08-419, 2009 WL 5206280, at \*2 (D.N.J. Dec. 22, 2009) ("[C]ourts need not admit bare conclusions or mere assumptions proffered under the guise of 'expert opinions'" (quoting *Feit v. Great-West Life & Ann. Ins. Co.*, 460 F. Supp. 2d 632, 637 (D.N.J. 2006)); *Zeller v. J.C. Penney Co.*, No. 05-2546, 2008 WL 906350, at \*4 (D.N.J. Mar. 31, 2008) (same).

Rounding out its reasons to exclude Dr. Schoukens's opinions, FieldTurf asserts that Dr. Schoukens's theory that the catalyst used in manufacturing the polymers contributed to Duraspine's defects, to the extent it is still being offered, is inadmissible. (Defs.' Mot. to Exclude Schoukens 30.) The Court agrees that Plaintiffs have seemingly abandoned this argument. (*See* Schoukens Rebuttal Decl. 7, ECF No. 247-2 ("I understand FieldTurf also argues that a Ziegler-Natta might not have been used in some Duraspine produced in the Dayton facility. That possibility

---

[11] Labosport, the company that developed the Lisport test, has stated that 5,000 cycles equate to three to four years of moderate use and 20,000 cycles equate to six to eight years of high use. (*See* Cox Decl. App. C.)

[12] *See* Cox Decl. 10 ("The *Lisport* test was developed to simulate the wear that occurs on [soccer] fields. This means that the number of cycles and studs used on the rollers have no direct meaning for other sports, such as American Football or baseball, which have different footwear and their own unique wear patterns.").

[13] *E.g.,* Schoukens Dep. Tr. 202:18-20, ECF No. 234-4 ("I don't know the -- exactly what's is [sic] going on with the American football to give an opinion about that.").

does not change my opinions here" and "[t]he use of C4 LLDPE in itself was improper.").) In any event, at this juncture, the Court cannot find that Plaintiffs have done enough to meet their burden that Dr. Schoukens's opinion is reliable on this point.

In sum, the Court finds that Dr. Schoukens's declaration and testimony may be admitted in support of establishing that design defects in Duraspine exist; however, it may not be offered in support of his temporal conclusion that Duraspine turf will degrade in four to six years. Dr. Schoukens's testimony regarding the catalyst used to produce Duraspine is also inadmissible.

## C.   FieldTurf's Motion to Exclude the Opinions of Dr. Stephen Hamilton

FieldTurf also moves to exclude the testimony and report from Dr. Stephen Hamilton, Plaintiffs' damages expert. (*See generally* Defs.' Mot. to Exclude Hamilton, ECF No. 235.) Dr. Hamilton contends that "if Plaintiffs can establish liability" based on Duraspine's defects, he can calculate a damages model on a class-wide basis. (Hamilton Decl. ¶ 19, ECF No. 217-2.) Specifically, Dr. Hamilton concludes that "[v]alid and accurate methodologies exist" to measure Plaintiffs' economic damages from "purchasing products advertised to last 8-10 years or more, without being informed that the Duraspine fiber could be expected to remain substantially upright and intact for a shorter time of no more than 4-6 years." (*Id.* ¶ 21.)

To quantify economic damages as a result of Duraspine's inherent defects, Dr. Hamilton offers two models: (1) the value of services method and (2) a conjoint analysis. (*Id.* ¶¶ 23-24.) According to Dr. Hamilton, the value of services method amortizes the net present value of services provided over a shorter period than expected to accurately calculate the "replacement cycle" which is then used to create the valuation. (*Id.* ¶ 23.) Said another way, the value of services method seeks to quantify the difference between the turfs that showed deterioration after four to six years rather than the 10 years that FieldTurf allegedly claimed. Calculating the overcharge using the value of services method, Dr. Hamilton states that this methodology relies on calculating

13

the difference in the expected present value of services from fields with a shorter replacement standard relative to fields with a longer replacement standard, and then amortizing the difference in buyer cost to create a valuation to be used in the damages calculation. In this case, he proposes amortizing the field over four to six years, as opposed to ten years as Plaintiffs expected. (*Id.*)

The second methodology is the conjoint analysis. According to Dr. Hamilton, this method consists of a "representative survey technique" to analyze consumer responses to calculate purchasers' "willingness-to-pay" for specific representations made on a product. (*Id.* ¶ 24.)

To measure restitution damages resulting from FieldTurf's alleged unjust enrichment, Dr. Hamilton offers three metrics that are readily available. (*Id.* ¶ 26.) Those metrics are FieldTurf's "net sales," "gross profit," and "net profit before tax." (*Id.*)

FieldTurf sets forth several arguments for why this Court should exclude Dr. Hamilton's report including: (1) the report's value of services methodology does not accurately isolate durability, (2) the value of services method ignores the testimony that demonstrates that individual inquiries are needed and facts that contradict the four-to-six-year duration assumption, (3) Dr. Hamilton's methodology is inconsistent with Plaintiffs' theory of liability, (4) Dr. Hamilton's conjoint model is nonexistent, and (5) the proposed measures of unjust enrichment damages do not provide sufficient detail regarding their application. (*See generally* Defs.' Mot. to Exclude Hamilton.) Considering Dr. Hamilton's arguments and the parties' submissions, the Court finds Dr. Hamilton's damages models unreliable.

Regarding Dr. Hamilton's value of services methodology, the Court finds several methodological errors that render his opinion unreliable. First, Dr. Hamilton's value of services

model fails to apprise the Court of any other features of Duraspine that contribute to the price.[14] According to Dr. Hamilton, "[t]he difference in the expected net present value of services for the buyer depends only on the difference in expected replacement cost under a 4-year versus a 10-year replacement standard." (Hamilton Decl. ¶ 92.) This is because "there is no difference in the value of the service flow received from the field in each scenario, because the artificial turf fields are identical apart from the difference in durability under the misleading claims and but-for claims scenario." (*Id.*) But the Court finds that at bottom, the model's assumption that because of FieldTurf's alleged omissions, the average Plaintiff did not receive *any value* in the years after Duraspine fibers began to degrade is unsupported. Dr. Hamilton's value of services model assumes that the Duraspine defects render the fields unusable. This is because the model attributes all value to replacing the fields in four years rather than ten years. But this is where the disconnect lies between Dr. Hamilton's model and reality: a vast majority of Plaintiffs continued using the fields well after the alleged expiration date. (*E.g.*, Hudson Dep. Tr. 52:16-24 (confirming that it used its Duraspine field for ten years); Defs.' Opp'n Br. Ex. 4 (showing that Levittown used its Duraspine field for nine years).) However, this results in an all-or-nothing damages model that simply calculates the difference in net present value of replacement fields if Plaintiffs' current fields last four years as opposed to ten years. If the average Plaintiff immediately replaced its Duraspine

---

[14] Such factors include: (i) FieldTurf's reputation (Ugone Rep. ¶¶ 35(a) and (f), ECF No. 229-1); (ii) the fact that professional sports teams had Duraspine fields (Hamilton Dep. Tr. 214:3-14, ECF No. 254-5; Ugone Rep. ¶¶ 35(a), (b), (d), (e), (f), and (g)); (iii) FieldTurf's warranty (Hamilton Dep. Tr. 99:4-9; 226:7-12; Ugone Rep. ¶¶ 35(a)-(c), and (f)); (iv) that Duraspine required less maintenance than grass (Hamilton Dep. Tr. 213:10-15; Ugone Rep. ¶¶ 35(a)-(c)); (v) the fact that nearby schools and communities used FieldTurf (Hamilton Dep. Tr. 214:15-215:3; Ugone Rep. ¶ 35(b) and (f)); (vi) the safety of FieldTurf's fields (Hamilton Dep. Tr. 57:5-15; Ugone Rep. ¶¶ 35(c)-(d)); (vii) that FieldTurf's fields can be used year-round (Ugone Rep. ¶ 35(c)); (viii) color options offered by FieldTurf (Hamilton Dep. Tr. 65:15 20; 66:19-67:15; Ugone Rep. ¶ 35(a)); and (ix) the customer's prior experience with FieldTurf (Hamilton Dep. Tr. 233:22-234:9; Ugone Rep. ¶ 35(g)).

fields within the four-to-six-year period, the Court could subscribe to Dr. Hamilton's model. But that does not appear to be the case here. As FieldTurf emphasizes, Duraspine met its eight-year warranty in most instances. (Defs.' Opp'n Br. 3-4.) Although the Court appreciates that replacement value may not be a simple equation, it is not the equivalent of a model that isolates the attributes of Duraspine fields. This model does nothing to explain how other Duraspine features factor into Duraspine's price and account for damages. Indeed, Dr. Hamilton ignores reality that features such as brand recognition, use by professional sports teams, reduced maintenance, and FieldTurf's warranty provided value to Plaintiffs. (Defs.' Mot. to Exclude Hamilton 12-13.)

Second, the value of services model does not account for discounts, repairs, replacements, or any other concessions FieldTurf made despite having that data available to him. (Hamilton Dep. Tr. 88:11-22.) According to Dr. Hamilton, this is because he is "describing a methodology that can be applied to the entire class." (*Id.* 88:17-22.) But without proposing any differences among class members, such as a discount model, the Court cannot find that the proposed methodology is reliable. *Mueller v. Puritan's Pride, Inc.*, No. 16-6717, 2021 WL 5494254, at *6 (N.D. Cal. Nov. 23, 2021) ("While a damages methodology need not deliver mathematical precision, and may accommodate some individual variability among class members, it must be capable of determining damages . . . " (internal citation omitted)). Here, Dr. Hamilton does not even attempt to account for any differences amongst class members.

Finally, Dr. Hamilton's reliance on Dr. Schoukens's unreliable theory that all Duraspine turf will deteriorate in four to six years also contributes to the value of services model's unreliability. Dr. Hamilton offers no opinion on the quality and durability of Duraspine and relies on Plaintiffs' theory of liability to develop the models, including the value of services model. (Hamilton Decl. ¶ 48.) But as noted above, the Court finds Dr. Schoukens's temporal conclusions unreliable. Here, the value of services model calculates overcharge damages based on Plaintiffs

replacing their fields in four years instead of ten years because of Dr. Schoukens's unreliable conclusion. Unsurprisingly, then, the Court also notes that Dr. Hamilton's value of services model fails with it.

Regarding Dr. Hamilton's conjoint analysis method to determine the overcharge amount, the Court cannot say whether the model would be reliable or not because Dr. Hamilton has yet to offer the model for the Court's review.

Dr. Hamilton's declaration is replete with an explanation of what a conjoint analysis is but contains no details on how he would apply the conjoint analysis to the case at hand.[15] (*See* Hamilton Decl. ¶ 24 ("Conjoint analysis is a representative survey technique that analyzes consumer responses directly—rather than analyzing historical sales prices and the expected discounted value of services over time that determines these prices—to calculate purchasers' willingness-to-pay for specific representations made on a product").) Indeed, Dr. Hamilton readily admits that "because the value of services method is [his] preferred approach for deriving the [o]vercharge premium, [he had] not yet designed the conjoint [analysis]." (*Id*. at 43.) Dr. Hamilton does not even offer one feature he would include in his survey. Furthermore, in his rebuttal, Dr. Hamilton acknowledges the argument put forward by Dr. Jerry Wind's, FieldTurf's marketing expert, that a "conjoint analysis using a survey of representative buyers of artificial turf product poses considerable challenges" but indicates that such a model is not unworkable. (Hamilton Rebuttal Decl. ¶ 101.) Although Dr. Hamilton admits that a conjoint analysis model will be challenging, he provides this Court with no information to evaluate whether he was successful in creating the model.

---

[15] *See also Dzielak v. Whirlpool Corp.*, No. 21-20089, 2017 WL 1034197, at *5 (D.N.J. Mar. 17, 2017) ("Conjoint analysis involves a survey in which respondents are asked to make a series of trade-offs between different product features and prices.").

This Court's finding is buttressed by a similar analysis by the court in *In re ConAgra Foods, Inc.* There, the defendants argued with respect to the conjoint analysis that the expert "ha[d] not determined the characteristics of the survey sample he would use in the analysis, the list of relevant product attributes, the sample size of the survey, or whether he would conduct separate surveys in each proposed class state or one large multi-state survey." 302 F.R.D. 537, 551 (C.D. Cal. 2014). The *ConAgra* court agreed and found that because the expert did not "identify any variables he intend[ed] to build into the models" nor "any data presently in his possession to which the models [could] be applied", the declaration was "so incomplete as to be inadmissible as irrelevant." (*Id.*)

Similarly here, Dr. Hamilton fails to set forth any model for this Court to examine. At this juncture, the Court concludes that this portion of his declaration is essentially irrelevant. The Court thus excludes Dr. Hamilton's value of services and conjoint models.[16]

### III.    MOTION FOR CLASS CERTIFICATION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted). "To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). A class may be certified pursuant to Rule 23(a) of the Federal Rules of Civil Procedure when: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Rule 23(b)(3) requires that "questions of law or fact

---

[16] The Court addresses Dr. Hamilton's proposed measures of restitution damages below.

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In this Circuit, when certification is sought under Rule 23(b)(3), a prerequisite to an analysis of the Rule 23(a) requirements is the determination of ascertainability of the proposed class. *See Marcus*, 687 F.3d at 592-93.

To be sure, "the requirements set out in Rule 23 are not mere pleading rules." *Hydrogen Peroxide*, 552 F.3d at 316. Instead, plaintiffs seeking class certification must establish each element of Rule 23 by a preponderance of the evidence. *Marcus*, 687 F.3d at 591. This requires actual, not presumed compliance with Rule 23's requirements. *See id.*; *Hydrogen Peroxide*, 552 F.3d at 309 ("Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met.") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

### A.    Ascertainability

To satisfy the threshold ascertainability inquiry, the party seeking certification must show that (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citations omitted). The ascertainability inquiry is narrow. *Id.* at 165. It "does not mean that a plaintiff must be able to identify all class members at class certification; instead, a plaintiff need only show that 'class members can be identified.'" *Id.* at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)).

The Court finds that ascertainability is satisfied here. The proposed classes are defined with reference to objective criteria as they are limited to purchasers of Duraspine over a several year

period who can be identified by the geographic area where the fields were installed. Moreover, FieldTurf does not challenge ascertainability.

### B.      Rule 23(a) Requirements

FieldTurf also does not challenge class certification on numerosity, commonality, typicality, or adequacy grounds. Likewise, the Court is satisfied that Plaintiffs have met those requirements. Because the Court must independently find these requirements met, it addresses them nonetheless.

#### 1.      Numerosity

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no minimum number needed for a suit to proceed as a class action, but where a class is likely to exceed forty members, the Rule 23(a) numerosity requirement is generally met. *See Marcus*, 687 F.3d at 595. Here, Plaintiffs contend (and FieldTurf does not dispute) that there are hundreds of Duraspine purchasers and well over 40 purchasers in each of the subclasses.[17] (*See* Pls.' Moving Br. 25.) The Court, accordingly, finds that estimate sufficient to satisfy numerosity.

#### 2.      Commonality

Rule 23(a)(2) further requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." *Mielo v. Steak'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018). Commonality only requires that the "common contention . . . must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Plaintiffs identified common contentions that are central to the

---

[17] *See generally* Duraspine Tracker, ECF No. 216-27.

validity of their claims—namely that "all the claims depend on common facts regarding" Duraspine's defects. (Pls.' Moving Br. 26.) To recap, Plaintiffs allege that Duraspine turf used a fiber "(1) with a 'fatal[ly] flawed' spine and wing shape and (2) that was made with polymers that were 'unsuitable' for routine, long-term outdoor athletic use." (*Id.*) As such, the commonality requirement is satisfied. *See Marcus*, 687 F.3d at 597 (holding commonality satisfied where plaintiff sought to offer evidence about "whether [a product is] 'defective,' whether the defendants had a duty to disclose those defects, and whether the defendants did in fact fail to disclose those defects").

### 3.    Typicality and Adequacy

The typicality and adequacy analyses often merge and may therefore be discussed together. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001) (providing that "typicality criteria tend to merge into [the] analysis of adequacy of representation under [Rule] 23(a)"). The standard for demonstrating typicality requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." *Id.* at 183-84. Additionally, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Regarding typicality, Plaintiffs allege that all Duraspine fields have the same two defects. *Marcus*, 687 F.3d at 599 ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types"). Plaintiffs have established typicality.

Adequacy depends on two factors: (1) whether the attorney is qualified, experienced, and generally able to conduct the proposed litigation, and (2) whether the plaintiff has interests

antagonistic to those of the class. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007). Additionally, "[t]he burden to prove that the representation is not adequate rests with the party challenging the class's representation." *Bizzarro v. Ocean Cnty.*, No. 07-5665, 2009 WL 1617887, at *14 (D.N.J. June 9, 2009).

Here, class counsel has presented sufficient information demonstrating their qualifications, and the class representatives easily satisfy the adequacy requirement. The Court, therefore, finds that Rule 23(a)'s prerequisites to class certification are satisfied.

### C.    Rule 23(b) Requirements

Having fulfilled Rule 23(a)'s requirements, Plaintiffs must now show that a class action may be maintained under one of the three categories established by Rule 23(b). Fed. R. Civ. P. 23(b). Plaintiffs seek Rule 23(b)(3) certification on behalf of consumers who suffered damages arising from their purchase of Duraspine. To succeed, they must establish that (1) questions of law or fact "predominate" over individual questions, and (2) a class action is "superior" to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

### 1.    Predominance

Though seemingly similar to Rule 23(a)'s commonality requirement, Rule 23(b)(3)'s predominance requirement is much more demanding. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is intended to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In other words, predominance compels a court to determine whether there are questions common to the class that predominate over individual questions. "[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member[.]"

*In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)), *as amended* (Sept. 29, 2016). In comparison, "a common question is one where the same evidence will suffice for each member to make prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.*

Whether this precondition is met turns on the "nature of the evidence" and whether the evidence used at trial to prove the "essential elements" of plaintiff's claim is better suited for class or individual treatment. *See Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311). To assess whether predominance is met, the Third Circuit describes the district court's task as follows:

> In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, "through the prism" of Rule 23, undertake a "rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove" those elements.

*Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 128 (3d Cir. 2018). If, after doing so, a district court determines that "proof of the essential elements of the [claim] requires individual treatment, then class certification is unsuitable." *Id.* (quoting *Newton*, 259 F.3d at 172).

Predominance lies at the heart of the pending motions. According to Plaintiffs, all the claims stem from FieldTurf's common course of conduct related to the sale of Duraspine with the same inherent defects that led to each class member "overpaying" for the turf. (Pls.' Moving Br. 27.) FieldTurf, however, disputes that all Duraspine turf fields exhibited substantial degradation due to any flawed design and asserts that Plaintiffs' argument is reliant on individual inquires that predominate over any common evidence necessary to adjudicate these claims. (Defs.' Opp'n Br. 23-40.)

### a.     Whether Common Factual Issues Predominate

For common questions of fact to predominate, they must be "both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003). Although individual issues do not make certification impossible, "they must be less significant than the common issues and must not be so unmanageable as to preclude class treatment." *Dal Ponte v. Am. Mortg. Exp. Corp.*, No. 04-2152, 2006 WL 2403982, at *7 (D.N.J. Aug. 17, 2006). Where plaintiffs' claims are all based on an alleged common product defect, courts in this District have recognized that even the basic issue of whether the common defect exists may defeat predominance and render the class action unmanageable. *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 342-46 (D.N.J. 1997) (finding that although the switches have a common design, whether Plaintiffs' ignition switches are defective will depend on facts particular to each individual plaintiff).

The essence of each of Plaintiffs' claims is that they incurred damages because FieldTurf misrepresented Duraspine's longevity and durability. To determine whether individual factual issues predominate for each of Plaintiffs' claims, the Court must examine whether there is common proof to support the elements of the claims. *Marcus*, 687 F.3d at 602. To that end, the Court identifies four factual disputes that it will address to determine whether common or individual issues predominate. Those factual issues include whether: (1) Duraspine is indeed defective, (2) Plaintiffs relied on FieldTurf's omissions or misrepresentations, (3) causation can be proven, and (4) damages are measurable on a class-wide basis. The Court, accordingly, addresses each of these questions in turn.

### i.    *Whether Duraspine is Defective*

The answer to whether there is an inherent defect is "an essential element of Plaintiffs' misrepresentation-based claims, and whether it is susceptible to class wide evidence is dispositive of whether Plaintiffs can satisfy predominance." *Gonzalez v. Corning*, 885 F.3d 186, 196 (3d Cir. 2018), *as amended* (Apr. 4, 2018). As previously noted, Plaintiffs claim that the product they purchased from FieldTurf, Duraspine, was sold to them with inherent defects. (Pls.' Moving Br. 9.) According to Plaintiffs, Duraspine fiber's geometric design created break points that made the fibers more susceptible to failure—namely splitting, laying over and breaking after just a few years of normal use. (*Id.* at 9.) Worse yet, Plaintiffs contend that the polymers used to make Duraspine's fibers was unsuitable for Plaintiffs' use as they are weak, easily torn, and will not hold up to regular athletic use for more than a few years. (*Id.*)

But FieldTurf claims that Plaintiffs fail to identify any uniform defect that impacts the turf's durability. FieldTurf highlights that Duraspine met or exceeded its eight-year warranty in most instances. (Defs.' Opp'n Br. 3.) FieldTurf further asserts that the fibers in the turf laying over or splitting is not an inherent defect in and of itself— "any fiber can experience layover or split over the years of use." (*Id.* at 8.) According to FieldTurf, mechanical wear does not alter the properties of the fibers and the only impact of it is cosmetic, and artificial turf is measured by "meeting industry standards for acceptable performance of a given sport, not its appearance." (*Id.* at 9.)

Where plaintiffs allege that a defendant's product suffers from a common design defect, courts have found that this issue is a common one that predominates over individual ones. Here in the Third Circuit, in *Marcus*, the district court found that plaintiff offered enough evidence that BMW's run-flat tires suffered from a design defect that made them more susceptible to road damage. 687 F.3d at 603. The Third Circuit affirmed this finding, holding that "[o]ur inquiry is

limited to whether the District Court abused its discretion when finding that, should a defect exist at all in [defendant's tires] that makes them more susceptible to road hazard damage, [plaintiff] will be capable of proving that defect at trial through evidence that is common to the class rather than individual to its members." *Id.*

After consideration of the parties' positions, the Court finds that Plaintiffs have met their burden of demonstrating that the question of whether Duraspine is inherently defective is subject to class-wide proof. To start, Dr. Schoukens reliably demonstrates that Duraspine's "geometry" and its polymers were inherently defective and unsuitable for the turf based on the discovery produced in this action. (*See generally* Schoukens Decl.) Dr. Schoukens further asserts that the Duraspine fibers cannot stay erect and intact with routine use, but instead, they layover, split, and break prematurely. (*Id.* ¶ 6.) As he puts it, the supposedly "resilient" spine causes stress in the fiber when it is bent or compressed, which leads to breaking between the spine and wings. (*Id.* ¶ 119.) This breakage "takes away from the grassy look of the field, but also means that the remaining fiber has less mass to resist forces . . . and thus will be even more easily deformed." (*Id.* ¶ 29.) Further in support of finding a uniform defect, a former FieldTurf director admitted that the "crossectional geometry problems . . . scared the hell out of" him. (Pls.' Moving Br. Ex. 11, ECF No. 213-12.) Moreover, a FieldTurf expert in previous litigation opined that Duraspine's "shape contains certain inherent weakness[es]" because "the fibers contain a spine running down the center of the fiber" and "[t]here is no transition from spine to wings; the wings are directly connected to the spine at abrupt angles." (*See* ECF No. 213-14.)

FieldTurf argues that whether the defect has manifested is an issue necessary to determine whether class certification is appropriate. The Court agrees that for claims where manifestation is a requirement, "proving a class-wide defect where the majority of class members have not yet experienced any issues . . . would be extremely difficult." *Chin*, 182 F.R.D. at 456. But at this

stage, Plaintiffs adequately set forth their theory of the defect and that its existence is susceptible to common class-wide proof. *See Hydrogen Peroxide*, 552 F.3d at 311-12 ("Plaintiffs' burden at the class certification stage is not to prove the elements . . . [i]nstead, the task for plaintiffs at class certification is to demonstrate that the element[s] . . . [are] capable of proof at trial through evidence common to the class rather than individual to its members").

To avoid doubt, this does not mean that the Court finds the defect *actually* exists or that Plaintiffs will, in fact, be able to prove the defect at trial. But that determination is not appropriate at the class certification stage. *See e.g., In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) (counseling that if [d]efendant "can prove that most class members have not experienced" the defect, then [d]efendant "should welcome class certification").

### ii. *Reliance and Duraspine Marketing*

With that, the Court moves to reliance. At the crux of the parties' dispute is whether reliance may be presumed on a class-wide basis. Plaintiffs contend that a presumption of reliance is appropriate because throughout FieldTurf's marketing of Duraspine to customers, it universally omitted the truth concerning Duraspine's design and durability. (Pls.' Moving Br. 15-18.) FieldTurf accomplished this marketing scheme, Plaintiffs argue, by running magazine ads, distributing marketing materials, and centrally training their sales agents to market Duraspine uniformly. (*Id.* at 15-16.) They further argue that those marketing efforts were material to all Plaintiffs. (*Id.* at 17.) Indeed, Plaintiffs highlight FieldTurf's claim that purchasers could amortize the cost of the field over ten or more years as evidence enough that durability was material to a reasonable customer. (*Id.* at 18.)

FieldTurf disputes that a presumption of reliance is warranted because, it alleges, "(i) facts about the alleged defect were not "uniformly omitted" and (ii) determining whether the allegedly omitted facts were "material" will require individualized inquiry." (Defs.' Opp'n Br. 28.) Instead,

FieldTurf alleges that it deployed a detailed sales process tailored to each Duraspine purchaser. (*Id.* at 27.) Accordingly, FieldTurf argues that reliance on any representations by FieldTurf cannot be presumed.

To determine whether reliance may be presumed, the Court engages in a two-part inquiry. First, the Court examines whether the misconduct at issue primarily involves misrepresentations or omissions. Second, if the Court determines that FieldTurf misrepresented Duraspine's durability, the Court will examine whether it engaged in conduct such that it uniformly misrepresented Duraspine to all class members. The Court begins, therefore, with determining whether FieldTurf's conduct concerns misrepresentations or omissions.

To establish reliance, the Supreme Court and the Third Circuit distinguish between misrepresentations and omissions. The Supreme Court makes clear that in cases involving omissions, reliance will be presumed. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) (finding presumption of reliance appropriate in securities fraud case where information was omitted); *In re Mercedes-Benz Tele Aid Cont. Litig.*, 257 F.R.D. 46, 74 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113 (D.N.J. 2010), *opinion modified on reconsideration*, No. 07-2720, 2010 WL 2976496 (D.N.J. July 22, 2010) (applying presumption of reliance to common law fraud claims involving omissions). What is equally clear is that the presumption does not apply in cases involving misrepresentations, although that does not end the analysis. *Affiliated Ute Citizens*, 406 U.S. at 154. However, as the Third Circuit noted, "[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme . . . and the mere fact of this concealment cannot, and should not, transform a misrepresentation into an omission." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001) (citation and internal quotation marks omitted). In cases involving both misrepresentations and omissions, courts must decide "whether

the offenses can be characterized primarily as omissions or misrepresentations, and therefore who most appropriately bears the burden of proof." *Id.* at 192 (citation omitted).

With that, the Court faces the present conundrum: did FieldTurf affirmatively misrepresent Duraspine's durability? Or, rather, did FieldTurf omit material information about the field's longevity when advertising to potential purchasers? Plaintiffs would lead this Court to believe that the answer is so clear that the question does not need to be asked. Plaintiffs contend that the "common thread" of all of FieldTurf's marketing of Duraspine to customers was the "uniform omission of the truth about Duraspine's design and limited durability." (Pls.' Reply Br. 5.) Indeed, Plaintiffs further aver that FieldTurf, without question, omitted information from purchasers. (*See* Pls.' Moving Br. 15 (arguing that FieldTurf's marketing was "deceptive for its material omissions").) For its part, FieldTurf holds that it neither misrepresented nor omitted material information regarding Duraspine's durability. (Defs.' Opp'n Br. 29.) But FieldTurf does concede that it did "disclose the information Plaintiffs claim was withheld with respect to Duraspine's expected wear." (*Id.* at 30.)

Ultimately, the Court finds that this is an omissions case and a presumption of reliance is appropriate here. At bottom, Plaintiffs allege that FieldTurf concealed the defects impacting durability when marketing and selling to Plaintiffs. Notably, Plaintiffs support their argument that FieldTurf "fraudulently concealed its misrepresentations and omissions" with evidence of "(1) 'oral representations' of FieldTurf's sales agents that 'were substantially similar', and (2) 'uniform written materials on which the oral representations were based.'" (Pls.' Moving Br. 15.)

Indeed, Plaintiffs testified consistently that they were told FieldTurf was a durable product.[18] Furthermore, the discovery produced thus far indicates that FieldTurf was aware of issues with the Duraspine turf and did not disclose those issues to purchasers. (*See* Pls.' Moving Br. 8-10.) Indeed, FieldTurf was aware of Duraspine's premature deterioration as early as 2005 but still represented to customers that "Duraspine fibers were engineered to provide 'durability', 'resilience' and 'memory' so that the fibers would remain substantially upright in use." (*Id.* at 16.) The Court finds that while FieldTurf's conduct involves both misrepresentations and omissions, the omission of

---

[18] *See* Hudson Dep. Tr. 22:7-19, ECF No. 219 ("[T]he expectation would be ten-plus years would be the life of the field. . . [and] that representation was made at the Lincoln Park Administration Building"); Newark Dep. Tr. 72:11-19, ECF No. 220 ("The quality and durability of the product was very important to the district. And we were repeatedly told in our conversations . . . with representatives from FieldTurf that the product . . . would live frankly far beyond the warranty, that this was a product that could have a lifespan of well over ten years."); Saint Ynez Dep. Tr. 180:15-18, ECF No. 221 ("And those promises were [Duraspine] is going to be a great product and it's going to last a long time, it's going to last longer than eight years."); Neshannock Dep. Tr. 56:2-4, ECF No. 222 ("[A] key point as far as being sold on a fiber that was going to stand up and last at least ten years or more."); Levittown Dep. Tr. 160:13-25, ECF No. 218:6 (FieldTurf told Levittown that the "field would last in excess of ten years, and it would look the same as it did when it was installed."); Carteret Dep. Tr. 30:24-31:6, ECF No. 218-12 ("FieldTurf told us . . . [t]his field was going to be supported and be perfect for [] longer than eight years . . . this field will last ten-plus years"); Fremont Dep. Tr. 42:22-43:5, ECF No. 218-18 (FieldTurf's marketing materials represented that their "monofilament was going to last longer than some of the slit films they had in the ground that were, like, averaging nine years old, so . . . I remember some of the marketing materials saying the monofilament would last ten years or greater").

defects was more significant.[19] Because at bottom, Plaintiffs' allegations are not that the Duraspine turf was unusable after a short duration of time, but rather that FieldTurf did not reveal to them that defects would cause wear to the turf fields limiting their worth.

Applying the Third Circuit's reasoning here, the Court finds that the evidence weighs in favor of finding that common issues predominate and that Plaintiffs may establish reliance through common evidence because FieldTurf omitted Duraspine's defects.

### iii. Causation

Regarding causation, Plaintiffs argue that this Court "should reject FieldTurf's argument that Plaintiffs must prove causation on an individual basis because it ignores both the class definitions and the many cases affirming orders granting certification of similar cases based on similar facts." (Pls.' Reply Br. 7.) This argument misses the mark.

Here, the Court finds that "to determine why a particular class member's" Duraspine turf incurred damage "requires an individual examination." *Marcus*, 687 F.3d at 604. Therefore, "[t]hese individual inquiries are incompatible with Rule 23(b)(3)'s predominance requirement."[20] *Id.* While Plaintiffs' theory of the inherent defects may only give way to pre-purchase liability, to

---

[19] To be sure, it is not lost on the Court that each of the named Plaintiffs affirmed that FieldTurf's agents told them that Duraspine was a durable product that would last more than ten years. But even if this Court were to analyze this as a misrepresentation case, *i.e.* with a general assumption that oral misrepresentations are not uniform, it is not a foregone conclusion that a presumption of reliance is not appropriate. *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 490 (3d Cir. 2015) ("oral misrepresentation must be uniform in order to establish predominance"). Throughout their briefing, Plaintiffs contend that FieldTurf told Plaintiffs that "Duraspine . . . was uniquely designed with fiber that would look good, remain 'erect,' and withstand 10 years or more of routine use." (Pls.' Moving Br. 2.) Plaintiffs further aver that FieldTurf represented to every Plaintiff that Duraspine "would last well beyond the eight-year warranty period, and the product was expected to last at least ten years before any potential replacement would be needed." (*Id.* at 10.) Indeed, such uniform misrepresentations are precisely the type of allegations that would be an exception to the rule.

[20] Indeed, even measuring whether a Duraspine field has deteriorated is difficult since both parties' experts agree that monofilament will deteriorate. (*See* Cox Decl. 16; Schoukens Decl. ¶ 116.)

prove that they exist will require individual examinations of the field to determine that those defects contributed to Duraspine degrading prematurely.[21]

Plaintiffs argue that evidence of Plaintiffs' varied "use and maintenance" of the fields is irrelevant because they do not seek damages for anything that happened to their turf after purchase and installation—instead, they seek the "overcharge" paid at the point of sale because of FieldTurf's pre-purchase misrepresentations. (Pls.' Reply Br. 7.) But while Plaintiffs may seek damages solely for pre-purchase misrepresentations regarding Duraspine, to demonstrate that FieldTurf concealed inherent defects in the Duraspine turfs, Plaintiffs will have to provide proof of this defect—i.e., developments that took place post-purchase. "Because the great majority of the proposed class" used their fields for the entire warranty period, if not longer, the question of whether a defect exists that caused injury to Plaintiffs will "be determined based on facts that are particular to each individual proposed class member." *Payne v. FujiFilm U.S.A., Inc.*, No. 07-385, 2010 WL 2342388, at *6 (D.N.J. May 28, 2010).

To survive this pitfall, Plaintiffs rely on *Dzielak v. Whirlpool Corp.* to argue that the "existence of [] different circumstances, a 'safe harbor' defense, or other defenses that may affect class members differently does not compel a finding that individual questions predominate over common ones." No. 12-89, 2017 WL 6513347, at *17 (D.N.J. Dec. 20, 2017). But the Court finds *Dzielak* readily distinguishable. There, the plaintiffs brought a class action suit alleging that Whirlpool and several retailers misrepresented that certain washing machine models met the "Energy Star" requirements, signaling water and electrical efficiency. *Id.* at 1. The court certified the class against Whirlpool, finding that common issues did predominate. *Id.* at 17. But the

---

[21] For example, even Plaintiffs admit that the Tencate issue impacted the fields. (*See* Pls.' Reply Br. (noting that Duraspine's susceptibility to UV degradation was a secondary factor that may have shortened the lifespan of fibers at the time of purchase.)) Similarly FieldTurf's marketing materials also indicated the lifespan of the field would depend on usage patterns. (Defs.' Opp'n Br. 13 n.75.)

plaintiffs all suffered the same injury to which common proof could be used to determine whether or not the washing machines met the efficiency requirements. By contrast, here, while Duraspine may have inherent defects, whether Plaintiffs' injuries (field degradation) were caused by that defect or some other factor (overuse, poor maintenance, weathering etc.) will require individual inquiries.

Instead, the Court finds *Neale v. Volvo Cars of North America, LLC* instructive. There, the plaintiffs' claims stemmed from Volvo's sale of six vehicle models allegedly containing an undisclosed uniform design defect in the sunroof drainage system. *Neale v. Volvo Cars of N. Am., LLC*, No. 10-4407, 2021 WL 3013009, at *11 (D.N.J. July 15, 2021). Plaintiffs asserted two theories of damages, including a benefit of the bargain theory that each class member had suffered a quantifiable loss equal to the cost of mitigating the sunroof defect. *Id.* The Court ultimately denied class certification on the New Jersey Consumer Fraud Act ("NJCFA") claim, finding insufficient that plaintiffs "seek to recover the cost to remedy a problem that might not exist caused by a design flaw with no tangible impact on market value." *Id.* Although Plaintiffs are correct that for their benefit of the bargain theory, they are attempting to obtain damages based on class members obtaining less than what they purchased, nonetheless, the Court finds that in proving said defect, individual issues of causation will need to be explored.

### iv. *Proof Required for Damages*

Last, but certainly not least, is the issue of damages. In *Comcast Corp. v. Behrend*, the Supreme Court emphasized that issues regarding individual damages may preclude certification under Rule 23(b)(3). 569 U.S. 27, 31 (2013). At the certification stage, the Court must assure itself that defendant's alleged injurious conduct to each class member can be identified separately from damages that are not the result of the wrong. *Id.* at 32. Damages must be "capable of measurement on a classwide basis." *Id.* at 34. Where proof of damages is essential to liability, the need for

"individualized proof of economic loss," instead of through a formulaic calculation, can defeat predominance. *Newton*, 259 F.3d at 188.

Addressing the question of damages, FieldTurf contends that each class member will need to present evidence that it received less than it bargained for, and thus individual evidence needed to address the issue of damages predominate any common evidence. (Defs.' Opp'n Br. 36.) Plaintiffs argue that, at this stage, individualized calculations do not preclude certification. (Pls.' Moving Br. 46.) The Court agrees that Plaintiffs need not prove their specific number of damages at the class certification stage. Plaintiffs must, however, prove that they suffered an economic loss through a theory of injury. *Newton*, 259 F.3d at 188 ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)").

Regarding damages, the Court finds that individual issues predominate. First, as examined above, the Court reiterates that Plaintiffs' value of services theory of damages is speculative because of its methodological errors, including failure to account for class differences, and complete dependence on Dr. Schoukens's flawed theory that all Duraspine will degrade in four to six years. Second, the Court notes that Dr. Hamilton has not yet crafted the conjoint analysis such that the Court may determine whether it could accurately measure economic damages. Finally, even though Dr. Hamilton's proposal to use either (1) net sales, (2) gross profits, or (3) net profits to measure "FieldTurf's unjust gains" should not be excluded under *Daubert*, the Court does not find it satisfies *Comcast*. This is because it does not measure the proposed class member's loss. Another court ruled similarly in *Smith v. Keurig Green Mountain, Inc*. No. 18-06690, 2020 WL 5630051, at *8 (N.D. Cal. Sept. 21, 2020). There, plaintiffs also used Dr. Hamilton as their damages expert. (*Id*.) He proposed using net sales, gross profits, or net profits to measure restitution damages. But the Court rejected this proposal under *Comcast*, finding that "[t]he

problem with all of the proposed models is that they look to Keurig's gains, rather than the proposed class members' losses." *Id.* So too here.

The Court therefore finds that thus far, Plaintiffs have presented no cognizable method for measuring damages. *Cf. Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."). Here, the Court cannot find that common evidence predominates on this issue. *See Neale*, 2021 WL 3013009, at *11 (finding plaintiffs' benefit of the bargain theory too speculative to satisfy the definition of an ascertainable loss for NJCFA claim); *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. 11-7382, 2019 WL 2521958, at *14 (D.N.J. June 18, 2019). As it stands, Plaintiffs have failed to put forth any cognizable way of demonstrating damages.

### b. Whether Common Issues of Law Predominate

The Court next addresses whether common or individual issues predominate when applying the law. The Court addresses each of Plaintiffs' remaining causes of action in turn.

#### i. *Fraudulent Concealment*

Plaintiffs urge this Court to certify a nationwide fraudulent concealment class. According to Plaintiffs, certification of this class is appropriate because the elements of common law fraudulent concealment do not "materially differ across jurisdictions." (Pls.' Moving Br. 28.) FieldTurf retorts, however, that there are substantial variations among state fraudulent concealment laws including variations in standards for scienter and reliance, the burdens of proof, the definition of the term "materiality," and the defendant's legal duties that give rise to fraudulent concealment liability. (Defs.' Opp'n Br. 40.) Moreover, FieldTurf highlights that individual jurisdictions have different approaches to the economic loss rule. (*Id.*)

The Court finds that the elements of fraudulent concealment are similar nationwide. As even FieldTurf concedes, most states require a plaintiff to establish that "(1) [the] defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be false or the omission to be material and intending the other party to rely on it; and (3) the other party did in fact rely on the misrepresentation or omission to its detriment." (*Id.* (citing, among other cases, *Scholar Intelligent Sols., Inc. v. N.J. Eye Ctr., P.A.*, 2013 WL 2455959, at *2 (D.N.J. June 5, 2013); *see also* Pls.' Moving Br. 29 n.10; Defs.' Opp'n Br. App. A). Moreover, where there are differences in the elements, the "differences fall into a limited number of predictable patterns." *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997). While the Court notes variations among states in applying this common law claim, differences in state law alone are not sufficient to preclude class certification on these grounds. *See Chin*, 182 F.R.D. at 458.

Turning to whether the legal elements of fraudulent concealment may be proven by common evidence, this presents a harder inquiry. As the Court noted above, Plaintiffs adequately set forth that FieldTurf uniformly omitted from Plaintiffs issues related to Duraspine and common evidence predominates to demonstrate reliance. However, the issue of damages requires an individual inquiry that overwhelms in this instance. To recap, Plaintiffs have not presented a reliable model to measure economic damages. At this stage, the Court finds this warrants denial of this class. The Court thus finds certifying the fraudulent concealment class inappropriate at this juncture.

### ii.   NJCFA

Regarding the NJCFA claim, Plaintiffs argue that this claim will turn on common questions of law and the elements may be proven by facts common to the New Jersey Plaintiffs. (Pls.'

Moving Br. 32.) FieldTurf argues that individual questions concerning injury and causation preclude predominance as to Plaintiffs' NJCFA claim. (Defs.' Opp'n Br. 44.)

The NJCFA prohibits certain deceptive commercial behaviors. Those unlawful practices include:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby. . . .

N.J. Stat. Ann. § 56:8-2. An NJCFA claim requires proof of "(1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007) (citation, alterations, and quotation marks omitted). Unlawful conduct falls "into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994). Where the alleged unlawful conduct is a knowing omission, plaintiffs must further demonstrate that the defendant (a) "knowingly concealed" (b) "a material fact" (c) "with the intention that plaintiff rely upon the concealment."[22] *Coba v. Ford Motor Co.*, 932 F.3d 114, 124 (3d Cir. 2019) (citing *Judge v. Blackfin Yacht Corp.*, 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003)).

---

[22] The NJCFA permits a presumption of causation in cases where the unlawful conduct involves an omission where a plaintiff demonstrates by a preponderance of the evidence "(1) that the alleged defects were not knowable to a significant number of potential class members before they purchased . . . or (2) that, even if the defects were knowable, that class members were nonetheless relatively uniform in their decision making." *Marcus*, 687 F.3d at 611.

An ascertainable loss is defined as "either out-of-pocket loss or a demonstration of loss in value" that "is *quantifiable* or *measurable*." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792-93 (N.J. 2005) (emphases added). Courts recognize that the inability to establish an economic injury under Article III "may be fatal to . . . establishing an ascertainable loss or injury" in a state consumer fraud claim. *Neale*, 2021 WL 3013009, at *11 n.26 (collecting cases).

Finally, "causation under the [NJ]CFA is not the equivalent of reliance," and a plaintiff must demonstrate that he or she suffered an ascertainable loss as a result of the unlawful practice. *Lee v. Carter-Reed Co.*, 4 A.3d 561, 578 (N.J. 2010) (internal quotation marks omitted). "In other words, the alleged unlawful practice must be a proximate cause of the plaintiff's ascertainable loss." *Marcus*, 687 F.3d at 606.

Regarding the unlawful conduct, Plaintiffs contend that common evidence will prove their ascertainable loss. (Pls.' Moving Br. 34.) Here, Plaintiffs argue that, as set forth in Dr. Hamilton's report, common evidence shows class members suffered an ascertainable loss because the turf they received was worth objectively less money than the non-defective turf they expected. (*Id.*) But as currently constructed, the Court finds that Plaintiffs' theory of loss is too speculative to satisfy the ascertainable loss prong. As noted above, the Court finds this portion of Dr. Schoukens's testimony unreliable. Accordingly, the Court denies class certification of the NJCFA class.

### iii.    *New York General Business Law*

FieldTurf also argues that the New York statutory consumer fraud claim is not appropriate for class treatment. (Defs.' Opp'n Br. 46.) Plaintiffs argue that the class members have met all the elements to prove a claim under New York's General Business Law. (Pls.' Moving Br. 36.)

"To successfully assert a [New York General Business Law] claim, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of*

*New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009) (citation omitted). Under New York law, "[w]here . . . a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies." *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 123 (N.Y. App. Div. 2002) (citing *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997)) (internal quotations marks omitted). Indeed, New York law requires a manifested defect for a plaintiff to recover on any claim. *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 429 (S.D.N.Y. 2017), *modified on reconsideration*, No. 14-2543, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).

Regarding the material misrepresentation prong, courts generally find that a class of consumers do not have to show common misrepresentations when the alleged deceptive act was an omission. *See Oscar v. BMW of N. Am., LLC*, No. 09-11, 274 F.R.D. 498, 512-13 (S.D.N.Y. June 7, 2011).

Because of New York's manifestation requirement, however, the Court likewise finds that Plaintiffs have not met the predominance requirement for their New York consumer fraud claim. Importantly, resolution of Plaintiffs' claims will require individual inquiries into whether the defect manifested such that common questions do not predominate. In a case such as this one, where most Duraspine fields were in use for the entirety of the class period, without any altered use, proving manifestation will be difficult. Moreover, GBL § 349 also requires personal injury or property damage such that plaintiffs incurred repair costs or diminished value as a result of the defect.[23] *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2012 WL 379944, at *16 (D.N.J. Feb. 6, 2012). No evidence exists that all class members meet this requirement.

---

[23] *See also Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 59 (S.D.N.Y. 2019) ("plaintiffs alleging a 'price premium' theory must do more than 'merely alleg[e] that [they] paid a premium price [for their product], without making any other factual allegations' to support an inference that they would have paid less absent the misrepresentation or deception.'").

*iv.    California    Unfair    Competition    Law    and    False Advertising Law*

Regarding California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL") claims, FieldTurf argues that individual issues predominate because it is necessary to determine whether each class member was exposed to FieldTurf's alleged deceptive conduct. (Defs.' Opp'n Br. 48.) Plaintiffs contend, on the other hand, that FieldTurf's failure to disclose material defects to all customers demonstrates that common issues predominate. (Pls.' Moving Br. 37.)

The UCL provides a cause of action for "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. and Prof. Code § 17500; *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Both statutes "are governed by the 'reasonable consumer' test." *Williams*, 552 F.3d at 938. To state a claim under either statute, plaintiffs must show that the defendant's claimed omissions are likely to deceive a reasonable consumer. *Id.* "Under the reasonable consumer standard, [the plaintiff] must show that members of the public are likely to be deceived." *Id.* (quotations omitted). A true statement can be actionable if it is "couched in such a manner that it is likely to mislead or deceive the consumer." *Davis*, 691 F.3d at 1162. Moreover, the UCL generally requires reliance on the omission. *See True v. Am. Honda Motor Co., Inc.*, 520 F. Supp. 2d 1175, 1182 (C.D. Cal. 2007); *Wiener v. Dannon Co.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009) ("[M]ost courts . . . have concluded that the UCL now requires reliance.").

Under the UCL and FAL, Plaintiffs may rely on a presumption of reliance. *See Vasquez v. Superior Ct.*, 484 P.2d 964, 973 (Cal. 1971) ("It is sufficient for our present purposes to hold that if the trial court finds material [omissions] . . . at least an inference of reliance would arise as to the entire class."). An omission "is judged to be 'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction

40

in question." *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1043 (C.D. Cal. 2018). Here, as noted above, Plaintiffs readily satisfy reliance. This is because the Court finds that Plaintiffs consistently testified that the durability of Duraspine turf was a factor in the purchase of the field.

But as previously discussed at length, to show a proposed class is sufficiently cohesive to warrant adjudication by representation, Plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. To date, Plaintiffs have not presented a damages model that measures the difference between what they bargained for and what they received. Indeed, Plaintiffs aver that they were promised a durable field, but due to FieldTurf's omissions of the fields' defects, they received something less than that. But based purely on the omitted information, this Court cannot glean what Plaintiffs' damages may be nor have they presented a model delineating said damages. *E.g. In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II),* No. 03-4558, 2010 WL 2813788, at \*15 (D.N.J. July 9, 2010), *amended,* No. 03-4558, 2011 WL 601279 (D.N.J. Feb. 16, 2011) ("Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant"). The Court finds predominance on these claims is not met at this time.

### v.    *Breach of Implied Warranty Claims*

Plaintiffs argue that this Court should certify New Jersey, New York, Pennsylvania and California classes for breach of the implied warranty of merchantability and fitness claims because proof of each of these claims will turn on common evidence. (Pls.' Moving Br. 38.)  FieldTurf contends that to prove the implied warranties claims, individual issues will need to be addressed that predominate over any common ones. (Defs.' Opp'n Br. 49.)

Under New Jersey law, to state a claim for breach of the implied warranty of merchantability, "a plaintiff must allege (1) that a merchant sold goods, (2) which were not

'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2008 WL 4126264, at *19 (D.N.J. Sept. 2, 2008).

In New York, an implied warranty claim requires proof of the following elements: "(1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) that the defect is the proximate cause of the accident." *Plemmons v. Steelcase Inc.*, No. 04-4023, 2007 WL 950137, at *3 (S.D.N.Y. Mar. 29, 2007) (internal quotation marks and citations omitted). The implied warranty has been breached when the product is not "fit for the ordinary purposes for which such goods are used." *See* N.Y. U.C.C. § 2-314(2)(c); *Plemmons*, 2007 WL 950137, at *3.

Pennsylvania imposes an implied warranty of merchantability that requires that goods must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." PA. Cons. Stat. § 2314(b). The Pennsylvania Supreme Court has held that

> [t]he concept of merchantability does not require that the goods be the best quality or the best obtainable but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used.

*Gall v. Allegheny Cnty., Health Dep't*, 555 A.2d 786, 789-90 (Pa. 1989) (internal citations omitted).

Under California law, the implied warranty of merchantability means that consumer goods: "(1) [p]ass without objection in the trade under the contract description; (2) [a]re fit for the ordinary

purposes for which such goods are used; (3) [a]re adequately contained, packaged, and labeled; [and] (4) [c]onform to the promises or affirmations of fact made on the container or label." Cal. Civ. Code § 1791.1; *see also Clark v. LG Elecs. U.S.A., Inc.*, No. 13-485, 2013 WL 5816410, at *8 (S.D. Cal. Oct. 29, 2013). A plaintiff claiming breach of an implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003).

Once again, the Court finds that Plaintiffs will be hard pressed to demonstrate that under each of these state's respective laws, the fields were not fit for their ordinary purpose when the majority of Plaintiffs utilized the fields for more than the eight-year warranty period. Here, although FieldTurf may have advertised that the fields would last for ten or more years, that alone is not enough to show that they were not fit for their ordinary purpose. *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011); s*ee also Hughes v. Panasonic Consumer Elecs. Co.*, No. 10-846, 2011 WL 2976839, at *23 (D.N.J. July 21, 2011) (dismissing implied warranty claims because "plaintiffs do not allege that the [t]elevisions are inoperable or otherwise are not in working condition.").

Moreover, Plaintiffs' claims encounter further impediments to certification state-to-state. For example, in New Jersey, the implied warranty is limited to the duration of the express warranty. *Nobile v. Ford Motor Co.*, No. 10-1890, 2011 WL 900119, at *4 (D.N.J. Mar. 14, 2011). Here, many class members used their fields for the entirety of the warranty period. Accordingly, the Court finds that Plaintiffs' implied warranty claims will also be subject to individual issues that predominate over common ones.

### vi.    Unjust Enrichment

FieldTurf argues that the unjust enrichment class should not be certified because key legal differences exist between each state's unjust enrichment claim and individual facts predominate.

The Court first determines that the unjust enrichment laws do not vary in any "substantive manner" between the states. *Fenwick v. Ranbaxy Pharms., Inc.*, 353 F. Supp. 3d 315, 331 (D.N.J. 2018). Accordingly, this Court applies New Jersey law to Plaintiffs' unjust enrichment claim. To state a claim for unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 723 (N.J. 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519 (N.J. 1994)) (internal quotation marks omitted).

FieldTurf contends that this Court should not certify the unjust enrichment class because the following issues are necessary to adjudicate this claim: "(i) what representations they received, (ii) their independent knowledge about artificial turf fields, (iii) whether and to what degree their field exhibited any issue, and (iv) the actual value, i.e., the benefits and use . . . received from their Duraspine fields." (Defs.' Opp'n Br. 52.) According to Plaintffs, however, this Court must solely determine as follows: "(1) that FieldTurf was enriched at the expense of Plaintiffs; (2) that FieldTurf retained this benefit; and (3) that this retention is unfair." (Pls.' Reply Br. 19.)

Considering the parties' contentions, the Court finds that individual issues predominate on the unjust enrichment claims. Most importantly, not all Plaintiffs in the proposed class have even experienced the defect. *Green*, 279 F.R.D. at 285 (denying certification of unjust enrichment claims because "[n]ot all members of the putative class have experienced a defect"). Plaintiffs attempt to distinguish *Green* by arguing they "demonstrate[d] that all Duraspine turf fields are defective." (Pls.' Reply Br. 19 n.26.) But that is not the question. Instead, this Court focuses on whether that defect has manifested such that a plaintiff did not experience the full value of the field. As examined above, the issue of whether Plaintiffs received the benefit of their bargain presents issues ripe for individual determinations.

Moreover, Plaintiffs have not proposed a measure of restitution damages that measures Plaintiffs losses instead of FieldTurf's gains. *Green*, 279 F.R.D. at 285.

### 2. Superiority

Finally, Rule 23(b)(3) requires that the class representatives establish that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both predominance and superiority must be met to certify the classes. *Chin*, 182 F.R.D. at 462. In other words, if either of Rule 23(b)(3)'s predominance or superiority requirements are not met, the class may not be certified. To determine whether a class action is superior, courts consider the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s superiority requirement recognizes that "it is desirable to litigate similar, related claims in one forum." *Chin*, 182 F.R.D. at 462. But where the Court determines that class certification would "quickly devolve into an unmanageable morass of divergent legal and factual issues," the superiority requirement is not met. *Id.*

In light of the Court's determination above, it need not discuss superiority at length. At bottom, the Court casts doubt on the efficiency and manageability of certifying the classes. *Newton*, 259 F.3d at 192 ("In terms of efficiency, a class of this magnitude and complexity could not be tried. There are simply too many uncommon issues, and the number of class members is surely too large"). Primary among the Court's concerns are the difficulties in establishing (1) damages, (2) causation, and (3) where relevant, manifestation.

45

To begin, Plaintiffs argue that where there is an inherent design defect, damages can easily be calculated using classwide proof. (Pls.' Reply Br. 20.) But as demonstrated above, Plaintiffs have not so demonstrated that damages are easily calculable. Indeed, as Plaintiffs readily concede, "differences in individual damages may be significant." (Pls.' Moving Br. 52.) At this stage, Plaintiffs have not shown that damages are measurable class-wide on any consistent model, let alone presented evidence that they can calculate any individual differences. *E.g. Gordon v. Maxim Healthcare Servs., Inc.*, No. 13-7175, 2017 WL 3116153, at *13 (E.D. Pa. July 21, 2017) (finding that because of "the individual inquiries . . . managing this case as a class action would be untenable").

Next, the Court concludes that issues of causation may present severe manageability issues. In support of their argument that superiority weighs in favor of class certification, Plaintiffs submitted a trial plan delineating how they intend to satisfy each element of the claims. (Pls.' Reply Br. Ex. F ("Trial Plan") 3, ECF No. 247-7.) For claims where causation is an element, such as the NJCFA, Plaintiffs assert that the evidence will show they received less than what they paid for because FieldTurf did not disclose Duraspine's defects. However, as observed above, because of the subjective nature of Plaintiffs' injury, it is seemingly insurmountable that Plaintiffs will be able to prove that they *actually* did receive less than what they bargained for when purchasing the fields.

Finally, for the instances where manifestation is required, examined *supra*, the Court finds Plaintiffs would be hard-pressed to prevail on the issue of superiority. Most importantly, many of the Plaintiffs used the Duraspine fields for well over the general four to six years in which Plaintiffs assert that Duraspine would begin to fibrillate. *See Newto*n, 259 F.3d at 192.

At bottom, the Court finds that the superiority requirement is not satisfied either. Although the Court certainly understands that class actions provide a vehicle for Plaintiffs to aggregate

claims for adjudication, at this stage, the Court gleans severe manageability issues such that the superiority requirement weighs against certification.

IV.   **CONCLUSION**

For the reasons stated above, the Court denies Plaintiffs' motion for class certification, grants-in-part and denies-in-part FieldTurf's motion exclude the testimony of Dr. Gustaaf Schoukens, and grants FieldTurf's motion to exclude the testimony of Dr. Stephen Hamilton. An appropriate order will follow.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE