## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RE: FIELDTURF ARTIFICIAL TURF MARKETING AND SALES PRACTICES LITIGATION | Case No. 3:17-md-02779-MAS-TJB |
| | Hon. Michael A. Shipp, U.S.D.J. |
| | Electronically Filed |
| | **ORAL ARGUMENT REQUESTED** |
| | **MOTION DATE: September 5, 2023** |

## <u>DECLARATION OF L. REID SKIBELL</u>

I, L. REID SKIBELL, hereby declare:

1.      I am a partner at Glenn Agre Bergman & Fuentes LLP, counsel of record for Defendants in the above-entitled action. I am admitted to practice law in the state of New Jersey and in this Court. I submit this Declaration on behalf of Defendants and in support of Defendants' Motion to Stay Proceedings Pending the Resolution of their Rule 23(f) Petition for Permission to Appeal, and if Permitted to Appeal, Continuance of the Stay Until the Appeal is Adjudicated.

2.      Attached as Exhibit A is a true and correct copy of the Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), filed in the United States Court of Appeals for the Third Circuit on July 27, 2023, in *In re FieldTurf Artificial Turf Sales and Marketing Practices Litigation*, Case No. 23-8033.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 4, 2023, New York, New York.


<u>/s/ L. Reid Skibell</u>
L. Reid Skibell

# Exhibit A

No. 23 - _____

# United States Court of Appeals for the Third Circuit

IN RE FIELDTURF ARTIFICIAL TURF SALES
AND MARKETING PRACTICES LITIGATION

On Petition for Permission to Appeal from the United States District Court
for the District of New Jersey, No. 17-2779-MAS-TJB (Shipp, J.)

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 23(F)

Reid Skibell
GLENN AGRE BERGMAN
 & FUENTES LLP
1185 Avenue of the Americas,
22nd Floor
New York, NY 10036
(212) 970-1610
rskibell@glennagre.com

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
gregory.silbert@weil.com
konrad.cailteux@weil.com

*Counsel for Defendants – Petitioners FieldTurf USA, Inc., FieldTurf Inc.,
FieldTurf Tarkett SAS, and Tarkett, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Local Appellate Rule 26.1, Defendants-Petitioners FieldTurf USA, Inc., FieldTurf Inc., FieldTurf Tarkett SAS, and Tarkett, Inc. make the following disclosures:

**1. For nongovernmental corporate parties, please list all parent corporations:**

FieldTurf USA, Inc. and Tarkett Sports Canada, Inc. (fka FieldTurf, Inc.) are indirect wholly owned subsidiaries of Tarkett, a publicly traded French company. FieldTurf Tarkett, Inc. was merged into Tarkett, Inc., an indirect wholly owned subsidiary of Tarkett. FieldTurf Tarkett SAS refers to FieldTurf Tarkett, a French company and direct subsidiary of Tarkett.

**2. For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of a party's stock:**

No other publicly held company owns 10% or more of FieldTurf USA, Inc., FieldTurf, Inc., or FieldTurf Tarkett SAS.

**3. If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:**

Not applicable.

4. **In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant:**

Not applicable.

Dated:  July 27, 2023

/s/ *Gregory Silbert*

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
gregory.silbert@weil.com
konrad.cailteux@weil.com

# TABLE OF CONTENTS

Introduction ................................................................................. 1

Background .................................................................................. 3

Questions Presented .................................................................... 5

Relief Sought .............................................................................. 5

Reasons for Granting the Petition .............................................. 5

    I.   Review is warranted to correct and clarify the district court's
inappropriate certification of the deception issue ............................ 6

        A.  The district court wrongly applied a federal presumption to
override state law .......................................................... 6

        B.  Under a proper analysis, individual reliance questions
predominate ................................................................ 11

    II.  Review is warranted to correct the district court's certification
of the defect issue class ........................................................ 15

        A.  The district court confused plaintiffs' defect theory and
ignored individualized issues ....................................... 15

        B.  Individual questions predominate plaintiffs' defect theory ...... 17

    III. Review is warranted to correct and clarify the district court's
misapplication of the *Gates* factors ................................... 18

    IV. Review is warranted to reconsider the *Gates* factors .................... 24

Conclusion ................................................................................ 25

Certificate of Compliance .......................................................... 26

Certificate of Bar Admission ..................................................... 27

Certificate of Service ................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adkins v. Facebook, Inc.*,
424 F. Supp. 3d 686 (N.D. Cal. 2019) ............................................. 21

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 129 (1972) ................................................................. 7, 8, 10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................ 7

*Brazil v. Dell Inc.*,
585 F. Supp. 2d 1158 (N.D. Cal. 2008) ......................................... 14

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ........................................................... 15

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ................................................................... 23

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
254 F.R.D. 68 (E.D.N.C. 2008) ..................................................... 21

*Franco v. Connecticut Gen. Life Ins. Co.*,
289 F.R.D. 121 (D.N.J. 2013) ....................................................... 18

*Gaffin v. Teledyne, Inc.*,
611 A.2d 467 (Del. 1992) ............................................................... 13

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004) ......................................................... 15

*Gates v. Rohm & Haas Co.*,
655 F.3d 255 (3d Cir. 2011) ..................................................*passim*

*Gonzalez v. Owens Corning*,
885 F.3d 186 (3d Cir. 2018) ........................................................... 18

*Harris v. Med. Transportation Mgmt., Inc.,*
No. 22-7033, 2023 WL 4567258 (D.C. Cir. July 18, 2023) ............ 23

*Humana, Inc. v. Castillo,*
728 So. 2d 261 (Fla. 2d DCA 1999) ................................................. 13

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.,*
822 F. Supp. 2d 368 (S.D.N.Y. 2011) ............................................... 9

*Johnston v. HBO Film Mgmt., Inc.,*
265 F.3d 178 (3d Cir. 2001) .................................................. 10, 11

*Laudato v. EQT Corp.,*
23 F.4th 256 (3d Cir. 2022) ............................................. 5, 6, 10, 24

*Martin v. Behr Dayton Thermal Prods. LLC,*
896 F.3d 405 (6th Cir. 2018) ........................................................... 22

*Microsoft Corp. v. Baker,*
582 U.S. 23 (2017) ............................................................................. 5

*Mirkin v. Wasserman,*
858 P.2d 568 (Cal. 1993) ................................................................ 14

*Rubalcaba v. Pacific/Atlantic Crop Exchange, Inc.,*
952 S.W.2d 552 (Tex. Ct. App.—El Paso 1997, no writ) ............... 12

*Russell v. Educ. Comm'n for Foreign Med. Graduates,*
15 F.4th 259 (3d Cir. 2021) ..................................................*passim*

*Sec. Inv. Prot. Corp. v. BDO Seidman,*
LLP, 222 F.3d 63 (2d Cir. 2000) ...................................................... 9

*Sikes v. Teleline, Inc.,*
281 F.3d 1350 (11th Cir. 2002) ........................................................ 9

*Staudt v. Artifex Ltd.,*
16 F. Supp. 2d 1023 (E.D. Wis. 1998) ........................................... 13

*Tershakovec v. Ford Motor Co.,*
No. 22-10575, 2023 WL 4377585 (11th Cir. July 7, 2023) ......*passim*

*United States v. Sineneng-Smith*,
  140 S. Ct. 1575 (2020) ...................................................................... 17

*Zarella v. Minnesota Mut. Life Ins. Co.*,
  No. CIV A 96-2782, 1999 WL 226223 (R.I. Super. Ct.
  Apr. 14, 1999) ................................................................................. 13

**Statutes**

Securities Act of 1934, Section 10(b) .................................................... 7

**Other Authorities**

Restatement (Second) of Torts §§ 525, 550 (Am. L. Inst.
  1977) ............................................................................................... 6

Fed. R. Civ. P. 23(b)(3) ........................................................... 2, 23, 24

Fed. R. Civ. P. 23(c)(4) ................................................................ *passim*

Fed. R. Civ. P. 23(f) ........................................................................ 1, 6

# INTRODUCTION

The Court should grant this Petition to review an unprecedented and incorrect order certifying two issue classes under Rule 23(c)(4). The district court erred by applying the *federal securities law* presumption of reliance for omission claims to nationwide *state-law* fraud claims—ignoring that dozens of states expressly prohibit any presumption of reliance. The Eleventh Circuit recently granted a Rule 23(f) petition and reversed a class certification order because of this same error. The district court compounded its error by wrongly determining that this is an *omissions* case to begin with. In reality, Plaintiffs' alleged that FieldTurf[1] falsely "*touted*" its durability and made multiple false "*representations*."

The district court also erred by certifying issue classes when individual trials would still be necessary to determine causation, defect manifestation, and damages. As the district court acknowledged, the same evidence from the class trial will necessarily be reexamined in these subsequent individual trials. Class certification is inappropriate when so much is left to individualized proceedings.

Plaintiffs are a putative nationwide class of school districts claiming that the Duraspine artificial turf fields they purchased from FieldTurf are

---

[1] "FieldTurf" refers to Defendants-Petitioners FieldTurf USA, Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc.

defective. As expected for such significant investments, Plaintiffs purchasing Duraspine fields participated in a lengthy sales process ranging from 12 to 18 months. Plaintiffs contend that during this process they were deceived because FieldTurf claimed that Duraspine would be durable and last "for ten or more years under normal use," yet "FieldTurf's representations turned out to be false."[2]

The district court first denied class certification under Rule 23(b)(3), holding that the causation, manifestation, and damages issues required individualized proof. Later, it granted Plaintiffs' request to certify issue classes for the "Defect and Deception Issues." This decision was erroneous for several reasons.

The district court's predominance analysis was faulty as to the Deception and Defect issues. The court applied a federal common-law presumption of reliance to a nationwide state-law fraud class, even though many states forbid this presumption. It incorrectly held that this is an omissions case even though Plaintiffs expressly base their claims on alleged misrepresentations. And it erroneously carried forward prior rulings based on outdated arguments, even though Plaintiffs switched their theory of defect when seeking issue certification.

---

[2] August 18, 2022 Order Denying Class Certification (Dkt. 270) at 2.

Beyond that, the district court erred in holding that Rule 23(c)(4) issue class certification was "appropriate." Its (erroneous) certification of the Defect and Deception issues still leaves unresolved elements relevant to FieldTurf's liability, including defect manifestation and causation. To answer these questions at individual trials, a jury would have to consider the same evidence presented at class trials to learn what the alleged defect is and what representations FieldTurf made to each Plaintiff. There is no efficiency from issue class treatment under these circumstances.

The decision below is both novel and wrong. The Court should grant this Petition and clarify for the lower courts the fundamental questions of predominance and issue class certification that are presented here.

## BACKGROUND

1. This case concerns FieldTurf's Duraspine artificial turf fields. From 2005 through 2012, FieldTurf sold and installed 1,439 Duraspine fields, which were used for a variety of different sports activities and community events. Over the entire period Duraspine was sold, not a single event was cancelled due to an alleged field condition. Dkt. 228 at 23 & n.152. And, when customers replaced their Duraspine fields, many purchased their new fields from FieldTurf. *Id.* at 4.

Unlike off-the-shelf products, purchasing an artificial field is a significant undertaking and a substantial investment. There is no single factor,

such as a company script or a mass-produced brochure, on which all cus-
tomers rely before making a purchase. *Id.* at 16–20. FieldTurf's customers
are sophisticated purchasers. Their purchasing decisions are based on
many factors including: cost, specific project requirements, safety, appear-
ance, reputation, customer service, and maintenance requirements. *Id.* at
14–20. The sales and purchasing process also involves a variety of infor-
mation sources: individualized sales pitches, company materials, meetings
with consultants, and discussions with a variety of stakeholders. *Id.*

2. On April 5, 2021, Plaintiffs sought class certification under Rule
23(b)(3) for four types of claims: nationwide fraudulent concealment and
unjust enrichment classes, and New Jersey, New York, and California
statutory consumer fraud and implied warranty claims. Dkt. 212 at 22.
On July 20, 2021, FieldTurf opposed, (Dkt. 228), and the district court de-
nied class certification. Dkt. 270 at 45–47.

On October 5, 2022, Plaintiffs filed a Renewed Motion for Class Cer-
tification, seeking to certify two issue classes under Rule 23(c)(4): (1)
Whether all Duraspine fields sold by FieldTurf to the class share a com-
mon inherent defect (the "Defect" issue); and (2) Whether FieldTurf know-
ingly omitted the facts of this common defect from the proposed class in its
marketing and sales presentations (the "Deception" issue). On July 13,
2023, the district court certified the two issue classes, carrying forward

much of its prior reasoning that these two issues satisfied the predominance requirement. Dkt. 285 at 11–17.

## QUESTIONS PRESENTED

1. Whether the district court erred in presuming reliance and holding that common issues of deception predominated.

2. Whether common issues relating to defect predominated.

3. Whether the district court erred in certifying a Rule 23(c)(4) issue class for defect and deception.

4. Whether this Court's approach to analyzing issue class certification from *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011) should be overturned.

## RELIEF SOUGHT

FieldTurf seeks leave to appeal the July 13, 2023 Order granting Plaintiffs' Renewed Motion for Class Certification.

## REASONS FOR GRANTING THE PETITION

The Court may grant interlocutory review of the district court's class certification order "on the basis of *any* consideration." *Microsoft Corp. v. Baker*, 582 U.S. 23, 32–33 (2017) (emphasis in original). "Contrary to the more limited approaches" of other Circuits, "this Court exercises [its] 'very broad discretion' using a more liberal standard." *Laudato v. EQT Corp.*, 23 F.4th 256, 260 (3d Cir. 2022). Review is appropriate here because (1)

"the district court's class certification determination was erroneous," (2) "class certification risks placing inordinate pressure on defendants to settle," (3) the appeal "implicates novel or unsettled questions of law," and (4) "the appeal might facilitate development of the law on class certification." *Id.*

The Eleventh Circuit recently granted Rule 23(f) review and reversed a class certification determination that—like the decision below—applied a presumption of reliance to state-law claims when state law does not permit that presumption. *See Tershakovec v. Ford Motor Co.*, No. 22-10575, 2023 WL 4377585, at *7 (11th Cir. July 7, 2023). This Court should do the same.

## I. Review is Warranted to Correct and Clarify the District Court's Inappropriate Certification of the Deception Issue

### A. The District Court Wrongly Applied a Federal Presumption to Override State Law

1. The district court's "Deception" analysis was flawed because it improperly extended a federal presumption of reliance to state common-law fraud claims. *See id.* at *4 ("The root of the district court's error was in overgeneralizing the presumption-of-reliance issue."). State-law fraud claims typically require plaintiffs to prove reliance. *See* Restatement (Second) of Torts §§ 525, 550 (Am. L. Inst. 1977). At the federal level, the Supreme Court has identified two circumstances where reliance may instead

be presumed for claims under the federal securities laws. First, in *Affili-ated Ute Citizens of Utah v. United States*, the Court interpreted Section 10(b) of the Securities Act of 1934 and held that a presumption of reliance applies when a seller of securities omits certain facts that a "reasonable investor might have considered [] important" when deciding to purchase securities. 406 U.S. 128, 153–54 (1972). Second, in *Basic Inc. v. Levinson*, the Court held that a presumption of reliance is also appropriate in Section 10(b) cases under the "fraud-on-the-market" theory, when plaintiffs can prove they purchased securities in an efficient market. 485 U.S. 224, 241–42 (1988). The Court has never suggested that these federal securities presumptions apply to state-law claims.

The district court, however, extended the federal presumption of reliance in securities cases to state-law fraud claims—even though many states do not permit that presumption (even in omissions cases). In granting certification on the "Deception" issue, the district court adopted a flawed predominance analysis from its prior decision. Dkt. 285 at 11 (the "Court has already examined Plaintiffs' claims and concluded that the Defect and Deception Issues are subject to generalized class-wide proof"). That prior decision was anchored on an inapplicable line of federal securities cases. The district court first cited *Affiliated Ute* stating, "[t]he Supreme Court makes clear that in cases involving omissions, reliance will

be presumed." Dkt. 270 at 28. But the Supreme Court's analysis in *Affiliated Ute* was specifically targeted at the reliance element of Section 10(b); it did not purport to create a uniform, nationwide reliance doctrine that displaces state law.

The district court further erred by relying on *In re Mercedes-Benz Tele Aid Cont. Litig.*, which applied a presumption of reliance only after determining that New Jersey courts had previously recognized the presumption under state law. 257 F.R.D. 46, 74 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113 (D.N.J. 2010), *opinion modified on reconsideration*, No. CIV. 07-2720 DRD, 2010 WL 2976496 (D.N.J. July 22, 2010). *Mercedes-Benz* provides no support for the district court's approach. Unlike this case, *Mercedes-Benz* determined that all consumer fraud claims would be governed by New Jersey law. *See id.* at 63.[3] This case, however, involves common-law fraudulent concealment claims under the laws of all states.

Instead of applying the federal securities presumption of reliance, the district court should have applied state law, including whether (and under what circumstances) each state allows reliance to be presumed. *See Tershakovec*, 2023 WL 4377585, at *4 (inquiry turns on whether each "state-

---

[3] The district court stated that the "elements of fraudulent concealment are similar nationwide" (Dkt. 285 at 14), but did not analyze the fact that most states do not allow for presumptions of reliance. *See* Dkt. 228. Appendix A (listing states where no presumption of reliance applies).

law cause[] of action … permits a presumption of reliance and, if it does, under what circumstances"). The district court erred by disregarding state laws governing Plaintiffs' claims.

Multiple Circuits have reached the same conclusion, declining to graft federal securities presumptions onto state-law claims. For example, the Second Circuit has explained that "federal courts [have] repeatedly [] refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context." *Sec. Inv. Prot. Corp. v. BDO Seidman*, LLP, 222 F.3d 63, 73 (2d Cir. 2000) (Sotomayor, J.); *see also Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011) (federal presumptions "serve the specific prophylactic purposes of the federal securities laws, but are not appropriate in the common law context"). And the Eleventh Circuit has held that "[t]he securities market presents a wholly different context than a consumer fraud case, and neither this circuit nor the Supreme Court has extended a presumption of reliance outside the context of securities cases." *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1363 (11th Cir. 2002), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

This Court should grant FieldTurf's Petition and similarly hold that the *Affiliated Ute* presumption does not extend to state-law claims. Review

is especially appropriate here given the significance of the district court's error and the novelty of the issue which would significantly "facilitate the development of the law on class certification." *Laudato*, 23 F.4th at 260.

2. The district court also erred by treating this as an omissions case. *Affiliated Ute*'s presumption applies only in omission cases; "no presumption arises in cases of alleged misrepresentations." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001). This case rests on alleged misrepresentations. As the district court acknowledged, "Plaintiffs testified consistently that they were *told* FieldTurf was a durable product." Dkt. 270 at 30 (emphasis added); *see also id.* (FieldTurf "*represented* to customers" that Duraspine is durable); *id.* n.18 (quoting Plaintiffs' testimony regarding representations); Plaintiffs' Second Amended Complaint ¶ 60, Dkt. 120 (listing nine alleged misrepresentations).

The district court nonetheless concluded that "this is an omissions case and a presumption of reliance is appropriate" because "Plaintiffs allege that FieldTurf concealed the defects impacting durability when marketing and selling to Plaintiffs." Dkt. 270 at 29. But, a failure to disclose a representation's falsity is not a genuine omission. As this Court has explained, every "fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself." *Johnston*, 265 F.3d at 193. A

10

"claim should not be transformed into an omission simply because the defendants failed to disclose that an allegedly misleading fact was untrue." *Id.* Otherwise, "nearly any misrepresentation could become an omission, which . . . would allow the presumption to swallow the reliance requirement almost completely." *Id.*; *see also Tershakovec*, 2023 WL 4377585, at *5 (concluding case was "fundamentally about misrepresentations" where it "allege[d] an omission only derivatively").

The same is true here. FieldTurf's supposed failure to inform Plaintiffs that inherent defects would cause Duraspine fibers to layover and split in less than ten years would be meaningless without FieldTurf's alleged misrepresentations that Duraspine would have, for example, "unmatched durability" that was "especially resistan[t] to wear." Dkt. 120 at ¶ 60. As a result, the district court erred in characterizing Plaintiffs' claims as being grounded on "omissions."

## B. Under a Proper Analysis, Individual Reliance Questions Predominate

Without the inapplicable presumption of reliance, the "Deception" issue class could not have been certified due to the predominance of individualized questions that require individualized evidence. By erroneously presuming reliance, the district court side-stepped the predominance analysis. A proper analysis of state law clarifies that individual questions of reliance predominate.

11

As FieldTurf explained below, state laws differ dramatically in their treatment of reliance. Many states require a plaintiff to plead and prove actual reliance without any presumption, other states do not require reliance at all, and some states allow a presumption of reliance—albeit with varying requirements. *See* Dkt. 228 at 29 n.175. These divergent approaches to reliance require a separate analysis of each state's reliance scheme. *See Tershakovec*, 2023 WL 4377585, at *4.

Given the applicable state law, it is inevitable that individualized questions of reliance will predominate in a "Deception" issue trial. As an initial matter, dozens of states require proof of reliance and do not allow reliance to be presumed. *See, e.g.*, *id.* at 6 (concluding no authority for presumption of reliance under Washington, New York, and Tennessee common law); *Rubalcaba v. Pacific/Atlantic Crop Exchange, Inc.*, 952 S.W.2d 552, 556 (Tex. Ct. App.—El Paso 1997, no writ).[4]

Many state courts further recognize that *reliance cannot be presumed even in omissions cases*. For example Florida courts have held that "Florida law imposes a reliance requirement in an omissions case, which cannot be satisfied by assumptions." *Humana, Inc. v. Castillo*, 728 So. 2d 261,

---

[4] *See also* Dkt. 228. Appendix A (listing states where no presumption of reliance applies to common law fraud claims).

265 (Fla. 2d DCA 1999). And Delaware and Rhode Island courts have rejected a presumption of reliance in omission cases. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474–75 (Del. 1992) (rejecting presumption of reliance and decertifying a class where "reliance on . . . omissions . . . was not proven on a class-wide basis."); *Zarella v. Minnesota Mut. Life Ins. Co.*, No. CIV A 96-2782, 1999 WL 226223, at *8 (R.I. Super. Ct. Apr. 14, 1999) ("[F]or fraud-based claims cases stemming [from] misleading omissions . . . the vast majority of jurisdictions have not adopted a rule allowing a presumption of reliance . . . [t]his Court agrees."); *see also Staudt v. Artifex Ltd.*, 16 F. Supp. 2d 1023, 1031 (E.D. Wis. 1998) (rejecting proposition that "reliance is presumed when a party claims fraudulent concealment" because there was "no Wisconsin case law to support this proposition" and "federal securities" law is inapplicable).

Even in states where a presumption of reliance may apply, there are additional threshold questions that must be answered. For example, California allows a presumption of reliance only when "the same material misrepresentations have actually been communicated to each member of a class." *Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993). Conversely, California "reject[s] a presumption of reliance where the same omission has not been communicated to each class member." *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1165 (N.D. Cal. 2008).

The class members in this case did not receive uniform representations or omissions. Before making the significant investment in Duraspine fields, different Plaintiffs received and reviewed different materials and had different interactions with sales representatives. For example, some Plaintiffs engaged in a lengthy bidding process, others used general contractors who independently selected FieldTurf, and still others relied on varying cooperative purchasing programs. Dkt. 228 at 16 & n. 94–96.

To make matters even more complicated, it is unclear what marketing materials each Plaintiff actually received—let alone reviewed. *See* Dkt. 228 at 18 n.115 (highlighting the variety of materials presented to differing Plaintiffs). Thus, to resolve any "Deception" issue, the district court must sift through at least *two* layers of individualized evidence: (1) the specific requirements of each state's reliance law; and (2) the specific circumstances surrounding a sale to each class member.

Had the district court properly analyzed the reliance issue and applied *state* rather than *federal* law, it is clear that individual questions of reliance would predominate and prevent the certification of the "Deception" issue class. At minimum, had the district court recognized that fraudulent concealment claims under dozens of state laws were not certifiable because there was no presumption of reliance, it would have materially

impacted its *Gates* analysis because the "Deception" issue could not be decided at one trial.

Multiple courts have considered similar circumstances and concluded that class certification would be difficult or impossible. *See, e.g.*, *Tershakovec*, 2023 WL 4377585 at *4; *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996). This Court should join them and reverse the decision below.

## II. Review is Warranted to Correct the District Court's Certification of the Defect Issue Class

### A. The District Court Confused Plaintiffs' Defect Theory and Ignored Individualized Issues

With respect to the "Defect" issue class, the district court's main error was confusing Plaintiffs' defect theory. Some background is necessary. This case involves *two* theories of defect. The first theory is that Duraspine is defective because of the "TenCate" issue. The TenCate theory is based on an alleged defect caused by FieldTurf's former supplier, TenCate, which involved the deterioration of certain fibers from UV radiation caused by heavy sunlight exposure. *See* Dkt. 277 at 17. In connection with this issue, FieldTurf previously sued TenCate in federal court. *See* Dkt. 274-1 at 2, 4. Recognizing the "TenCate defect" could only apply to a small number of fields (located in high UV states), Plaintiffs also alleged another theory—

that Duraspine was defective due to the geometry of its fibers and the polymer it used. *See* Dkt. 212-1 at 4. That theory alleges that the defect caused fields to "lay[] over, mat[], split[], and break[]" causing premature degradation. *Id.* at 21.

In its prior order rejecting class certification, the district court exclusively considered the second theory—the polymer and geometry theory—to determine that there was a common question of fact. Dkt. 270 at 26. But Plaintiffs shifted theories in their renewed motion by including evidence and argument in support of the TenCate theory. For example, Plaintiffs repeatedly stated that "FieldTurf sued its own supplier, TenCate, for *the exact same Defect and Deception Issues FieldTurf perpetrated on its own customers.*" Dkt. 274-1 at 2, 4 (emphasis in original). Plaintiffs even confirmed their reliance on the TenCate issue in a letter to the Court, stating "[t]he most important fact in this case is that FieldTurf sued its own supplier . . . Tencate, for the exact same Defect and Deception Issues that the proposed Class seeks to certify here." Dkt. 277 at 16 n.41 (emphasis omitted).

Based on these arguments and concessions, Plaintiffs should have been required to prove that the TenCate defect theory raised common questions of fact. Yet rather than analyzing predominance as to the Ten-Cate theory, the district court re-adopted its initial holding with respect to

16

the "polymer and geometry" theory to hold that common questions predominate. Dkt. 285 at 12. The district court thus erred by failing to evaluate the arguments and evidence Plaintiffs presented. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). And in doing so, the district court relied on an erroneous finding that Plaintiffs' theory sufficiently matched the "theory previously presented to the Court." Dkt. 285 at 12.

## B. Individual Questions Predominate Plaintiffs' "Defect" Theory

1. Had the district court evaluated the TenCate theory Plaintiffs asserted, individual questions would predominate. The TenCate UV radiation issue affected a small number of fields and did so in differing ways. For example, the parties' experts agreed that the alleged TenCate defect turned on a combination of different factors—including the location of the fields, the color of the fields (and thus their resistance to UV radiation), and many other technical manufacturing factors. *See* Dkt. 228 at 6–7 (explaining the expert agreement). The district court would need to conduct a field-by-field analysis to answer individualized questions like these. The "Defect" issue thus turns on evidence that varies from member to member. A "Defect" trial would therefore fail to "materially advance resolution of the claims" and would instead be mired in a series of highly-individualized questions. *See Gonzalez v. Owens Corning*, 885 F.3d 186, 202–03 (3d Cir. 2018), *as amended* (Apr. 4, 2018).

2. Given that individualized questions will predominate, the district court's failure to require Plaintiffs to provide a detailed trial plan is further reason to reverse the decision below. In light of the ever-changing nature of Plaintiffs' defect theory, a trial plan should have been required to make Plaintiffs explain *what* the defect theory was and *how* they would prove it on a classwide basis. *See Franco v. Connecticut Gen. Life Ins. Co.*, 289 F.R.D. 121, 140 (D.N.J. 2013), *aff'd*, 647 F. App'x 76 (3d Cir. 2016) (trial plan necessary to provide "workable framework" that permits a court to make adjudications without addressing individual questions). In sum, the many individualized questions that will arise at a "Defect" trial, combined with the lack of any trial plan to address such questions, shows why the "Defect" issue class is defective and should be reversed.

## III. Review is Warranted to Correct and Clarify the District Court's Misapplication of the *Gates* Factors

1. The district court erred in certifying Rule 23(c)(4) issue classes for independent reasons: Following class trials on the Defect and Deception issues, Plaintiffs and FieldTurf would present substantially the *same evidence* for reexamination by different juries at individual trials on manifestation and causation. *See* Dkt. 270 at 32 (to establish causation and manifestation "Plaintiffs will have to provide proof of th[e] defect"). And because the district court overlooked that most states do not permit a presumption of reliance, individualized reliance trials would also be necessary

for most potential class members. For all these reasons, issue class certification is not "appropriate" under this Court's *Gates* analysis.

The district court misapplied *Gates* when it considered the "efficiencies to be gained by granting partial certification" (factor three), "the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues" (factor seven), and the "kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues," including that future juries will "need to reexamine evidence" (factor nine). *Gates*, 655 F.3d at 273; *see also Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 268 (3d Cir. 2021). These factors all weigh heavily against class certification because individualized trials—reexamining the same evidence—would be necessary to determine manifestation (whether the alleged defects manifested on a particular field) and causation (whether the alleged defects or other factors caused a particular field to degrade).[5] In cases with this many individualized issues remaining, this Court has found issue class certification inappropriate.

---

[5] Plaintiffs inaccurately suggest that certification of the Defect and Deception issues "will almost completely resolve FieldTurf's liability to all Class members." Dkt. 274-1 at 12; *see also id*. at 7, 8, 10. But without proof of manifestation and causation, Plaintiffs are not close to "almost complete[]" resolution of their claims.

*Gates* is instructive. There, this Court affirmed the denial of issue class certification, agreeing that the "resolution of common questions leaves significant and complex questions unanswered." *Gates*, 655 F.3d at 273 (alteration adopted). It explained that a trial about whether the defendant contaminated an aquifer was "unlikely to substantially aid the resolution of the substantial issues on liability and causation." *Id*. at 274. There, like here, denial was appropriate because "causation" and the "extent" of injury "would need to be determined at follow-up proceedings." *Id*. at 272.

*Russell* likewise requires reversal. There, this Court reversed the certification of a class for the issues of duty and breach, which left for individual trials the questions whether class members were injured, whether the defendant's breach caused the injury, damages, and analysis of the defendant's affirmative defenses. *Russell*, 15 F.4th at 272. While, like here, the district court "briefly discussed the efficiencies of a single trial," it did not meaningfully consider the little progress issue certification made towards resolving the liability issue, or—here—the fact that the same evidence would be presented to address these issues, making a class trial inefficient. *See id*. at 272–73. Denial of certification is the rule, not the exception, in these circumstances because, where individual inquires will be required

with respect to causation and damages, issues classes are not a superior or more efficient approach to trying the case.[6]

The district court concluded that issue certification would still be efficient because, at individual trials, juries (while still needing to learn about the alleged defect) "need not rehash the intricacies of such a defect." Dkt. 285 at 19. This vague assertion ignores that juries would still need to understand what the alleged defect *is* in order to rule out alternative causes and determine whether any defect manifested. Moreover, the district court admitted that juries would need to *reconsider* whether FieldTurf actually omitted information from a specific plaintiff—which requires re-presentation of the same evidence on FieldTurf's advertising and marketing. Dkt. 285 at 19. Accordingly, any efficiency in having a trial on the Defect and Deception issues is outweighed by the subsequent need to present the same evidence to individual juries. Issue class certification will not materially advance the case. *See Russell*, 15 F.4th at 272 (reversing

---

[6] *E.g.*, *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 697 (N.D. Cal. 2019) ("[B]ifurcating elements of liability does not materially advance the overall disposition of the case because the court must still consider plaintiff-specific matters such as fact of injury, causation … and extent of damage."); *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 77–78 (E.D.N.C. 2008) ("[A] possible, speculative increase in judicial efficiency . . . does not merit issue certification (if it exists), because the individual issues of causation and affirmative defenses would still predominate").

district court for failing to "rigorously consider what efficiencies would be gained by resolution of the certified issues").

The district court wrongly believed that *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416 (6th Cir. 2018), a toxic tort class action, supported its conclusion.[7] There, the Sixth Circuit concluded that the jury in individual trials would not need to re-examine evidence concerning whether an area was contaminated to determine if contamination "caused an actual injury to property owners." *Id.* at 414. This case is different, as issue class certification would not avoid the need for juries to consider evidence regarding manifestation of the defect and alternative causes.

2. The district court also failed to consider how certification of the issue classes will impact the effectiveness and fairness of resolving the remaining issues. In particular, it did not fully consider that a finding against defendants on the issue classes may create "undue pressure to settle" even if their conduct "did not cause Plaintiffs' harm." *Russell*, 15 F.4th at 272. As the district court recognized, there are many other potential causes of premature turf degradation, including misuse and overuse (which some Plaintiffs admitted), weathering, or other issues. *See* Dkt. 270 at 32–33. Yet, with certification of the Defect and Deception issues,

---

[7] The Sixth Circuit decision applies a "broad approach," rather than this Court's *Gates* analysis. *Martin*, 896 F.3d at 412–13.

FieldTurf could be "unfairly" pressured "to settle even unmeritorious claims." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1632 (2018). Plaintiffs even suggest that, with issue class certification, settlement (not individual trials) is their intended target. *See* Dkt. 274-1 at 25 (after issue class verdict, counsel "subsequently settled the case" before individualized "damages phase"); *id.* at 27 (quoting *Russell* for proposition that "settlement" is "perhaps more realisitic[ ]").

Despite *Russell*'s instruction, the district court did not meaningfully consider settlement pressure. Instead, it relied on the premise that FieldTurf will still be able to "challenge causation (and relatedly, manifestation) individually." Dkt. 285 at 18. That was precisely what the defendant in *Russell* could do, yet this Court reversed issue class certification for failure to consider fairness. *See* 15 F.4th at 272. It should do so again.

The district court's ruling also fails to "ensure that Rule 23(c)(4)'s authorization of issue classes does not end up at war with Rule 23(b)(3)'s predominance requirement." *Harris v. Med. Transportation Mgmt., Inc.*, No. 22-7033, 2023 WL 4567258, at *10 (D.C. Cir. July 18, 2023). By artificially carving up liability into "overly narrow issue class[es]" and (wrongly) determining that those issues "predominate[ ] as to [themselves]" the district court has nullified Rule 23(b)(3)'s requirements. *Id.* That alone warrants immediate review. And, because the district court's ruling now gives

23

other plaintiffs a playbook to likewise "eviscerate the predominance requirement" (*id.*) review is even more appropriate. *See Laudato*, 23 F.4th at 260. The district court's failure to properly identify individualized issues of reliance and defect would only yield additional individual trials and further worsen the efficiency problem. Accordingly, review is warranted to correct the district court's misapplication of *Gates*.

## IV.  Review is Warranted to Reconsider The *Gates* Factors

This Court should also grant review because the *Gates* factors lack support in Rule 23's text and should be overturned. The Circuits are divided as to the proper standard to determine whether issue class certification is "appropriate." *See Russell*, 15 F.4th at 273–74. FieldTurf acknowledges that *Gates* is the law of this Circuit but preserves the issue for further review.

# CONCLUSION

FieldTurf's petition for permission to appeal should be granted.

Respectfully submitted,

Reid Skibell
GLENN AGRE BERGMAN
 & FUENTES LLP
1185 Avenue of the Americas,
22nd Fl.
New York, NY 10036
(212) 970-1610
rskibell@glennagre.com

July 27, 2023

*/s/ Gregory Silbert*

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
gregory.silbert@weil.com
konrad.cailteux@weil.com

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32 that the Petition complies with the type-volume limitation of Fed. R. App. P. 5(c) because, excluding the parts of the Petition exempted by Fed. R. App. P. 32(f), this document contains 5,179 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

/s/ Gregory Silbert
Gregory Silbert
Konrad L. Cailteux
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
gregory.silbert@weil.com
konrad.cailteux@weil.com

July 27, 2023

Case 2:23-cv-03885-TDC Document 29 Page: 34 Date Filed 07/27/2023

## CERTIFICATE OF BAR ADMISSION

I, Gregory Silbert, certify as follows:

      1.     I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

      2.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: July 27, 2023

*/s/ Gregory Silbert*
Gregory Silbert
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
gregory.silbert@weil.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2023, I filed the foregoing Petition for Permission to Appeal under Rule 23(f) with the Clerk of Court using the CM/ECF system. A true and correct copy was sent via e-mail and overnight mail to the following counsel of record:

| | |
|---|---|
| Christopher A. Seeger<br>Jennifer R. Scullion<br>Christopher L. Ayers<br>**SEEGER WEISS LLP**<br>55 Challenger Rd., 6th Fl.<br>Ridgefield Park, NJ 07660<br>Tel: 973-639-9100<br>cseeger@seegerweiss.com<br>jscullion@seegerweiss.com<br>cayers@seegerweiss.com | Adam M. Moskowitz<br>Howard M. Bushman<br>**THE MOSKOWITZ LAW FIRM, PLLC**<br>2 Alhambra Plaza, Suite 601<br>Coral Gables, FL 33134<br>Tel: 305-740-1423<br>adam@moskowitz-law.com<br>howard@moskowitz-law.com |
| James E. Cecchi<br>Michael A. Innes<br>**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO**<br>5 Becker Farm Rd.<br>Roseland, NJ 07068<br>Tel: (973) 994-1700<br>jcecchi@carellabyrne.com<br>minnes@carellabyrne.com | |

/s/ Gregory Silbert
<div style="margin-left: 40%;">

Gregory Silbert
Konrad Cailteux
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
gregory.silbert@weil.com
konrad.cailteux@weil.com
</div>

July 27, 2023

**APPENDIX**

# APPENDIX
# TABLE OF CONTENTS

**Page**

Memorandum Opinion of the Honorable Michael A. Shipp, dated July 13, 2023 (Dkt. 285) .................................................................. A-1

Order of the Honorable Michael A. Shipp, dated July 13, 2023 (Dkt. 286) ...................................................................... A-21

Memorandum Opinion of the Honorable Michael A. Shipp, dated August 18, 2022 (Dkt. 270) ........................................................ A-23

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
|  | : |  |
| IN RE: FIELDTURF ARTIFICIAL TURF | : | Civil Action No. 17-2779 (MAS) (TJB) |
| MARKETING AND SALES PRACTICES | : |  |
| LITIGATION | : | **MEMORANDUM OPINION** |
|  | : |  |

---

**SHIPP, District Judge**

This matter comes before the Court on two motions: First is a Renewed Motion for Class Certification ("Renewed Motion," ECF No. 274) by the following plaintiffs: (i) Borough of Carteret, State-Operated School District of the City of Newark, and County of Hudson; (ii) the City of Fremont and Santa Ynez Valley Union High School District; (iii) Levittown Union Free School District; (iv) Neshannock Township School District (collectively as a group, "Plaintiffs"). (*See generally* Renewed Mot.) Defendants FieldTurf USA Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc. (collectively, "FieldTurf") opposed (ECF No. 277), and Plaintiffs replied (ECF No. 278). This matter also comes before the Court upon Plaintiffs' Motion to Strike Supplemental Declaration of Dr. Charles A. Daniels ("Dr. Daniels"). ("Motion to Strike," ECF No. 279.) Defendants opposed (ECF No. 280), and FieldTurf replied (ECF No. 281). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants in part and denies in part Plaintiffs' Motion to Strike, and grants Plaintiffs' Renewed Motion.

## I.   BACKGROUND

The Court presumes that the parties are familiar with the factual background and only sets forth the factual and procedural background relevant to the Motions at issue. The Court incorporates by reference the Court's August 31, 2018, Memorandum Opinion (ECF No. 117);

October 8, 2019, Memorandum Opinion (ECF No. 165); and August 18, 2022, Memorandum

Opinion ("August 2022 Memorandum Opinion," ECF No. 270).

Previously, in Plaintiffs' first Motion for Class Certification, Appointment of Class

Counsel, and Appointment of Class Representatives ("Plaintiffs' First Motion"), Plaintiffs

attempted to bring this class action on behalf of themselves and all Duraspine purchasers and

moved to certify four types of claims: fraudulent concealment, statutory consumer fraud, implied

warranty, and unjust enrichment. (*See generally* Pls.' First Mot., ECF No. 211.) In the August

2022 Memorandum Opinion, the Court denied Plaintiffs' First Motion, finding that Plaintiffs failed

to satisfy the requisite elements of Federal Rule of Civil Procedure 23(b)[1] because individual issues

predominated over common questions, and therefore, a class action was not the superior method

of adjudicating Plaintiffs' claims against FieldTurf. (Aug. 2022 Mem. Op. 45-47.) Specifically,

with respect to causation, the Court found that an individualized inquiry would need to be

conducted, counter to the requirements of Rule 23(b)(3), to determine why a particular class

member's Duraspine turf may have incurred damage, which would include considering whether

the purported damage was caused by the respective field owners. (*Id.* at 31-33.) With respect to

damages, the Court also found that individual issues predominated, explaining that "Plaintiffs have

presented no cognizable method for measuring damages." (*Id.* at 34-35.)

In so holding, however, the Court isolated two issues that could potentially be examined

on a class-wide basis, which Plaintiffs identify as the "Defect and Deception Issues" or "Issue

Classes:"

1.   whether all Duraspine fields sold by FieldTurf to the class
     share a common inherent defect ("Defect Issue"); and

---

[1] Hereinafter, all references to a "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

A-2

> 2. whether FieldTurf knowingly omitted the facts of this
> common defect from the proposed class in its marketing and
> sales presentations ("Deception Issue").

(Pls.' Renewed Mot. Moving Br. 1, ECF No. 274-1.) The Court found that the Defect and

Deception Issues satisfy Rule 23(a) and that these issues are susceptible to common, class-wide

proof based on reliable class-wide evidence. (*See* Aug. 2022 Mem. Op. 26-31.)

On October 5, 2022, Plaintiffs filed the instant Renewed Motion seeking to certify the

Defect and Deception Issues for class treatment pursuant to Rule 23(c)(4). (Pls.' Renewed Mot.

Moving Br. 1.) Plaintiffs also renewed their prior requests to appoint certain individuals as class

representatives and class counsel. (*Id.* at 6-7.) Additionally, Plaintiffs filed the instant Motion to

Strike in response to FieldTurf's Opposition Brief. (*See generally* Pls.' Mot. to Strike Moving Br.,

ECF No. 279-1.) The Motions are ripe for resolution.

## II.   LEGAL STANDARDS

### A.   Motion to Strike

For the purposes of class certification, courts may need to consider the expert opinions

offered to support or oppose class certification. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d

305, 323 (3d Cir. 2008), *as amended* (Jan. 16, 2009). Where an expert opinion is necessary to class

certification and a party challenges that expert's opinion, the court's duty requires that it analyze

whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), before analyzing whether

Rule 23's requirements have been met. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183,

188 (3d Cir. 2015).

As established under *Daubert*, the trial court serves as a "gatekeep[er]" tasked with

"ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task

at hand" in deciding whether that testimony is admissible. *Daubert*, 509 U.S. at 597; *see also*

A-3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (applying *Daubert* standard to all expert testimony). To uphold that duty, courts must evaluate three factors in deciding whether to admit the testimony, including whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, *i.e.*, "fit." *See United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010); Fed. R. Evid. 702. The party offering the expert testimony must prove these three requirements by a preponderance of the evidence. *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)). But proponents of expert testimony need not "prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of [the] evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal quotation marks omitted) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

Federal Rule of Evidence 702 permits those witnesses who are "qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony if:

1. the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
2. the testimony is based on sufficient facts or data;
3. the testimony is the product of reliable principles and methods; and
4. the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

**B.      Renewed Motion**

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Based on this rule, the Third Circuit recently instructed district courts to "treat renewed motions for class certification as they would initial motions under

4

A-4

Rule 23." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020). The Third Circuit explained that "concern about parties getting a second opportunity" to certify a class "cannot override the language of Rule 23(c)(1)(C)." *Id.* at 476. The rule "allows for multiple bites at the apple throughout the litigation, and that does not impose an additional requirement on parties to prove a change in law or show new evidence to succeed on a renewed motion for certification." *Id.*

Under Rule 23(c)(4), "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). In the Third Circuit, an issue is appropriate for class treatment if it: (1) satisfies Rule 23(a)'s requirements; (2) fits within one of Rule 23(b)'s categories; and (3) is "appropriate" under a framework known as the "*Gates* factors." *See Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 262, 270 (3d Cir. 2021), *cert. denied*, 142 S. St. 2706 (2022) (citing *Gates v. Rohm and Haas Co.*, 655 F.3d 255 (3d Cir. 2011)).

While "Rule 23(a) and Rule 23(b) decide if the proposed issues *can* be brought or maintained as [a] class action," the Court must also perform a rigorous analysis to determine if the matter should be brought as a class action. *Id.* at 270, 275 (emphasis in original); *see Gates*, 655 F.3d at 272 ("Rule 23(c)(4) both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to treat common things in common and to distinguish the distinguishable."); *see also Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200-01 (3d Cir. 2009) ("[A] court's decision to exercise its discretion under Rule 23(c)(4), like any other certification determination under Rule 23, must be supported by rigorous analysis."). The Third Circuit has instructed that the "rigorous analysis" of the *Gates* factors be "analytically independent from the predominance inquiry under Rule 23(b)(3)," even though the same concerns may be relevant to both. *Russell*, 15 F.4th at 274-75.

A-5

To perform this "rigorous analysis," the Third Circuit has provided a multi-factor test—the aforementioned *Gates* factors—to determine whether a class action is appropriate. *See id.* at 270; *Gates*, 655 F.3d at 272-73. The *Gates* factors are a "non-exclusive list of factors [to] guide courts" faced with motions to certify particular issues, listed as follows:

1. the type of claim(s) and issue(s) in question;
2. the overall complexity of the case;
3. the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives;
4. the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy;
5. the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s);
6. the potential preclusive effect or lack thereof that resolution of the proposed issue class will have;
7. the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues;
8. the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others;
9. and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Russell*, 15 F.4th at 268 (quoting *Gates*, 655 F.3d at 273).

III. **DISCUSSION**

A. **Motion to Strike**

Plaintiffs move to strike the supplemental declaration of Dr. Daniels (the "Dr. Daniels Declaration"), which FieldTurf submitted in opposition to Plaintiffs' Renewed Motion. (*See generally* Dr. Daniels Decl., ECF No. 277-3.) Plaintiffs contend that (1) the Dr. Daniels Declaration is not admissible because it addresses legal questions that are solely within the purview

6

A-6

of the Court; (2) Dr. Daniels should not be permitted to speculate as to future testimony; and (3) Dr. Daniels's opinion on the record in a prior litigation is not helpful to the Court. (Pls.' Mot. to Strike Moving Br. 1-8.) The Court examines Plaintiffs' points in turn.

Plaintiffs first contend that Dr. Daniels impermissibly discusses legal issues because he opines on jury instructions. (*Id.* at 5.) Specifically, Plaintiffs take issue with Dr. Daniels's opinion that even if Plaintiffs were able to prove a common defect, "an instruction to the jury would not provide enough context or information"; Plaintiffs also take issue with other opinions by Dr. Daniels on the kinds of evidence Dr. Daniels believes he would have to present to the jury to establish whether any defect exists. (*Id.* (quoting Dr. Daniels Decl. ¶ 21); Dr. Daniels Decl. ¶¶ 22-24.) FieldTurf responds that Dr. Daniels is not commenting on the sufficiency of jury instructions, but rather, his opinions can "assist the Court in deciding the legal issues in dispute." (Defs.' Opp'n Br. to Mot. to Strike 4, ECF No. 280.) Yet it is axiomatic that questions involving the sufficiency of evidence or what evidence is necessary to prove elements of a claim is a legal one. *See, e.g.*, *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp*., 643 F. Supp. 2d 675, 695 (E.D. Pa. 2009) ("It is the function of the court to determine whether there is sufficient evidence for a claim to reach the trier of fact."). Indeed, the sufficiency of jury instructions is precisely "a legal question." *Berardelli v. Allied Servs. Inst. of Rehab. Med*., 900 F.3d 104, 114 (3d Cir. 2018). The Court grants Plaintiffs' Motion to Strike on this point.

Next, Plaintiffs contend that Dr. Daniels should not be permitted to speculate as to the testimony Dr. Daniels would offer to disprove the existence of an inherent defect. (Pls.' Mot. to Strike Moving Br. 6.) FieldTurf responds that Dr. Daniels's opinions are not based upon speculation or conjecture, but rather, his observations and experience as an expert in other Duraspine cases, among other experiences. (Defs.' Opp'n Br. to Mot. to Strike 6-7.) It is true that "expert testimony is excluded if it is based merely on unfounded speculation and unquantified

7

possibilities." *Ludwig v. Michaels Arts & Crafts Store*, No, 18-10306, 2020 WL 6883451, at *5 (D.N.J. Nov. 24, 2020); *see also E.E.O.C. v. FAPS, Inc*., No. 10-3095, 2014 WL 4798802, at *9 (D.N.J. Sept. 26, 2014) ("It is well-established that expert testimony that is based upon unsupported speculation is unreliable and inadmissible."). Yet Plaintiffs fail to cite to or otherwise identify exactly which opinions by Dr. Daniels constitute speculation. Because the Court cannot examine the contours of Plaintiffs' argument here, the Court denies Plaintiffs' Motion to Strike on this point.

Finally, Plaintiffs contend that Dr. Daniels's opinion on the record in prior litigation (the "TenCate litigation") is not helpful to the Court because the defect articulated by FieldTurf in the TenCate litigation is not at issue in this matter. (Pls.' Mot. to Strike Moving Br. 7-8.) FieldTurf responds that Dr. Daniels's statements about his testimony in the TenCate litigation are not offered as an expert opinion, but rather, to correct mischaracterizations Plaintiffs made regarding his prior testimony. (Defs.' Opp'n Br. to Mot. to Strike 7.) The Court agrees with FieldTurf. In their Renewed Motion, Plaintiffs discuss how the "record before the Court demonstrates that FieldTurf sued its own supplier, TenCate, for the exact same Defect and Deception Issues FieldTurf is guilty of perpetrating on its own customers." (Pls.' Renewed Mot. Moving Br. 2.) Because Plaintiffs opened the door to this issue, FieldTurf should be able to rebut Plaintiffs' argument. The Court denies Plaintiffs' Motion to Strike on this point.

In sum, the Court denies Plaintiffs' Motion to Strike except to the extent Dr. Daniels opines on the sufficiency of jury instructions; as to that limited point, the Court grants the Motion to Strike.

**B.      Renewed Motion**

As mentioned, Plaintiffs move to certify the Defect and Deception Issues for class treatment pursuant to Rule 23(c)(4). (Pls.' Renewed Mot. Moving Br. 1.) Plaintiffs contend that

A-8

the proposed Issue Classes satisfy the requirements of Rule 23(a), Rule 23(b), and the *Gates*
factors; overall, Plaintiffs contend that certifying the Issue Classes will materially advance this
litigation. (*See generally id.*) The Court examines each requirement in turn.

     *1.    Rule 23(a)*

     Plaintiffs first contend that the Issue Classes meet the requirements of Rule 23(a). (Pls.'
Renewed Mot. Moving Br. 8.) Indeed, Plaintiffs explain that the Court, in the August 2022
Memorandum Opinion, already ruled that these requirements of numerosity, commonality,
typicality, and adequacy have been met. (*Id.*) FieldTurf, perhaps in recognition of this ruling, does
not meaningfully contest that the proposed Issue Classes pass muster under Rule 23(a), except to
contend, in a footnote, that "to the extent Plaintiffs' defect theory is centered on the TenCate
Issue,"[2] (Defs.' Opp'n Br. to Renewed Mot. 20 n.54, ECF No. 277.) Plaintiffs cannot satisfy Rule
23(a) because Plaintiffs' own experts have acknowledged that none of the named plaintiffs' fields
in this case experience that issue. (*Id.*) Because the Class definitions are the same as those in
Plaintiffs' First Motion, and the Court previously found that the Issue Classes satisfy Rule 23(a),
the Court once more finds that the proposed Issue Classes satisfy Rule 23(a). (*See* Aug. 22 Mem.
Op. 19-22 ("Fieldturf also does not challenge class certification on numerosity, commonality,
typicality, or adequacy grounds. Likewise, the Court is satisfied that Plaintiffs have met those
requirements.").)

     *2.    Rule 23(b)*

     Next, Plaintiffs contend that the proposed Issue Classes satisfy Rule 23(b) because the
Defect and Deception Issues satisfy Rule 23(b)'s predominance and superiority requirements.

---

[2] The "TenCate Issue" was an allegation by FieldTurf in the TenCate litigation that a subset of
Duraspine fibers was manufactured by TenCate with less UV protection than required for mid- or
high-UV areas, causing some fibers to become prematurely embrittled. (Defs.' Opp'n Br. to
Renewed Mot. 4.)

A-9

(Pls.' Renewed Mot. Moving Br. 8-17.) Defendants contend that the proposed Issue Classes meet neither of these requirements, nor can Plaintiffs meet their burden to demonstrate how this case can be tried in a manageable manner. (Defs.' Opp'n Br. to Renewed Mot. 10-12.)

"Once beyond Rule 23(a)'s four prerequisites, plaintiffs then must seek to certify a class of one of three 'types,' each with additional requirements." *Russell*, 15 F.4th at 266; *see* Fed. R. Civ. P. 23(b). For instance, Rule 23(b)(3)—the provision at issue here (Am. Compl. ¶ 189, ECF No. 120)—"states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Russell*, 15 F.4th at 266[3]

### i.   Predominance

The Court begins with Rule 23(b)'s predominance requirement for the Defect and Deceptions Issues. Though seemingly similar to Rule 23(a)'s commonality requirement, Rule 23(b)(3)'s predominance requirement is much more demanding. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is intended to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In other words, predominance compels a court to determine whether there are questions common to

---

[3] The Court must also find that "the class is 'currently and readily ascertainable based on objective criteria.'" *Buck v. Am. Gen. Life Ins. Co.*, No. 17-13278, 2021 WL 733809, at *10 (D.N.J. Feb. 25, 2021) (quoting *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 593 (3d Cir. 2012)). Because the Court already found ascertainability, the Court declines to reconsider this issue. (*See* Aug. 2022 Mem. Op. 19 ("The Court finds that ascertainability is satisfied here.").)

A-10

the class that predominate over individual questions. "[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member[.]" *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)), *as amended* (Sept. 29, 2016). In comparison, "a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (alteration in original).

Whether this precondition is met turns on the "nature of the evidence" and whether the evidence used at trial to prove the "essential elements" of a plaintiff's claim is better suited for class or individual treatment. *See Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311). To assess whether predominance is met, the Third Circuit describes the district court's task as follows:

> In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, "through the prism" of Rule 23, undertake a "rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove" those elements.

*Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 128 (3d Cir. 2018). If, after doing this rigorous assessment, a district court determines that "proof of the essential elements of the [claim] requires individual treatment, then class certification is unsuitable." *Id.* (alteration in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)).

This Court has already examined Plaintiffs' claims and concluded that the Defect and Deception Issues are subject to generalized class-wide proof on the allegations that Duraspine turf fields suffer from a uniform design defect and that FieldTurf omitted the existence of this defect from sales and marketing presentations to Plaintiffs. (*See generally* Aug. 2022 Mem. Op.) As to the Defect Issue, the Court previously found that "Plaintiffs have met their burden of demonstrating that the question of whether Duraspine is inherently defective is subject to

11

A-11

class-wide proof." (Aug. 2022 Mem. Op. 26.)[4] As to the Deception Issue, the Court found that
there is class-wide evidence asserting that "FieldTurf concealed the defects impacting durability
when marketing and selling to Plaintiffs," with "discovery produced thus far indicat[ing] that
FieldTurf was aware of issues with the Duraspine turf and did not disclose those issues to
purchasers." (*Id.* at 29-30.) The Court further found that considering, among other things,
allegations that FieldTurf "did not reveal to [Plaintiffs] that defects would cause wear to the turf
fields limiting their worth," the "evidence weighs in favor of finding that common issues
predominate and that Plaintiffs may establish reliance through common evidence because
FieldTurf omitted Duraspine's defects." (*Id.* at 31.)

FieldTurf's "predominance" argument against certification rests almost entirely on the
premise that Plaintiffs have somehow changed their defect theory. (*See* Defs.' Opp'n Br. to
Renewed Mot. 16.) Essentially, FieldTurf argues that the Court should not rely on the fact the
Court previously determined that the Defect Issue can be resolved by common evidence because
Plaintiffs have shifted their theory as to why Duraspine is defective. (*Id.*) According to FieldTurf,
Plaintiffs previously argued that the TenCate Issue was a secondary reason as to why Duraspine is
defective, yet now, Plaintiffs contend it is the primary reason. (*Id.*) And because the TenCate Issue
is not "common" to all Duraspine fibers or fields, its inclusion in Plaintiffs' theory of product
failure renders issue class treatment unsuitable. (*Id.* at 18.)

The Court need not enter the thicket of the TenCate Issue, however, because the Court
finds that Plaintiffs' theory in the Renewed Motion matches their theory previously presented to
the Court in Plaintiffs' First Motion. (*See* Aug. 2022 Mem. Op. 25 (explaining Plaintiffs' theory

---

[4] The Court clarified, however, that the Court's finding that Plaintiffs' theory of the defect and its
existence is susceptible to common class-wide proof "does not mean that the Court finds that the
defect *actually* exists or that Plaintiffs will, in fact, be able to prove the defect at trial." (*Id.* at 27
(emphasis in original).)

A-12

that Duraspine's fiber was defectively designed and used unsuitable polymers); Pls.' Renewed Mot. Br. 4 (summarizing the Court's ruling on this same theory as support for certification of the Defect Issue).) And Plaintiffs represent to the Court that the Defect Issue they seek to certify is the same one the Court already found can be decided based on Plaintiffs' theory of Duraspine's defective design (the Duraspine's "spine and wing" shape) and unsuitable polymer. (*See* Pls.' Renewed Mot. Reply Br. 4, ECF No. 278.) Thus, the Court rejects FieldTurf's contention that the theory on the defect before the Court now differs from the theory previously before the Court.

Given the Court's prior findings, and after further review of the submissions in this case, the Court finds by a preponderance of the evidence that Plaintiffs "present a pair of issues that can most efficiently be determined on a class-wide basis, consistent with" Rule 23(c)(4). *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012), *abrogated on other grounds by Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 559 (7th Cir.), *reh'g and suggestion for reh'g en banc denied*, (7th Cir. Aug. 3, 2016). "An issue is common to the class when it is susceptible to generalized, class-wide proof." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006). Here, the Court reiterates its findings that the same expert evidence will help resolve the Defect and Deception Issues on a class-wide basis. For example, the Deception Issue turns on FieldTurf's knowledge and conduct in marketing its materials. Similarly, as mentioned, the Defect Issue turns on whether FieldTurf used a defective design and unsuitable polymer. (*See* Aug. 2022 Mem. Op. 21, 25.) Because the Defect and Deception Issues, which are relevant to FieldTurf's liability for all causes of action, can be resolved on a class-wide basis, these issues predominate. *See C.P. v. N.J. Dep't of Educ.*, No. 19-12807, 2022 WL 3572815, at *12 (D.N.J. Aug. 19, 2022) (finding common issues predominated for issue class certification because "[e]ach of these issues would not require 'individualized review' in order to dispose of them") (citation omitted).

A-13

ii.    *Superiority*

The Court turns next to the superiority requirement of Rule 23(b). Rule 23(b)'s superiority requirement involves a court determining that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, No. 11-7382, 2019 WL 2521958, at \*14 (D.N.J. June 18, 2019) (quotation omitted). The Court examines "(1) the interest of individual members of the class in controlling the prosecution of the action, (2) the extent of litigation commenced elsewhere by class members, (3) the desirability of concentrating claims in a given forum, and (4) the management difficulties likely to be encountered in pursuing the class action." *Ridley v. MRS BPO, LLC*, No. 18-12696, 2019 WL 6888532, at \*10 (D.N.J. Dec. 18, 2019) (citation omitted).

Plaintiffs contend that the superiority requirement is met here, where certification of the proposed Issue Classes would resolve common issues, as held previously by the Court. (Pls.' Renewed Mot. Moving Br. 11-13.) FieldTurf contends that the superiority requirement cannot be met because certifying the proposed Issue Classes does not present any greater practical advantages to resolving the cases than do other available dispute resolution mechanisms. (Defs.' Opp'n Br. to Renewed Mot. 14-16.) This point merges with FieldTurf's separate argument on the management issues that would come with certifying a class action in this case. (*Id.* at 11.)

The Court begins by analyzing the fraudulent concealment claim. The Court previously determined that "the elements of fraudulent concealment are similar nationwide," and that most states require a plaintiff to establish that "(1) [the] defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be false or the omission to be material and intending the other party to rely on it; and (3) the other party did in fact rely on the

14

A-14

misrepresentation or omission to its detriment." (Aug. 2022 Mem. Op. 36.) The Court did not opine on whether common evidence would prove the legal elements of fraudulent concealment because the Court instead found that "the issue of damages requires an individual inquiry that overwhelms in this instance." (*Id.*) The Court also acknowledged, however, the existence of some common evidence. (*Id.*)

The Court's analysis of the unjust enrichment claim followed a similar path, with the Court once again denying class certification related to questions about causation—*i.e.*, whether the defect manifested on every field—and damages distinct from the Defect and Deception Issues. (*Id.* at 44); *see In re Terazosin Hydrochloride*, 220 F.R.D. 672, 697-98 (S.D. Fl. 2004) (certifying a class of indirect purchasers in part because "the same common operative facts that form the basis for each of the state classes' antitrust claims form[] the basis for the unjust enrichment claims")).

The Court's analysis of the state consumer protection laws also shows that the Defect and Deception Issues can materially advance liability determinations for Class members. The Court's findings support the existence of class-wide evidence in regard to the following: (a) that FieldTurf engaged in "unlawful conduct," as required by the New Jersey Consumer Fraud Act; (b) that FieldTurf engaged in "consumer-oriented conduct" that is "materially misleading," as required by New York's General Business Law; and (c) that FieldTurf's "omissions" were "likely to deceive a reasonable consumer," as required by California's Unfair Competition Law and False Advertising Law. (*See* Aug. 2022 Mem. Op. 37-43.)

As to breach of implied warranty claims, the Court found that individual inquiries will be needed to determine whether each Class member used the field during or past the warranty period. (*Id.* at 42-43.) While the Court postulated that "Plaintiffs will be hard pressed to demonstrate that under each of the[] state's respective laws,"—that is, the laws of New Jersey, New York, Pennsylvania, and California—"the fields were not fit for their ordinary purpose," a disposition at

15

A-15

trial on the Defect Issue in FieldTurf's favor would likely cease all inquiries into warrantability issues, because the existence of a defect is an element of all the states' warranty laws. (*Id.* at 43; Pls.' Renewed Mot. Br. 15-16.)

When considering these findings alongside the *Ridley* factors, the Court finds that "resolving this matter by way of class action appears to be the superior method for bringing the present class members' claims to resolution." *Ridley*, 2019 WL 6888532, at *11. First, the Court finds that with respect to the Defect and Deception Issues, the interest of individual members in controlling the prosecution of the actions "would be minimal to nonexistent," as they would likely not "turn on the particulars of any individual class member's case." *See C.P.*, 2022 WL 3572815, at *12. Indeed, it would be difficult for any individual Class member to gather the requisite litigation resources, such as the experts to testify on any potential defect in the Duraspine turf fields. (*See* Pls.' Renewed Mot. Moving Br. 3 (explaining that Plaintiffs are mostly small towns and public schools).) As for the second factor, FieldTurf contends that it has already reviewed and resolved claims arising from identical issues. (Defs.' Opp'n Br. to Renewed Mot. 14.) While FieldTurf contends that these "alternative procedures" are more efficient and cost-effective, the Court is not convinced, considering the potential of answers to the Defect and Deception issues to streamline this case. (*See id.*) In any event, a claim that some individuals or entities have already commenced actions based on the same alleged conduct is not a bar to finding superiority. *See C.P.*, 2022 WL 3572815, at *13 (finding superiority even where some putative class members already commenced individual actions based on the same conduct). Similarly for factor three, the Court finds that there is a high desirability to concentrate claims in one forum for purposes of both consistency and efficiency. (*See* Pls.' Renewed Mot. Moving Br. 16-17 (explaining the risk of collateral estoppel that would come with proceeding with individual claims).) Finally, the Court is not concerned about management difficulties that may arise as a result of certifying these two

16

A-16

discrete issues while leaving other aspects of liability and damages to individual adjudication. *See Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004) ("[C]ourts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication–or, perhaps more realistically, settlement.").

Thus, after weighing all the factors, the Court is satisfied that superiority exists here.

### *iii.* Gates *Factors*

The Court turns next to the *Gates* factors. The first factor asks the Court to consider the type of claims and issues in question. *Gates*, 655 F.3d at 273. "While there is not much gloss in the case law on how to weigh this factor, the Court finds that it counsels in favor of certifying the issues class." *See C.P.*, 2022 WL 3572815, at *15. As already foreshadowed earlier, the Defect and Deception Issues would apply to the class as a whole. Factors two and three, on the complexity of the case and the efficiencies to be gained by partial certification, also counsel in favor of granting certification because of the complex issues of fact that apply to the class members regarding, for instance, the existence of a defect. Factor four focuses on the substantive law underlying the claims and considerations such as choice-of-law issues. *See Gates*, 655 F.3d at 273. The Court's August 2022 Memorandum Opinion analyzed, in depth, the substantive law underlying the claims— including choice-of-law issues. (Aug. 2022 Mem. Op. 35.) As to the nationwide claims, this Court has already concluded that the elements of fraudulent concealment are similar nationwide (*id.* at 36), and that the Court may apply New Jersey law to adjudicate the unjust enrichment claim (*id.* at 44); meanwhile, the few state subclasses are each governed by their own state laws. Thus, the Court does not foresee choice-of-law issues here as a barrier to class certification. Moreover, while "resolution of the certified issues 'will not resolve the question of [d]efendants' liability either to the class as a whole or to any individual therein[,]" it "will go a long way toward doing so, and this is the most efficient way of resolving the [two] issues that the district court has certified."

17

A-17

*Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416 (6th Cir. 2018). This favors certification.

Factors five through nine require the Court to consider the effect that issue class certification will have on later stages of the litigation. *Gates*, 655 F.3d at 273. In general, the Court finds these factors weigh in favor of issue class certification; as noted earlier, the Defect Issue is central to all of Plaintiffs' causes of action, and the Deception Issue is relevant to Plaintiffs' claims of fraudulent concealment, violation of state consumer protection laws, and unjust enrichment. Resolution of these issues on a class-wide basis will therefore increase judicial efficiency, ensure that similarly situated class members are treated fairly, and allow for a more fair and less costly determination of each Class member's damages. As to factor five, the Court does not find that partial certification would harm FieldTurf's statutory or constitutional rights because "[a]s long [FieldTurf] is given the opportunity to challenge each [C]lass member's claim to recovery during the damages phase, [FieldTurf's] due process rights are protected." *See Mullins v. Direct Digit., LLC*, 795 F.3d 654, 671 (7th Cir. 2015). Here, FieldTurf would be able to challenge causation (and relatedly, manifestation) individually, for instance. As to factor six, resolution of the proposed issue classes will allow for one trial with a single, preclusive determination regarding FieldTurf's conduct, rather than repeated trials regarding the same evidence of the alleged defect and deception—inquiries the Court has already determined are susceptible to class-wide proofs. For factor eight, the Court again reiterates that assuming Plaintiffs prevail at trial as to the Defect and Deception Issues, the remaining individual trials will largely focus on causation and damages— which will be presented to and decided by a jury—and will thus not create indivisible remedies that would make relief as to one claimant determinative of the claims of others.

Factor nine is perhaps the trickiest hurdle for Plaintiffs to surpass, because it asks for an assessment of the risk that subsequent triers of fact will need to reexamine evidence and findings

despite resolution of the common issues. *See Gates*, 655 F.3d at 273. It is true that some of the evidence presented to resolve the Defect and Deception Issues will necessarily need to be presented in subsequent separate individual trials. For example, with the Defect Issue, a jury will need to consider how any potential identified defect manifested on a particular field. Similarly, with the Deception Issue, a jury will need to consider whether FieldTurf actually omitted information from the specific plaintiff in question in the subsequent case. Yet the Court stills find that, on balance, the common evidence that does exist will materially push the litigation forward. If the jury finds, for instance, that Duraspine has an inherently defective geometry and was made using an unsuitable polymer, as testified to by Plaintiffs' expert Dr. Gustaaf Schouckens (*see* Pls.' Renewed Mot. 4), then a future proceeding need not rehash the intricacies of such a defect; rather, the jury could focus on other issues, such as whether the particular field owner's own actions contributed to such a defect.

In sum, upon analyzing Plaintiffs' causes of action, the Court finds that certification will significantly advance this litigation by determining key elements of FieldTurf's liability using class-wide evidence. The Court, therefore, finds that certification of the Defect and Deception Issues is appropriate here under the *Gates* factors.

       3.     *Class representatives and class counsel*

Finally, the Court turns to Plaintiffs' renewed request to appoint class counsel and class representatives for certain subclasses. (Pls.' Renewed Mot. 6-7.) Specifically, Plaintiffs renew their request to appoint them as Class Representatives and request that, consistent with the Interim Counsel Order ("Interim Counsel Order," ECF No. 61), the counsel previously appointed as interim Co-Lead and Liaison Counsel now be appointed as Co-Lead and Liaison Class Counsel and that the members of the Court-appointed interim Plaintiffs' Executive Committee be appointed as Additional Class Counsel. (Pls.' Renewed Mot. 6-7.) FieldTurf does not appear to oppose such

19

A-19

requests in its briefing—instead focusing its briefing on opposition to issue certification in general. (*See generally* Defs.' Opp'n Br. to Pls.' Renewed Mot.)

Rules 23(a)(4) and 23(g) require a court to assess the adequacy of proposed class counsel. *See C.P.*, 2022 WL 3572815, at \*15. The Court already touched on this issue in its analysis of Rule 23(a)(4) in the August 2022 Memorandum Opinion. (*See* Aug. 2022 Mem. Op. 22 ("Here, class counsel has presented sufficient information demonstrating their qualifications, and the class representatives easily satisfy the adequate requirement [of Rule 23(a)].").). Similarly, the Court previously entered the aforementioned Interim Counsel Order appointing interim lead counsel and managing Plaintiffs' leadership structure following the Court's review of the qualifications and experience of each applicant pursuant to Rule 23(g). (*See generally* Interim Counsel Order.)

Given the Court's previous Interim Counsel Order, as well as the Court's findings on the qualifications of counsel in the August 2022 Memorandum Opinion, the Court grants Plaintiffs' requests.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court grants-in-part and denies-in-part Plaintiffs' Motion to Strike and grants Plaintiffs' Renewed Motion. An appropriate order will follow.

/s/ **Michael A. Shipp**
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

A-20

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: FIELDTURF ARTIFICIAL TURF | : | Civil Action No. 17-2779 (MAS) (TJB) |
| MARKETING AND SALES PRACTICES | : |  |
| LITIGATION | : | **ORDER** |
|  | : |  |

This matter comes before the Court on two motions: First is a Renewed Motion for Class Certification ("**Renewed Motion**, ECF No. 274) by the following plaintiffs: (i) Borough of Carteret, State-Operated School District of the City of Newark, and County of Hudson; (ii) the City of Fremont and Santa Ynez Valley Union High School District; (iii) Levittown Union Free School District; (iv) Neshannock Township School District (collectively as a group, "Plaintiffs"). (*See generally* Renewed Mot.) Defendants FieldTurf USA Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc. (collectively, "**FieldTurf**") opposed (ECF No. 277), and Plaintiffs replied (ECF No. 278). This matter also comes before the Court upon Plaintiffs' Motion to Strike Supplemental Declaration of Dr. Charles A. Daniels ("Dr. Daniels"). ("Motion to Strike," ECF No. 279.) Defendants opposed (ECF No. 280), and FieldTurf replied (ECF No. 281). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons set forth in the accompanying Memorandum Opinion, and for other good cause shown,

A-21

**IT IS** on this <u>13th </u>day of <u>July </u>2023 **ORDERED** that:

1. Plaintiffs' Motion to Strike (ECF No. 279) is **GRANTED** in part and **DENIED** in part.

   a.  Dr. Daniels may not opine on jury instructions.

2. Plaintiffs' Renewed Motion (ECF No. 274) is **GRANTED**.

<div align="right">

<u>/s/ Michael A. Shipp            </u>
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

</div>

A-22

<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| _____ : | |
| IN RE: FIELDTURF ARTIFICIAL TURF : | Civil Action No. 17-2779 (MAS) (TJB) |
| MARKETING AND SALES PRACTICES : | |
| LITIGATION : | **MEMORANDUM OPINION** |
| _____ : | **(Under temporary seal)** |

<u>**SHIPP, District Judge**</u>

  This matter comes before the Court on several motions: First is a Motion for Class Certification, Appointment of Class Counsel, and Appointment of Class Representatives by the following Plaintiffs: (i) Borough of Carteret ("Carteret"), State Operated School District of the City of Newark ("Newark"), and County of Hudson ("Hudson") (collectively, "NJ Plaintiffs"); (ii) City of Fremont ("Fremont") and Santa Ynez Valley Union High School District ("Santa Ynez") (collectively, "CA Plaintiffs"); (iii) Levittown Union Free School District ("Levittown" or "NY Plaintiff"); and Neshannock Township School District ("Neshannock" or "PA Plaintiff") (collectively as a group, "Plaintiffs"). (ECF No. 211.) Defendants FieldTurf USA Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett Inc. (collectively, "FieldTurf") opposed (ECF No. 228), and Plaintiffs replied (ECF No. 247). FieldTurf filed a Motion for Leave to File a Sur-Reply. (ECF No. 250.) Plaintiffs opposed (ECF No. 252), and FieldTurf replied (ECF No. 261). Next is FieldTurf's Motion to Exclude the testimony of Dr. Gustaaf Schoukens. (ECF No. 234.) Plaintiffs opposed (ECF No. 245), and FieldTurf replied (ECF No. 253). Finally, FieldTurf filed a Motion to Exclude the expert opinions of Dr. Stephen F. Hamilton. (ECF No. 235.) Plaintiffs opposed (ECF No. 246), and FieldTurf replied (ECF No. 254). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1.

Case 3:17-md-02779-MAS-TJB   Document 270   Filed 08/18/22   Page 2 of 47 PageID: 17317

## I.   BACKGROUND

The Court presumes that the parties are familiar with the factual background and only sets out the facts relevant to the motions currently before the Court. *In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, No. 17-2779, 2018 WL 4188459, at *1 (D.N.J. Aug. 31, 2018), ECF No. 117. FieldTurf markets, manufactures, sells, and installs artificial turf across the United States. (*See generally* Am. Compl., ECF No. 69.) Plaintiffs filed this putative class action, alleging that FieldTurf hid design defects in its Duraspine artificial turf ("Duraspine") that negatively impacted the durability of the turf fields. (*See generally* Pls.' Moving Br., ECF No. 212.) To market Duraspine, FieldTurf claimed that it engineered Duraspine to be durable and that it would last aesthetically for ten or more years under normal use.[1] (*Id.* at 16.) But according to Plaintiffs, FieldTurf's representations turned out to be false. The truth, Plaintiffs assert, is that FieldTurf was aware as early as 2005 that Duraspine had inherent design defects that caused it to deteriorate much sooner than FieldTurf represented to purchasers. (*Id.* at 5-6.) Plaintiffs claim that FieldTurf strategized to conceal Duraspine's defects and continued to market the turf as a durable and resilient product instead of informing purchasers that Duraspine would not last as long as it initially expected.[2] (*Id.* at 18.)

Plaintiffs bring this class action on behalf of themselves and all Duraspine purchasers, and now move to certify four types of claims: fraudulent concealment, statutory consumer fraud,

---

[1] The parties agree that normal use of artificial turf is approximately 3,000 hours per year. (Pls.' Moving Br. 9; Defs.' Opp'n Br. 18, ECF No. 228.)

[2] Earlier in this litigation, Plaintiffs also claimed that FieldTurf was defective because of "tuft bind" issues during the manufacturing process. (Am. Compl. ¶¶ 122-132.) That allegation has since been abandoned.

A-24

implied warranty, and unjust enrichment.[3] (ECF No. 211.) FieldTurf opposed Plaintiffs' Motion

and filed motions to exclude the opinions of two of Plaintiffs' experts, Dr. Gustaaf Schoukens

("Dr. Schoukens") and Dr. Stephen Hamilton ("Dr. Hamilton").[4] (ECF Nos. 234, 235.)

## II.     **MOTIONS TO EXCLUDE**

### A.     **Legal Standard**

For the purposes of class certification, courts may need to consider the expert opinions

offered to support or oppose class certification. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d

305, 323 (3d Cir. 2008), *as amended* (Jan. 16, 2009). Where an expert opinion is necessary to class

certification and a party challenges that expert's opinion, the court's duty requires that it analyze

whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and

*Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), before analyzing whether

Rule 23's requirements have been met. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183,

188 (3d Cir. 2015).

---

[3] Plaintiffs seek certification of a nationwide class of purchasers of Duraspine Turf from 2005 through 2012 for the fraudulent concealment and unjust enrichment claims (or New Jersey, New York, Pennsylvania and California subclasses in the alternative), New Jersey, New York, and California subclasses for the statutory consumer fraud claims, and New Jersey, New York, Pennsylvania, and California subclasses for the implied warranty claims. (*Id.*)

[4] FieldTurf also filed a motion for leave to file a sur-reply. (ECF No. 250.) FieldTurf argues that in their reply, Plaintiffs raised two new arguments that did not appear in the motion for class certification. (*Id.* at 1.) "[T]he Court typically will not consider sur-replies that parties have filed without seeking and receiving leave to do so." *Norkunas v. S. Pa. Transp. Auth.*, No. 19-627, 2019 WL 6337913, at *2 n.3 (D.N.J. Nov. 27, 2019) (citing *Young v. United States*, 152 F. Supp. 3d 337, 352 (D.N.J. 2015)). "[A] sur-reply is meant only to address new issues raised by the opposing party for the first time in a reply brief. It is not meant to be used as a vehicle for providing the Court with arguments that could have been included in the earlier opposition brief." *Zahl v. Loc. 641 Teamsters Welfare Fund*, No. 09-1100, 2010 WL 3724520, at *3 (D.N.J. Sept. 14, 2010) (internal citations and quotations omitted). Because FieldTurf properly sought this Court's permission under Local Civil Rule 7.1(d)(6), and because the Court finds good cause to consider FieldTurf's sur-reply as it relates to Plaintiffs' trial plan, FieldTurf's Motion for leave to file a sur-reply is granted.

As established under *Daubert*, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" in deciding whether that testimony is admissible. *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (applying *Daubert* standard to all expert testimony). To accomplish that duty, courts must evaluate three factors in deciding whether to admit the testimony, including whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, *i.e.*, "fit." *See United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010); Fed. R. Evid. 702.

Particularly relevant here, in determining whether proposed expert testimony is reliable, the trial court should examine:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994); *see also Schneider ex rel Estate of Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003). Each step of the expert's analysis must be reliable, including "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (internal quotation marks omitted) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

The party offering the expert testimony must prove these three requirements by a preponderance of the evidence. *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)). But proponents of expert testimony need not

"prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal quotation marks omitted) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744). Reliability is the touchstone.

The district court, exercising its discretion, serves as a gatekeeper to prevent expert testimony that falls short of these requirements from reaching the jury. *Daubert*, 509 U.S. at 592-95. Nevertheless, the "basic standard of relevance . . . is a liberal one." *Id.* at 587. Within the principles outlined above, the Court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (internal citation omitted) (emphasis in original).

FieldTurf contends that this Court should exclude the opinions of Plaintiffs' experts, Dr. Schoukens and Dr. Hamilton. The Court considers each motion in turn.

**B.      FieldTurf's Motion to Exclude the Opinions of Dr. Schoukens**

FieldTurf challenges Plaintiffs' defect expert, Dr. Schoukens, under *Daubert's* reliability requirement. (*See generally* Defs.' Mot. to Exclude Schoukens, ECF No. 234-1.) In his declaration and deposition testimony, Dr. Schoukens draws his conclusions from two relevant observations. The first is that Duraspine's fibers have a fatally flawed geometry. (Schoukens Decl. ¶ 3, ECF No. 217-3.) According to Dr. Schoukens, FieldTurf designed the fiber with a thicker, rounded central "spine" and much thinner "wings" on each side. (*Id.* ¶ 32.) These wings are rectangular in shape and contain an arched profile. (*Id.* ¶ 3.) This design makes the fiber susceptible to layover, matting, splitting and separation of the wings from the spine. (*Id.*) According to Dr. Schoukens, the thinness of the wings results in less pliant and more brittle fibers, meaning that they were torn or sheared off the spine with little resistance. (*Id.*)

5

The second observation is that Duraspine was manufactured with polymers that are unsuitable for long-term athletic use in artificial turf. Dr. Schoukens observed that most of Duraspine's fibers were made with a C4 Linear Low-Density Polyethylene ("LLDPE"). (*Id.* ¶ 32.) According to Dr. Schoukens, this polymer is unsuitable for community fields because it is relatively weak, easily torn, and not amenable to regular athletic use for more than a few years. (*Id.*) This is because C4-LLDPE has "low memory" and is relatively weak and susceptible to tearing and fibrillation (i.e. layover and matting of the turf). (*Id.* ¶ 44.) By comparison, within this particular family of polymers, C4-LLDPE has the lowest resistance to splitting and bending and can be correlated with the fast degradation of the mechanical properties of Duraspine fibers.[5] (*Id.* ¶ 35.)

From these observations, Dr. Schoukens concluded that the fibers used in Duraspine were inappropriate for either school or community sports fields because all Duraspine fields would experience substantial loss of resilience, resulting in fibrillation as well as substantial deterioration of the physical integrity of the fibers within the first four to six years of use.[6] The Court first begins with reviewing Dr. Schouken's qualifications and then addresses whether his opinions are reliable.

### 1.     Qualifications

Dr. Schoukens received a degree in Chemical Engineering from the Catholic University of Leuven (K.U. Leuven) in Belgium and also obtained his Ph.D from the same university. (Schoukens Decl. ¶ 11.) Dr. Schoukens's experience with polymers spans more than four decades.

---

[5] Dr. Schoukens also concluded that: (1) FieldTurf's manufacturing processes further weakened the fiber and (2) a failure to adequately protect the fiber from the effects of UV radiation contributed to the inherent weakness of Duraspine. (*See* Schoukens Decl. ¶ 2; Gotro Dep. Tr. 28:4-8 ("Well, in general, materials that are called polyolefins, which include polyethylene and polypropylene, those polymers, when exposed to the sun, can undergo degradation").)

[6] Dr. Schoukens admits that while all artificial turf fibers will layover and fibrillate, "the important question is timing." (*Id.* ¶ 91.)

A-28

From 1978 to 2004, Dr. Schoukens was a senior researcher for two private companies, specializing in polymerization and polymer processing. (*Id.* ¶ 12.) In 1994, Dr. Schoukens began teaching "polymer processing" as a part-time lecturer at Ghent University. (*Id.* ¶ 13.) From 2004 through 2014, he was a full-time professor at the same university, where he taught polymer technology, including polymerization processes. (*Id.*) Currently, Dr. Schoukens researches, advises, and consults in the general field of polymer processing, with a particular concentration on polymers used in artificial turf primarily for sports applications. (*Id.* ¶ 14.)

Dr. Schoukens also has experience with the mechanical properties of monofilaments used for artificial turf applications, including "testing for resilience and durability." (Schoukens Rebuttal Decl. ¶ 6, ECF No. 245-1.) According to the report, Dr. Schoukens developed testing methods and devices for examining mechanical qualities of turf fibers and co-authored articles and a textbook chapter on the mechanical aspects of turf fibers. (*Id.* ¶ 8.) Dr. Schoukens is also the founder of the European Research Centre for Artificial Turf (ERCAT) at the University of Ghent. (*Id.* ¶ 10.) Fittingly, Dr. Schoukens also advised Desso, another turf manufacturer, on the chemical and physical-mechanical design and qualities of turfs that it developed. (*Id.* ¶ 11.)

In sum, Dr. Schoukens has 15 years of research and practical experience concerning the chemical and mechanical properties of monofilaments used in artificial turf products. Given Dr. Schoukens's extensive experience studying polymers and their chemical and mechanical

A-29

properties, the Court concludes that he satisfies the qualification prong as an expert on the matters at hand.[7]

### 2.   Whether Dr. Schoukens's Opinions Are Reliable

FieldTurf sets forth several reasons why Dr. Schoukens's opinions should be excluded, including that: (1) his opinion that Duraspine will degrade within four to six years is not the product of a reliable methodology; (2) Dr. Schoukens relies on a biased, incomplete record to support his theory that Duraspine's fiber geometry was defective; (3) his opinions should not apply to football and baseball fields; and (4) Dr. Schoukens's polymer theory, to the extent it is still being offered, is inadmissible. (*See generally* Defs.' Mot. to Exclude Schoukens.)

Plaintiffs argue that Dr. Schoukens's declaration and testimony meet the Third Circuit's liberal policy of admissibility. (Pls.' Opp'n to Mot. to Excl. Schoukens 4, ECF No. 245.) Most importantly, Plaintiffs argue that Dr. Schoukens's opinions are based on testing, secondary analyses, data, and business records. (*Id.*) Plaintiffs point to the historical testing and analyses of Duraspine and Duraspine Pro over the years as ample basis to form Dr. Schoukens's opinions.[8]

---

[7] Although FieldTurf does not explicitly move to exclude Dr. Schoukens on the basis that he is unqualified, in its motion to exclude his testimony, FieldTurf repeatedly references Dr. Schoukens's lack of qualifications. (Defs.' Mot. to Exclude Schoukens 4 (Dr. Schoukens "has neither the training nor specialized knowledge that could even potentially justify" dismissal of certain types of relevant testing).) This contention, however, ignores that Dr. Schoukens has extensive experience with the mechanical properties of monofilaments and their use in artificial turf products. (Schoukens Decl. 3.) In fact, FieldTurf discusses several of Dr. Schoukens's publications concerning analysis and testing of the mechanical properties of artificial turf fibers. (*See* Defs.' Mot. to Exclude 14.)

[8] FieldTurf argues that the testing Pennsylvania State University performed on Duraspine Pro is improper to project to the performance of all Duraspine fibers as Duraspine Pro was made from a different fiber. (*See* Defs.' Mot. to Exclude Schoukens 23, ECF No. 234.) Still, the Court finds that Dr. Schoukens reliably explains his analysis for this purpose in that the products have the same geometry. (Schoukens Decl. ¶ 35(b).)

A-30

After reviewing the relevant submissions, the Court determines that Dr. Schoukens's declaration
and opinions are admissible in part.

Although Dr. Schoukens is qualified to comment on whether Duraspine was suitable for
Plaintiffs' use, the Court concludes that his opinions asserting that all Duraspine turf will degrade
within four to six years is the product of an insufficient methodology and is therefore unreliable.
Regarding Dr. Schoukens's determination that Duraspine was defectively designed, Dr.
Schoukens explains that he reviewed and relied on testing and analysis performed on Duraspine
by FieldTurf and others.[9] That testing included:

- FieldTurf's wear-testing from 2004-2006 using FieldTurf's Mad Max machine
- Bonar Yarn's 2005 report that included its Lisport testing
- Tarkett's 2005 fiber development test
- Tencate's 2009 wear testing
- Penn State University's 2011 wear testing of Duraspine Pro

(Schoukens Decl. ¶¶ 65-112.) Although Dr. Schoukens did not perform his own testing to form
his opinion on Duraspine's geometry, that alone is not enough to exclude his opinions. *See, e.g.,*
*Pineda v. Ford Motor Co.*, 520 F.3d 237, 248-49 (3d Cir. 2008) (holding that expert's failure to
test the effectiveness of his proposed warning or compare it to warnings used by other
manufacturers did not render his opinions inadmissible under *Daubert*); *Altieri v. State Farm &*
*Cas. Co.*, No. 09-2342, 2011 WL 1883054, at *3 (E.D. Pa. May 17, 2011) (finding that the

---

[9] Lisport testing consists of the following:

> two heavy rollers located in a trolley frame on which 145 studs are
> mounted to each roller, in low frequency sine wave pattern, to ensure
> a uniform wear pattern across the sample. The sample is mounted in
> a tray that moves from side to side, whilst at the same time the trolley
> is pulled over the sample at a specified velocity. This causes the two
> rollers to rotate, and as they are linked via a chain mounted to
> different sized sprockets, this causes one to rotate 40% faster than
> the other, causing slippage.

(Cox Decl. 8, ECF No. 230-9.)

A-31

shortcomings of an expert's report (lack of testing, scientific information or mathematical equations) "go to the credibility, not the admissibility of his opinion").

FieldTurf argues that Plaintiffs attempt to impermissibly filter evidence already in the record through Dr. Schoukens's declaration because he did nothing to "independently verify the testing protocol or results" (Defs.' Mot. to Exclude Schoukens 21), but the Court disagrees. Experts are allowed to draw conclusions from discovery and are not required to do their own testing, though doing so could certainly strengthen expert testimony. Dr. Schoukens utilizes his own observations and experience with artificial turf to conclude that based on the discovery produced in this action—including testing, data, and statements—Duraspine has an inherently defective geometry and was made using an unsuitable polymer. At this stage, that is enough to find Dr. Schoukens's supposition that Duraspine was less durable than FieldTurf represented reliable. *See Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) ("[T]he role of the District Court is simply to evaluate whether the *methodology* utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier in fact." (emphasis in original)).

Regarding Dr. Schoukens's conclusion that Duraspine will degrade within four to six years, however, the Court concludes that "there is simply too great an analytical gap between the data and the opinion proffered." *Sakolsky v. Genie Indus.*, No. 15-6893, 2021 WL 3661398, at *8 (D.N.J. Aug. 18, 2021), *appeal dismissed*, No. 21-2755, 2021 WL 7617668 (3d Cir. Nov. 2, 2021). Dr. Schoukens's declaration casts a wide brush that all Duraspine will degrade within a maximum of six years. But the Court finds this temporal framework's application to the entire class unreliable. Simply put, Dr. Schoukens does not demonstrate that his temporal conclusion is the product of a reliable methodology.

Fatal to his analysis, Dr. Schoukens does not explain how he arrives at the conclusion that all Duraspine products will degrade within four to six years. Indeed, Dr. Schoukens readily admitted that it is "difficult to give an exact value" on when Duraspine will degrade. (Schoukens Dep. Tr. 185:19-21, ECF No. 234-4.) Even when Dr. Schoukens was specifically asked for a percentage of fibers that would lose resilience within the four-to-six-year period, he could only conclude that "it's certainly a . . . relatively high percentage" but "[i]t's not possible to give an exact value." (Schoukens Dep. Tr. 179:7-22, ECF No. 230-7.) Making his conclusion more unreliable, and arguably even undermining his ultimate conclusion concerning Duraspine's defect, he also readily admitted that he could not identify any other monofilament, like Duraspine, that would stay erect longer than four years. (Schoukens Dep. Tr. 228:11-16, ECF No. 230-7.) All in all, the Court is left to conclude that Dr. Schoukens's assertion that Duraspine will degrade in four to six years is little more than a methodology-free guesstimate.

Dr. Schoukens also provides no support for his conclusion that the testing he relies on has ever been used to measure whether artificial turf is suitable for sports such as football or baseball, let alone that reliable information exists to make temporal conclusions as to how the testing translates to hours and years of use for those sports. FieldTurf contends, and Plaintiffs do not dispute, that artificial turf testing such as Lisport testing was created in conjunction with developing industry standards primarily for soccer fields.[10] (*See, e.g., id.* 291:15-22; 273:11-17.) While certain bodies like the International Federation of Association Football ("FIFA") may have their own measures of how many Lisport cycles equate to one year of use, still, there appears to

---

[10] "Those standards, known as the FIFA Quality Concept for Artificial Turf [the 'FIFA Standards'], apply to artificial turf systems and to their component fibers, and are considered the 'industry standard' for quality in the artificial turf industry." (Defs.' Mot. to Exclude Schoukens 4.)

A-33

be no agreed-on measure of how Lisport cycles translate to hours of wear on soccer fields.[11] (*See* Cox Decl. 7.) Moreover, very few other sports have adopted Lisport testing, and the parties set forth no other evidence that any other governing sports body has attempted to develop a standard for measuring how long an artificial turf will last under that sport's playing conditions.[12] Although Dr. Schoukens asserts that testing such as Lisport cycles can be used for other sports like football and baseball, he provides no methodology to support his assertion.[13] *See Edison Wetlands Ass'n, Inc. v. Akzo Nobel Chems., Inc.*, No. 08-419, 2009 WL 5206280, at *2 (D.N.J. Dec. 22, 2009) ("[C]ourts need not admit bare conclusions or mere assumptions proffered under the guise of 'expert opinions'" (quoting *Feit v. Great-West Life & Ann. Ins. Co.*, 460 F. Supp. 2d 632, 637 (D.N.J. 2006)); *Zeller v. J.C. Penney Co.*, No. 05-2546, 2008 WL 906350, at *4 (D.N.J. Mar. 31, 2008) (same).

Rounding out its reasons to exclude Dr. Schoukens's opinions, FieldTurf asserts that Dr. Schoukens's theory that the catalyst used in manufacturing the polymers contributed to Duraspine's defects, to the extent it is still being offered, is inadmissible. (Defs.' Mot. to Exclude Schoukens 30.) The Court agrees that Plaintiffs have seemingly abandoned this argument. (*See* Schoukens Rebuttal Decl. 7, ECF No. 247-2 ("I understand FieldTurf also argues that a Ziegler-Natta might not have been used in some Duraspine produced in the Dayton facility. That possibility

---

[11] Labosport, the company that developed the Lisport test, has stated that 5,000 cycles equate to three to four years of moderate use and 20,000 cycles equate to six to eight years of high use. (*See* Cox Decl. App. C.)

[12] *See* Cox Decl. 10 ("The *Lisport* test was developed to simulate the wear that occurs on [soccer] fields. This means that the number of cycles and studs used on the rollers have no direct meaning for other sports, such as American Football or baseball, which have different footwear and their own unique wear patterns.").

[13] *E.g.*, Schoukens Dep. Tr. 202:18-20, ECF No. 234-4 ("I don't know the -- exactly what's is [sic] going on with the American football to give an opinion about that.").

A-34

does not change my opinions here" and "[t]he use of C4 LLDPE in itself was improper.").) In any event, at this juncture, the Court cannot find that Plaintiffs have done enough to meet their burden that Dr. Schoukens's opinion is reliable on this point.

In sum, the Court finds that Dr. Schoukens's declaration and testimony may be admitted in support of establishing that design defects in Duraspine exist; however, it may not be offered in support of his temporal conclusion that Duraspine turf will degrade in four to six years. Dr. Schoukens's testimony regarding the catalyst used to produce Duraspine is also inadmissible.

### C.    FieldTurf's Motion to Exclude the Opinions of Dr. Stephen Hamilton

FieldTurf also moves to exclude the testimony and report from Dr. Stephen Hamilton, Plaintiffs' damages expert. (*See generally* Defs.' Mot. to Exclude Hamilton, ECF No. 235.) Dr. Hamilton contends that "if Plaintiffs can establish liability" based on Duraspine's defects, he can calculate a damages model on a class-wide basis. (Hamilton Decl. ¶ 19, ECF No. 217-2.) Specifically, Dr. Hamilton concludes that "[v]alid and accurate methodologies exist" to measure Plaintiffs' economic damages from "purchasing products advertised to last 8-10 years or more, without being informed that the Duraspine fiber could be expected to remain substantially upright and intact for a shorter time of no more than 4-6 years." (*Id.* ¶ 21.)

To quantify economic damages as a result of Duraspine's inherent defects, Dr. Hamilton offers two models: (1) the value of services method and (2) a conjoint analysis. (*Id.* ¶¶ 23-24.) According to Dr. Hamilton, the value of services method amortizes the net present value of services provided over a shorter period than expected to accurately calculate the "replacement cycle" which is then used to create the valuation. (*Id.* ¶ 23.) Said another way, the value of services method seeks to quantify the difference between the turfs that showed deterioration after four to six years rather than the 10 years that FieldTurf allegedly claimed. Calculating the overcharge using the value of services method, Dr. Hamilton states that this methodology relies on calculating

13

A-35

the difference in the expected present value of services from fields with a shorter replacement standard relative to fields with a longer replacement standard, and then amortizing the difference in buyer cost to create a valuation to be used in the damages calculation. In this case, he proposes amortizing the field over four to six years, as opposed to ten years as Plaintiffs expected. (*Id.*)

The second methodology is the conjoint analysis. According to Dr. Hamilton, this method consists of a "representative survey technique" to analyze consumer responses to calculate purchasers' "willingness-to-pay" for specific representations made on a product. (*Id.* ¶ 24.)

To measure restitution damages resulting from FieldTurf's alleged unjust enrichment, Dr. Hamilton offers three metrics that are readily available. (*Id.* ¶ 26.) Those metrics are FieldTurf's "net sales," "gross profit," and "net profit before tax." (*Id.*)

FieldTurf sets forth several arguments for why this Court should exclude Dr. Hamilton's report including: (1) the report's value of services methodology does not accurately isolate durability, (2) the value of services method ignores the testimony that demonstrates that individual inquiries are needed and facts that contradict the four-to-six-year duration assumption, (3) Dr. Hamilton's methodology is inconsistent with Plaintiffs' theory of liability, (4) Dr. Hamilton's conjoint model is nonexistent, and (5) the proposed measures of unjust enrichment damages do not provide sufficient detail regarding their application. (*See generally* Defs.' Mot. to Exclude Hamilton.) Considering Dr. Hamilton's arguments and the parties' submissions, the Court finds Dr. Hamilton's damages models unreliable.

Regarding Dr. Hamilton's value of services methodology, the Court finds several methodological errors that render his opinion unreliable. First, Dr. Hamilton's value of services

14

A-36

model fails to apprise the Court of any other features of Duraspine that contribute to the price.[14] According to Dr. Hamilton, "[t]he difference in the expected net present value of services for the buyer depends only on the difference in expected replacement cost under a 4-year versus a 10-year replacement standard." (Hamilton Decl. ¶ 92.) This is because "there is no difference in the value of the service flow received from the field in each scenario, because the artificial turf fields are identical apart from the difference in durability under the misleading claims and but-for claims scenario." (*Id.*) But the Court finds that at bottom, the model's assumption that because of FieldTurf's alleged omissions, the average Plaintiff did not receive *any value* in the years after Duraspine fibers began to degrade is unsupported. Dr. Hamilton's value of services model assumes that the Duraspine defects render the fields unusable. This is because the model attributes all value to replacing the fields in four years rather than ten years. But this is where the disconnect lies between Dr. Hamilton's model and reality: a vast majority of Plaintiffs continued using the fields well after the alleged expiration date. (*E.g.*, Hudson Dep. Tr. 52:16-24 (confirming that it used its Duraspine field for ten years); Defs.' Opp'n Br. Ex. 4 (showing that Levittown used its Duraspine field for nine years).) However, this results in an all-or-nothing damages model that simply calculates the difference in net present value of replacement fields if Plaintiffs' current fields last four years as opposed to ten years. If the average Plaintiff immediately replaced its Duraspine

---

[14] Such factors include: (i) FieldTurf's reputation (Ugone Rep. ¶¶ 35(a) and (f), ECF No. 229-1); (ii) the fact that professional sports teams had Duraspine fields (Hamilton Dep. Tr. 214:3-14, ECF No. 254-5; Ugone Rep. ¶¶ 35(a), (b), (d), (e), (f), and (g)); (iii) FieldTurf's warranty (Hamilton Dep. Tr. 99:4-9; 226:7-12; Ugone Rep. ¶¶ 35(a)-(c), and (f)); (iv) that Duraspine required less maintenance than grass (Hamilton Dep. Tr. 213:10-15; Ugone Rep. ¶¶ 35(a)-(c)); (v) the fact that nearby schools and communities used FieldTurf (Hamilton Dep. Tr. 214:15-215:3; Ugone Rep. ¶ 35(b) and (f)); (vi) the safety of FieldTurf's fields (Hamilton Dep. Tr. 57:5-15; Ugone Rep. ¶¶ 35(c)-(d)); (vii) that FieldTurf's fields can be used year-round (Ugone Rep. ¶ 35(c)); (viii) color options offered by FieldTurf (Hamilton Dep. Tr. 65:15 20; 66:19-67:15; Ugone Rep. ¶ 35(a)); and (ix) the customer's prior experience with FieldTurf (Hamilton Dep. Tr. 233:22-234:9; Ugone Rep. ¶ 35(g)).

A-37

fields within the four-to-six-year period, the Court could subscribe to Dr. Hamilton's model. But that does not appear to be the case here. As FieldTurf emphasizes, Duraspine met its eight-year warranty in most instances. (Defs.' Opp'n Br. 3-4.) Although the Court appreciates that replacement value may not be a simple equation, it is not the equivalent of a model that isolates the attributes of Duraspine fields. This model does nothing to explain how other Duraspine features factor into Duraspine's price and account for damages. Indeed, Dr. Hamilton ignores reality that features such as brand recognition, use by professional sports teams, reduced maintenance, and FieldTurf's warranty provided value to Plaintiffs. (Defs.' Mot. to Exclude Hamilton 12-13.)

Second, the value of services model does not account for discounts, repairs, replacements, or any other concessions FieldTurf made despite having that data available to him. (Hamilton Dep. Tr. 88:11-22.) According to Dr. Hamilton, this is because he is "describing a methodology that can be applied to the entire class." (*Id.* 88:17-22.) But without proposing any differences among class members, such as a discount model, the Court cannot find that the proposed methodology is reliable. *Mueller v. Puritan's Pride, Inc.*, No. 16-6717, 2021 WL 5494254, at *6 (N.D. Cal. Nov. 23, 2021) ("While a damages methodology need not deliver mathematical precision, and may accommodate some individual variability among class members, it must be capable of determining damages . . . " (internal citation omitted)). Here, Dr. Hamilton does not even attempt to account for any differences amongst class members.

Finally, Dr. Hamilton's reliance on Dr. Schoukens's unreliable theory that all Duraspine turf will deteriorate in four to six years also contributes to the value of services model's unreliability. Dr. Hamilton offers no opinion on the quality and durability of Duraspine and relies on Plaintiffs' theory of liability to develop the models, including the value of services model. (Hamilton Decl. ¶ 48.) But as noted above, the Court finds Dr. Schoukens's temporal conclusions unreliable. Here, the value of services model calculates overcharge damages based on Plaintiffs

16

A-38

replacing their fields in four years instead of ten years because of Dr. Schoukens's unreliable conclusion. Unsurprisingly, then, the Court also notes that Dr. Hamilton's value of services model fails with it.

Regarding Dr. Hamilton's conjoint analysis method to determine the overcharge amount, the Court cannot say whether the model would be reliable or not because Dr. Hamilton has yet to offer the model for the Court's review.

Dr. Hamilton's declaration is replete with an explanation of what a conjoint analysis is but contains no details on how he would apply the conjoint analysis to the case at hand.[15] (*See* Hamilton Decl. ¶ 24 ("Conjoint analysis is a representative survey technique that analyzes consumer responses directly—rather than analyzing historical sales prices and the expected discounted value of services over time that determines these prices—to calculate purchasers' willingness-to-pay for specific representations made on a product").) Indeed, Dr. Hamilton readily admits that "because the value of services method is [his] preferred approach for deriving the [o]vercharge premium, [he had] not yet designed the conjoint [analysis]." (*Id.* at 43.) Dr. Hamilton does not even offer one feature he would include in his survey. Furthermore, in his rebuttal, Dr. Hamilton acknowledges the argument put forward by Dr. Jerry Wind's, FieldTurf's marketing expert, that a "conjoint analysis using a survey of representative buyers of artificial turf product poses considerable challenges" but indicates that such a model is not unworkable. (Hamilton Rebuttal Decl. ¶ 101.) Although Dr. Hamilton admits that a conjoint analysis model will be challenging, he provides this Court with no information to evaluate whether he was successful in creating the model.

---

[15] *See also Dzielak v. Whirlpool Corp.*, No. 21-20089, 2017 WL 1034197, at *5 (D.N.J. Mar. 17, 2017) ("Conjoint analysis involves a survey in which respondents are asked to make a series of trade-offs between different product features and prices.").

This Court's finding is buttressed by a similar analysis by the court in *In re ConAgra Foods, Inc.* There, the defendants argued with respect to the conjoint analysis that the expert "ha[d] not determined the characteristics of the survey sample he would use in the analysis, the list of relevant product attributes, the sample size of the survey, or whether he would conduct separate surveys in each proposed class state or one large multi-state survey." 302 F.R.D. 537, 551 (C.D. Cal. 2014). The *ConAgra* court agreed and found that because the expert did not "identify any variables he intend[ed] to build into the models" nor "any data presently in his possession to which the models [could] be applied", the declaration was "so incomplete as to be inadmissible as irrelevant." (*Id.*)

Similarly here, Dr. Hamilton fails to set forth any model for this Court to examine. At this juncture, the Court concludes that this portion of his declaration is essentially irrelevant. The Court thus excludes Dr. Hamilton's value of services and conjoint models.[16]

## III.   **MOTION FOR CLASS CERTIFICATION**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted). "To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). A class may be certified pursuant to Rule 23(a) of the Federal Rules of Civil Procedure when: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, Rule 23(b)(3) requires that "questions of law or fact

---

[16] The Court addresses Dr. Hamilton's proposed measures of restitution damages below.

A-40

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In this Circuit, when certification is sought under Rule 23(b)(3), a prerequisite to an analysis of the Rule 23(a) requirements is the determination of ascertainability of the proposed class. *See Marcus*, 687 F.3d at 592-93.

To be sure, "the requirements set out in Rule 23 are not mere pleading rules." *Hydrogen Peroxide*, 552 F.3d at 316. Instead, plaintiffs seeking class certification must establish each element of Rule 23 by a preponderance of the evidence. *Marcus*, 687 F.3d at 591. This requires actual, not presumed compliance with Rule 23's requirements. *See id.*; *Hydrogen Peroxide*, 552 F.3d at 309 ("Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met.") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

### A.      Ascertainability

To satisfy the threshold ascertainability inquiry, the party seeking certification must show that (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citations omitted). The ascertainability inquiry is narrow. *Id.* at 165. It "does not mean that a plaintiff must be able to identify all class members at class certification; instead, a plaintiff need only show that 'class members can be identified.'" *Id.* at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)).

The Court finds that ascertainability is satisfied here. The proposed classes are defined with reference to objective criteria as they are limited to purchasers of Duraspine over a several year

period who can be identified by the geographic area where the fields were installed. Moreover, FieldTurf does not challenge ascertainability.

**B.     Rule 23(a) Requirements**

FieldTurf also does not challenge class certification on numerosity, commonality, typicality, or adequacy grounds. Likewise, the Court is satisfied that Plaintiffs have met those requirements. Because the Court must independently find these requirements met, it addresses them nonetheless.

**1.     Numerosity**

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no minimum number needed for a suit to proceed as a class action, but where a class is likely to exceed forty members, the Rule 23(a) numerosity requirement is generally met. *See Marcus*, 687 F.3d at 595. Here, Plaintiffs contend (and FieldTurf does not dispute) that there are hundreds of Duraspine purchasers and well over 40 purchasers in each of the subclasses.[17] (*See* Pls.' Moving Br. 25.) The Court, accordingly, finds that estimate sufficient to satisfy numerosity.

**2.     Commonality**

Rule 23(a)(2) further requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." *Mielo v. Steak'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018). Commonality only requires that the "common contention . . . must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Plaintiffs identified common contentions that are central to the

---

[17] *See generally* Duraspine Tracker, ECF No. 216-27.

validity of their claims—namely that "all the claims depend on common facts regarding" Duraspine's defects. (Pls.' Moving Br. 26.) To recap, Plaintiffs allege that Duraspine turf used a fiber "(1) with a 'fatal[ly] flawed' spine and wing shape and (2) that was made with polymers that were 'unsuitable' for routine, long-term outdoor athletic use." (*Id*.) As such, the commonality requirement is satisfied. *See Marcus*, 687 F.3d at 597 (holding commonality satisfied where plaintiff sought to offer evidence about "whether [a product is] 'defective,' whether the defendants had a duty to disclose those defects, and whether the defendants did in fact fail to disclose those defects").

### 3.    Typicality and Adequacy

The typicality and adequacy analyses often merge and may therefore be discussed together. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001) (providing that "typicality criteria tend to merge into [the] analysis of adequacy of representation under [Rule] 23(a)"). The standard for demonstrating typicality requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." *Id.* at 183-84. Additionally, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Regarding typicality, Plaintiffs allege that all Duraspine fields have the same two defects. *Marcus*, 687 F.3d at 599 ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types"). Plaintiffs have established typicality.

Adequacy depends on two factors: (1) whether the attorney is qualified, experienced, and generally able to conduct the proposed litigation, and (2) whether the plaintiff has interests

21

A-43

antagonistic to those of the class. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007). Additionally, "[t]he burden to prove that the representation is not adequate rests with the party challenging the class's representation." *Bizzarro v. Ocean Cnty.*, No. 07-5665, 2009 WL 1617887, at *14 (D.N.J. June 9, 2009).

Here, class counsel has presented sufficient information demonstrating their qualifications, and the class representatives easily satisfy the adequacy requirement. The Court, therefore, finds that Rule 23(a)'s prerequisites to class certification are satisfied.

### C.    Rule 23(b) Requirements

Having fulfilled Rule 23(a)'s requirements, Plaintiffs must now show that a class action may be maintained under one of the three categories established by Rule 23(b). Fed. R. Civ. P. 23(b). Plaintiffs seek Rule 23(b)(3) certification on behalf of consumers who suffered damages arising from their purchase of Duraspine. To succeed, they must establish that (1) questions of law or fact "predominate" over individual questions, and (2) a class action is "superior" to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

### 1.    Predominance

Though seemingly similar to Rule 23(a)'s commonality requirement, Rule 23(b)(3)'s predominance requirement is much more demanding. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Predominance requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance is intended to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In other words, predominance compels a court to determine whether there are questions common to the class that predominate over individual questions. "[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member[.]"

22

*In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)), *as amended* (Sept. 29, 2016). In comparison, "a common question is one where the same evidence will suffice for each member to make prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.*

Whether this precondition is met turns on the "nature of the evidence" and whether the evidence used at trial to prove the "essential elements" of plaintiff's claim is better suited for class or individual treatment. *See Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311). To assess whether predominance is met, the Third Circuit describes the district court's task as follows:

> In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, "through the prism" of Rule 23, undertake a "rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove" those elements.

*Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 128 (3d Cir. 2018). If, after doing so, a district court determines that "proof of the essential elements of the [claim] requires individual treatment, then class certification is unsuitable." *Id.* (quoting *Newton*, 259 F.3d at 172).

Predominance lies at the heart of the pending motions. According to Plaintiffs, all the claims stem from FieldTurf's common course of conduct related to the sale of Duraspine with the same inherent defects that led to each class member "overpaying" for the turf. (Pls.' Moving Br. 27.) FieldTurf, however, disputes that all Duraspine turf fields exhibited substantial degradation due to any flawed design and asserts that Plaintiffs' argument is reliant on individual inquires that predominate over any common evidence necessary to adjudicate these claims. (Defs.' Opp'n Br. 23-40.)

### a.  Whether Common Factual Issues Predominate

For common questions of fact to predominate, they must be "both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003). Although individual issues do not make certification impossible, "they must be less significant than the common issues and must not be so unmanageable as to preclude class treatment." *Dal Ponte v. Am. Mortg. Exp. Corp.*, No. 04-2152, 2006 WL 2403982, at *7 (D.N.J. Aug. 17, 2006). Where plaintiffs' claims are all based on an alleged common product defect, courts in this District have recognized that even the basic issue of whether the common defect exists may defeat predominance and render the class action unmanageable. *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 455 (D.N.J. 1998); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 342-46 (D.N.J. 1997) (finding that although the switches have a common design, whether Plaintiffs' ignition switches are defective will depend on facts particular to each individual plaintiff).

The essence of each of Plaintiffs' claims is that they incurred damages because FieldTurf misrepresented Duraspine's longevity and durability. To determine whether individual factual issues predominate for each of Plaintiffs' claims, the Court must examine whether there is common proof to support the elements of the claims. *Marcus*, 687 F.3d at 602. To that end, the Court identifies four factual disputes that it will address to determine whether common or individual issues predominate. Those factual issues include whether: (1) Duraspine is indeed defective, (2) Plaintiffs relied on FieldTurf's omissions or misrepresentations, (3) causation can be proven, and (4) damages are measurable on a class-wide basis. The Court, accordingly, addresses each of these questions in turn.

A-46

### i.    Whether Duraspine is Defective

The answer to whether there is an inherent defect is "an essential element of Plaintiffs' misrepresentation-based claims, and whether it is susceptible to class wide evidence is dispositive of whether Plaintiffs can satisfy predominance." *Gonzalez v. Corning*, 885 F.3d 186, 196 (3d Cir. 2018), *as amended* (Apr. 4, 2018). As previously noted, Plaintiffs claim that the product they purchased from FieldTurf, Duraspine, was sold to them with inherent defects. (Pls.' Moving Br. 9.) According to Plaintiffs, Duraspine fiber's geometric design created break points that made the fibers more susceptible to failure—namely splitting, laying over and breaking after just a few years of normal use. (*Id.* at 9.) Worse yet, Plaintiffs contend that the polymers used to make Duraspine's fibers was unsuitable for Plaintiffs' use as they are weak, easily torn, and will not hold up to regular athletic use for more than a few years. (*Id.*)

But FieldTurf claims that Plaintiffs fail to identify any uniform defect that impacts the turf's durability. FieldTurf highlights that Duraspine met or exceeded its eight-year warranty in most instances. (Defs.' Opp'n Br. 3.) FieldTurf further asserts that the fibers in the turf laying over or splitting is not an inherent defect in and of itself— "any fiber can experience layover or split over the years of use." (*Id.* at 8.) According to FieldTurf, mechanical wear does not alter the properties of the fibers and the only impact of it is cosmetic, and artificial turf is measured by "meeting industry standards for acceptable performance of a given sport, not its appearance." (*Id.* at 9.)

Where plaintiffs allege that a defendant's product suffers from a common design defect, courts have found that this issue is a common one that predominates over individual ones. Here in the Third Circuit, in *Marcus*, the district court found that plaintiff offered enough evidence that BMW's run-flat tires suffered from a design defect that made them more susceptible to road damage. 687 F.3d at 603. The Third Circuit affirmed this finding, holding that "[o]ur inquiry is

limited to whether the District Court abused its discretion when finding that, should a defect exist at all in [defendant's tires] that makes them more susceptible to road hazard damage, [plaintiff] will be capable of proving that defect at trial through evidence that is common to the class rather than individual to its members." *Id.*

After consideration of the parties' positions, the Court finds that Plaintiffs have met their burden of demonstrating that the question of whether Duraspine is inherently defective is subject to class-wide proof. To start, Dr. Schoukens reliably demonstrates that Duraspine's "geometry" and its polymers were inherently defective and unsuitable for the turf based on the discovery produced in this action. (*See generally* Schoukens Decl.) Dr. Schoukens further asserts that the Duraspine fibers cannot stay erect and intact with routine use, but instead, they layover, split, and break prematurely. (*Id.* ¶ 6.) As he puts it, the supposedly "resilient" spine causes stress in the fiber when it is bent or compressed, which leads to breaking between the spine and wings. (*Id.* ¶ 119.) This breakage "takes away from the grassy look of the field, but also means that the remaining fiber has less mass to resist forces . . . and thus will be even more easily deformed." (*Id.* ¶ 29.) Further in support of finding a uniform defect, a former FieldTurf director admitted that the "crossectional geometry problems . . . scared the hell out of" him. (Pls.' Moving Br. Ex. 11, ECF No. 213-12.) Moreover, a FieldTurf expert in previous litigation opined that Duraspine's "shape contains certain inherent weakness[es]" because "the fibers contain a spine running down the center of the fiber" and "[t]here is no transition from spine to wings; the wings are directly connected to the spine at abrupt angles." (*See* ECF No. 213-14.)

FieldTurf argues that whether the defect has manifested is an issue necessary to determine whether class certification is appropriate. The Court agrees that for claims where manifestation is a requirement, "proving a class-wide defect where the majority of class members have not yet experienced any issues . . . would be extremely difficult." *Chin*, 182 F.R.D. at 456. But at this

26

A-48

stage, Plaintiffs adequately set forth their theory of the defect and that its existence is susceptible to common class-wide proof. *See Hydrogen Peroxide*, 552 F.3d at 311-12 ("Plaintiffs' burden at the class certification stage is not to prove the elements . . . [i]nstead, the task for plaintiffs at class certification is to demonstrate that the element[s] . . . [are] capable of proof at trial through evidence common to the class rather than individual to its members").

To avoid doubt, this does not mean that the Court finds the defect *actually* exists or that Plaintiffs will, in fact, be able to prove the defect at trial. But that determination is not appropriate at the class certification stage. *See e.g., In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) (counseling that if [d]efendant "can prove that most class members have not experienced" the defect, then [d]efendant "should welcome class certification").

### ii.    *Reliance and Duraspine Marketing*

With that, the Court moves to reliance. At the crux of the parties' dispute is whether reliance may be presumed on a class-wide basis. Plaintiffs contend that a presumption of reliance is appropriate because throughout FieldTurf's marketing of Duraspine to customers, it universally omitted the truth concerning Duraspine's design and durability. (Pls.' Moving Br. 15-18.) FieldTurf accomplished this marketing scheme, Plaintiffs argue, by running magazine ads, distributing marketing materials, and centrally training their sales agents to market Duraspine uniformly. (*Id.* at 15-16.) They further argue that those marketing efforts were material to all Plaintiffs. (*Id.* at 17.) Indeed, Plaintiffs highlight FieldTurf's claim that purchasers could amortize the cost of the field over ten or more years as evidence enough that durability was material to a reasonable customer. (*Id.* at 18.)

FieldTurf disputes that a presumption of reliance is warranted because, it alleges, "(i) facts about the alleged defect were not "uniformly omitted" and (ii) determining whether the allegedly omitted facts were "material" will require individualized inquiry." (Defs.' Opp'n Br. 28.) Instead,

A-49

FieldTurf alleges that it deployed a detailed sales process tailored to each Duraspine purchaser. (*Id.* at 27.) Accordingly, FieldTurf argues that reliance on any representations by FieldTurf cannot be presumed.

To determine whether reliance may be presumed, the Court engages in a two-part inquiry. First, the Court examines whether the misconduct at issue primarily involves misrepresentations or omissions. Second, if the Court determines that FieldTurf misrepresented Duraspine's durability, the Court will examine whether it engaged in conduct such that it uniformly misrepresented Duraspine to all class members. The Court begins, therefore, with determining whether FieldTurf's conduct concerns misrepresentations or omissions.

To establish reliance, the Supreme Court and the Third Circuit distinguish between misrepresentations and omissions. The Supreme Court makes clear that in cases involving omissions, reliance will be presumed. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) (finding presumption of reliance appropriate in securities fraud case where information was omitted); *In re Mercedes-Benz Tele Aid Cont. Litig.*, 257 F.R.D. 46, 74 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113 (D.N.J. 2010), *opinion modified on reconsideration*, No. 07-2720, 2010 WL 2976496 (D.N.J. July 22, 2010) (applying presumption of reliance to common law fraud claims involving omissions). What is equally clear is that the presumption does not apply in cases involving misrepresentations, although that does not end the analysis. *Affiliated Ute Citizens*, 406 U.S. at 154. However, as the Third Circuit noted, "[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme . . . and the mere fact of this concealment cannot, and should not, transform a misrepresentation into an omission." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001) (citation and internal quotation marks omitted). In cases involving both misrepresentations and omissions, courts must decide "whether

A-50

the offenses can be characterized primarily as omissions or misrepresentations, and therefore who most appropriately bears the burden of proof." *Id.* at 192 (citation omitted).

With that, the Court faces the present conundrum: did FieldTurf affirmatively misrepresent Duraspine's durability? Or, rather, did FieldTurf omit material information about the field's longevity when advertising to potential purchasers? Plaintiffs would lead this Court to believe that the answer is so clear that the question does not need to be asked. Plaintiffs contend that the "common thread" of all of FieldTurf's marketing of Duraspine to customers was the "uniform omission of the truth about Duraspine's design and limited durability." (Pls.' Reply Br. 5.) Indeed, Plaintiffs further aver that FieldTurf, without question, omitted information from purchasers. (*See* Pls.' Moving Br. 15 (arguing that FieldTurf's marketing was "deceptive for its material omissions").) For its part, FieldTurf holds that it neither misrepresented nor omitted material information regarding Duraspine's durability. (Defs.' Opp'n Br. 29.) But FieldTurf does concede that it did "disclose the information Plaintiffs claim was withheld with respect to Duraspine's expected wear." (*Id.* at 30.)

Ultimately, the Court finds that this is an omissions case and a presumption of reliance is appropriate here. At bottom, Plaintiffs allege that FieldTurf concealed the defects impacting durability when marketing and selling to Plaintiffs. Notably, Plaintiffs support their argument that FieldTurf "fraudulently concealed its misrepresentations and omissions" with evidence of "(1) 'oral representations' of FieldTurf's sales agents that 'were substantially similar', and (2) 'uniform written materials on which the oral representations were based.'" (Pls.' Moving Br. 15.)

Indeed, Plaintiffs testified consistently that they were told FieldTurf was a durable product.[18]

Furthermore, the discovery produced thus far indicates that FieldTurf was aware of issues with the

Duraspine turf and did not disclose those issues to purchasers. (*See* Pls.' Moving Br. 8-10.) Indeed,

FieldTurf was aware of Duraspine's premature deterioration as early as 2005 but still represented

to customers that "Duraspine fibers were engineered to provide 'durability', 'resilience' and

'memory' so that the fibers would remain substantially upright in use." (*Id.* at 16.) The Court finds

that while FieldTurf's conduct involves both misrepresentations and omissions, the omission of

---

[18] *See* Hudson Dep. Tr. 22:7-19, ECF No. 219 ("[T]he expectation would be ten-plus years would
be the life of the field. . . [and] that representation was made at the Lincoln Park Administration
Building"); Newark Dep. Tr. 72:11-19, ECF No. 220 ("The quality and durability of the product
was very important to the district. And we were repeatedly told in our conversations . . . with
representatives from FieldTurf that the product . . . would live frankly far beyond the warranty,
that this was a product that could have a lifespan of well over ten years."); Saint Ynez Dep. Tr.
180:15-18, ECF No. 221 ("And those promises were [Duraspine] is going to be a great product
and it's going to last a long time, it's going to last longer than eight years."); Neshannock Dep. Tr.
56:2-4, ECF No. 222 ("[A] key point as far as being sold on a fiber that was going to stand up and
last at least ten years or more."); Levittown Dep. Tr. 160:13-25, ECF No. 218:6 (FieldTurf told
Levittown that the "field would last in excess of ten years, and it would look the same as it did
when it was installed."); Carteret Dep. Tr. 30:24-31:6, ECF No. 218-12 ("FieldTurf told us . . .
[t]his field was going to be supported and be perfect for [] longer than eight years . . . this field
will last ten-plus years"); Fremont Dep. Tr. 42:22-43:5, ECF No. 218-18 (FieldTurf's marketing
materials represented that their "monofilament was going to last longer than some of the slit films
they had in the ground that were, like, averaging nine years old, so . . . I remember some of the
marketing materials saying the monofilament would last ten years or greater").

A-52

defects was more significant.[19] Because at bottom, Plaintiffs' allegations are not that the Duraspine turf was unusable after a short duration of time, but rather that FieldTurf did not reveal to them that defects would cause wear to the turf fields limiting their worth.

Applying the Third Circuit's reasoning here, the Court finds that the evidence weighs in favor of finding that common issues predominate and that Plaintiffs may establish reliance through common evidence because FieldTurf omitted Duraspine's defects.

### iii.   Causation

Regarding causation, Plaintiffs argue that this Court "should reject FieldTurf's argument that Plaintiffs must prove causation on an individual basis because it ignores both the class definitions and the many cases affirming orders granting certification of similar cases based on similar facts." (Pls.' Reply Br. 7.) This argument misses the mark.

Here, the Court finds that "to determine why a particular class member's" Duraspine turf incurred damage "requires an individual examination." *Marcus*, 687 F.3d at 604. Therefore, "[t]hese individual inquiries are incompatible with Rule 23(b)(3)'s predominance requirement."[20] *Id.* While Plaintiffs' theory of the inherent defects may only give way to pre-purchase liability, to

---

[19] To be sure, it is not lost on the Court that each of the named Plaintiffs affirmed that FieldTurf's agents told them that Duraspine was a durable product that would last more than ten years. But even if this Court were to analyze this as a misrepresentation case, *i.e.* with a general assumption that oral misrepresentations are not uniform, it is not a foregone conclusion that a presumption of reliance is not appropriate. *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 490 (3d Cir. 2015) ("oral misrepresentation must be uniform in order to establish predominance"). Throughout their briefing, Plaintiffs contend that FieldTurf told Plaintiffs that "Duraspine . . . was uniquely designed with fiber that would look good, remain 'erect,' and withstand 10 years or more of routine use." (Pls.' Moving Br. 2.) Plaintiffs further aver that FieldTurf represented to every Plaintiff that Duraspine "would last well beyond the eight-year warranty period, and the product was expected to last at least ten years before any potential replacement would be needed." (*Id.* at 10.) Indeed, such uniform misrepresentations are precisely the type of allegations that would be an exception to the rule.

[20] Indeed, even measuring whether a Duraspine field has deteriorated is difficult since both parties' experts agree that monofilament will deteriorate. (*See* Cox Decl. 16; Schoukens Decl. ¶ 116.)

A-53

prove that they exist will require individual examinations of the field to determine that those defects contributed to Duraspine degrading prematurely.[21]

Plaintiffs argue that evidence of Plaintiffs' varied "use and maintenance" of the fields is irrelevant because they do not seek damages for anything that happened to their turf after purchase and installation—instead, they seek the "overcharge" paid at the point of sale because of FieldTurf's pre-purchase misrepresentations. (Pls.' Reply Br. 7.) But while Plaintiffs may seek damages solely for pre-purchase misrepresentations regarding Duraspine, to demonstrate that FieldTurf concealed inherent defects in the Duraspine turfs, Plaintiffs will have to provide proof of this defect—i.e., developments that took place post-purchase. "Because the great majority of the proposed class" used their fields for the entire warranty period, if not longer, the question of whether a defect exists that caused injury to Plaintiffs will "be determined based on facts that are particular to each individual proposed class member." *Payne v. FujiFilm U.S.A., Inc.*, No. 07-385, 2010 WL 2342388, at *6 (D.N.J. May 28, 2010).

To survive this pitfall, Plaintiffs rely on *Dzielak v. Whirlpool Corp.* to argue that the "existence of [] different circumstances, a 'safe harbor' defense, or other defenses that may affect class members differently does not compel a finding that individual questions predominate over common ones." No. 12-89, 2017 WL 6513347, at *17 (D.N.J. Dec. 20, 2017). But the Court finds *Dzielak* readily distinguishable. There, the plaintiffs brought a class action suit alleging that Whirlpool and several retailers misrepresented that certain washing machine models met the "Energy Star" requirements, signaling water and electrical efficiency. *Id.* at 1. The court certified the class against Whirlpool, finding that common issues did predominate. *Id.* at 17. But the

---

[21] For example, even Plaintiffs admit that the Tencate issue impacted the fields. (*See* Pls.' Reply Br. (noting that Duraspine's susceptibility to UV degradation was a secondary factor that may have shortened the lifespan of fibers at the time of purchase.)) Similarly FieldTurf's marketing materials also indicated the lifespan of the field would depend on usage patterns. (Defs.' Opp'n Br. 13 n.75.)

A-54

plaintiffs all suffered the same injury to which common proof could be used to determine whether or not the washing machines met the efficiency requirements. By contrast, here, while Duraspine may have inherent defects, whether Plaintiffs' injuries (field degradation) were caused by that defect or some other factor (overuse, poor maintenance, weathering etc.) will require individual inquiries.

Instead, the Court finds *Neale v. Volvo Cars of North America, LLC* instructive. There, the plaintiffs' claims stemmed from Volvo's sale of six vehicle models allegedly containing an undisclosed uniform design defect in the sunroof drainage system. *Neale v. Volvo Cars of N. Am., LLC*, No. 10-4407, 2021 WL 3013009, at *11 (D.N.J. July 15, 2021). Plaintiffs asserted two theories of damages, including a benefit of the bargain theory that each class member had suffered a quantifiable loss equal to the cost of mitigating the sunroof defect. *Id.* The Court ultimately denied class certification on the New Jersey Consumer Fraud Act ("NJCFA") claim, finding insufficient that plaintiffs "seek to recover the cost to remedy a problem that might not exist caused by a design flaw with no tangible impact on market value." *Id.* Although Plaintiffs are correct that for their benefit of the bargain theory, they are attempting to obtain damages based on class members obtaining less than what they purchased, nonetheless, the Court finds that in proving said defect, individual issues of causation will need to be explored.

### iv.   *Proof Required for Damages*

Last, but certainly not least, is the issue of damages. In *Comcast Corp. v. Behrend*, the Supreme Court emphasized that issues regarding individual damages may preclude certification under Rule 23(b)(3). 569 U.S. 27, 31 (2013). At the certification stage, the Court must assure itself that defendant's alleged injurious conduct to each class member can be identified separately from damages that are not the result of the wrong. *Id.* at 32. Damages must be "capable of measurement on a classwide basis." *Id.* at 34. Where proof of damages is essential to liability, the need for

33

A-55

"individualized proof of economic loss," instead of through a formulaic calculation, can defeat predominance. *Newton*, 259 F.3d at 188.

Addressing the question of damages, FieldTurf contends that each class member will need to present evidence that it received less than it bargained for, and thus individual evidence needed to address the issue of damages predominate any common evidence. (Defs.' Opp'n Br. 36.) Plaintiffs argue that, at this stage, individualized calculations do not preclude certification. (Pls.' Moving Br. 46.) The Court agrees that Plaintiffs need not prove their specific number of damages at the class certification stage. Plaintiffs must, however, prove that they suffered an economic loss through a theory of injury. *Newton*, 259 F.3d at 188 ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)").

Regarding damages, the Court finds that individual issues predominate. First, as examined above, the Court reiterates that Plaintiffs' value of services theory of damages is speculative because of its methodological errors, including failure to account for class differences, and complete dependence on Dr. Schoukens's flawed theory that all Duraspine will degrade in four to six years. Second, the Court notes that Dr. Hamilton has not yet crafted the conjoint analysis such that the Court may determine whether it could accurately measure economic damages. Finally, even though Dr. Hamilton's proposal to use either (1) net sales, (2) gross profits, or (3) net profits to measure "FieldTurf's unjust gains" should not be excluded under *Daubert*, the Court does not find it satisfies *Comcast*. This is because it does not measure the proposed class member's loss. Another court ruled similarly in *Smith v. Keurig Green Mountain, Inc*. No. 18-06690, 2020 WL 5630051, at *8 (N.D. Cal. Sept. 21, 2020). There, plaintiffs also used Dr. Hamilton as their damages expert. (*Id*.) He proposed using net sales, gross profits, or net profits to measure restitution damages. But the Court rejected this proposal under *Comcast*, finding that "[t]he

problem with all of the proposed models is that they look to Keurig's gains, rather than the proposed class members' losses." *Id.* So too here.

The Court therefore finds that thus far, Plaintiffs have presented no cognizable method for measuring damages. *Cf. Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."). Here, the Court cannot find that common evidence predominates on this issue. *See Neale*, 2021 WL 3013009, at *11 (finding plaintiffs' benefit of the bargain theory too speculative to satisfy the definition of an ascertainable loss for NJCFA claim); *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. 11-7382, 2019 WL 2521958, at *14 (D.N.J. June 18, 2019). As it stands, Plaintiffs have failed to put forth any cognizable way of demonstrating damages.

### b. Whether Common Issues of Law Predominate

The Court next addresses whether common or individual issues predominate when applying the law. The Court addresses each of Plaintiffs' remaining causes of action in turn.

#### i. Fraudulent Concealment

Plaintiffs urge this Court to certify a nationwide fraudulent concealment class. According to Plaintiffs, certification of this class is appropriate because the elements of common law fraudulent concealment do not "materially differ across jurisdictions." (Pls.' Moving Br. 28.) FieldTurf retorts, however, that there are substantial variations among state fraudulent concealment laws including variations in standards for scienter and reliance, the burdens of proof, the definition of the term "materiality," and the defendant's legal duties that give rise to fraudulent concealment liability. (Defs.' Opp'n Br. 40.) Moreover, FieldTurf highlights that individual jurisdictions have different approaches to the economic loss rule. (*Id.*)

35

A-57

The Court finds that the elements of fraudulent concealment are similar nationwide. As even FieldTurf concedes, most states require a plaintiff to establish that "(1) [the] defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be false or the omission to be material and intending the other party to rely on it; and (3) the other party did in fact rely on the misrepresentation or omission to its detriment." (*Id.* (citing, among other cases, *Scholar Intelligent Sols., Inc. v. N.J. Eye Ctr., P.A.*, 2013 WL 2455959, at *2 (D.N.J. June 5, 2013); *see also* Pls.' Moving Br. 29 n.10; Defs.' Opp'n Br. App. A). Moreover, where there are differences in the elements, the "differences fall into a limited number of predictable patterns." *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997). While the Court notes variations among states in applying this common law claim, differences in state law alone are not sufficient to preclude class certification on these grounds. *See Chin*, 182 F.R.D. at 458.

Turning to whether the legal elements of fraudulent concealment may be proven by common evidence, this presents a harder inquiry. As the Court noted above, Plaintiffs adequately set forth that FieldTurf uniformly omitted from Plaintiffs issues related to Duraspine and common evidence predominates to demonstrate reliance. However, the issue of damages requires an individual inquiry that overwhelms in this instance. To recap, Plaintiffs have not presented a reliable model to measure economic damages. At this stage, the Court finds this warrants denial of this class. The Court thus finds certifying the fraudulent concealment class inappropriate at this juncture.

### ii.   NJCFA

Regarding the NJCFA claim, Plaintiffs argue that this claim will turn on common questions of law and the elements may be proven by facts common to the New Jersey Plaintiffs. (Pls.'

A-58

Moving Br. 32.) FieldTurf argues that individual questions concerning injury and causation preclude predominance as to Plaintiffs' NJCFA claim. (Defs.' Opp'n Br. 44.)

The NJCFA prohibits certain deceptive commercial behaviors. Those unlawful practices include:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.
> . . .

N.J. Stat. Ann. § 56:8-2. An NJCFA claim requires proof of "(1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007) (citation, alterations, and quotation marks omitted). Unlawful conduct falls "into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994). Where the alleged unlawful conduct is a knowing omission, plaintiffs must further demonstrate that the defendant (a) "knowingly concealed" (b) "a material fact" (c) "with the intention that plaintiff rely upon the concealment."[22] *Coba v. Ford Motor Co.*, 932 F.3d 114, 124 (3d Cir. 2019) (citing *Judge v. Blackfin Yacht Corp.*, 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003)).

---

[22] The NJCFA permits a presumption of causation in cases where the unlawful conduct involves an omission where a plaintiff demonstrates by a preponderance of the evidence "(1) that the alleged defects were not knowable to a significant number of potential class members before they purchased . . . or (2) that, even if the defects were knowable, that class members were nonetheless relatively uniform in their decision making." *Marcus*, 687 F.3d at 611.

A-59

An ascertainable loss is defined as "either out-of-pocket loss or a demonstration of loss in value" that "is *quantifiable* or *measurable*." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792-93 (N.J. 2005) (emphases added). Courts recognize that the inability to establish an economic injury under Article III "may be fatal to . . . establishing an ascertainable loss or injury" in a state consumer fraud claim. *Neale*, 2021 WL 3013009, at *11 n.26 (collecting cases).

Finally, "causation under the [NJ]CFA is not the equivalent of reliance," and a plaintiff must demonstrate that he or she suffered an ascertainable loss as a result of the unlawful practice. *Lee v. Carter-Reed Co.*, 4 A.3d 561, 578 (N.J. 2010) (internal quotation marks omitted). "In other words, the alleged unlawful practice must be a proximate cause of the plaintiff's ascertainable loss." *Marcus*, 687 F.3d at 606.

Regarding the unlawful conduct, Plaintiffs contend that common evidence will prove their ascertainable loss. (Pls.' Moving Br. 34.) Here, Plaintiffs argue that, as set forth in Dr. Hamilton's report, common evidence shows class members suffered an ascertainable loss because the turf they received was worth objectively less money than the non-defective turf they expected. (*Id.*) But as currently constructed, the Court finds that Plaintiffs' theory of loss is too speculative to satisfy the ascertainable loss prong. As noted above, the Court finds this portion of Dr. Schoukens's testimony unreliable. Accordingly, the Court denies class certification of the NJCFA class.

### iii.   *New York General Business Law*

FieldTurf also argues that the New York statutory consumer fraud claim is not appropriate for class treatment. (Defs.' Opp'n Br. 46.) Plaintiffs argue that the class members have met all the elements to prove a claim under New York's General Business Law. (Pls.' Moving Br. 36.)

"To successfully assert a [New York General Business Law] claim, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of*

A-60

*New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009) (citation omitted). Under New York law, "[w]here . . . a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies." *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 123 (N.Y. App. Div. 2002) (citing *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997)) (internal quotations marks omitted). Indeed, New York law requires a manifested defect for a plaintiff to recover on any claim. *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 429 (S.D.N.Y. 2017), *modified on reconsideration*, No. 14-2543, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).

Regarding the material misrepresentation prong, courts generally find that a class of consumers do not have to show common misrepresentations when the alleged deceptive act was an omission. *See Oscar v. BMW of N. Am., LLC*, No. 09-11, 274 F.R.D. 498, 512-13 (S.D.N.Y. June 7, 2011).

Because of New York's manifestation requirement, however, the Court likewise finds that Plaintiffs have not met the predominance requirement for their New York consumer fraud claim. Importantly, resolution of Plaintiffs' claims will require individual inquiries into whether the defect manifested such that common questions do not predominate. In a case such as this one, where most Duraspine fields were in use for the entirety of the class period, without any altered use, proving manifestation will be difficult. Moreover, GBL § 349 also requires personal injury or property damage such that plaintiffs incurred repair costs or diminished value as a result of the defect.[23] *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2012 WL 379944, at *16 (D.N.J. Feb. 6, 2012). No evidence exists that all class members meet this requirement.

---

[23] *See also Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 59 (S.D.N.Y. 2019) ("plaintiffs alleging a 'price premium' theory must do more than 'merely alleg[e] that [they] paid a premium price [for their product], without making any other factual allegations" to support an inference that they would have paid less absent the misrepresentation or deception.'").

A-61

iv.   *California Unfair Competition Law and False Advertising Law*

Regarding California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL") claims, FieldTurf argues that individual issues predominate because it is necessary to determine whether each class member was exposed to FieldTurf's alleged deceptive conduct. (Defs.' Opp'n Br. 48.) Plaintiffs contend, on the other hand, that FieldTurf's failure to disclose material defects to all customers demonstrates that common issues predominate. (Pls.' Moving Br. 37.)

The UCL provides a cause of action for "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. and Prof. Code § 17500; *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Both statutes "are governed by the 'reasonable consumer' test." *Williams*, 552 F.3d at 938. To state a claim under either statute, plaintiffs must show that the defendant's claimed omissions are likely to deceive a reasonable consumer. *Id.* "Under the reasonable consumer standard, [the plaintiff] must show that members of the public are likely to be deceived." *Id.* (quotations omitted). A true statement can be actionable if it is "couched in such a manner that it is likely to mislead or deceive the consumer." *Davis*, 691 F.3d at 1162. Moreover, the UCL generally requires reliance on the omission. *See True v. Am. Honda Motor Co., Inc.*, 520 F. Supp. 2d 1175, 1182 (C.D. Cal. 2007); *Wiener v. Dannon Co.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009) ("[M]ost courts . . . have concluded that the UCL now requires reliance.").

Under the UCL and FAL, Plaintiffs may rely on a presumption of reliance. *See Vasquez v. Superior Ct.*, 484 P.2d 964, 973 (Cal. 1971) ("It is sufficient for our present purposes to hold that if the trial court finds material [omissions] . . . at least an inference of reliance would arise as to the entire class."). An omission "is judged to be 'material' if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction

40

A-62

in question." *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1043 (C.D. Cal. 2018). Here, as noted above, Plaintiffs readily satisfy reliance. This is because the Court finds that Plaintiffs consistently testified that the durability of Duraspine turf was a factor in the purchase of the field.

But as previously discussed at length, to show a proposed class is sufficiently cohesive to warrant adjudication by representation, Plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. To date, Plaintiffs have not presented a damages model that measures the difference between what they bargained for and what they received. Indeed, Plaintiffs aver that they were promised a durable field, but due to FieldTurf's omissions of the fields' defects, they received something less than that. But based purely on the omitted information, this Court cannot glean what Plaintiffs' damages may be nor have they presented a model delineating said damages. *E.g. In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2010 WL 2813788, at *15 (D.N.J. July 9, 2010), *amended,* No. 03-4558, 2011 WL 601279 (D.N.J. Feb. 16, 2011) ("Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant"). The Court finds predominance on these claims is not met at this time.

### *v. Breach of Implied Warranty Claims*

Plaintiffs argue that this Court should certify New Jersey, New York, Pennsylvania and California classes for breach of the implied warranty of merchantability and fitness claims because proof of each of these claims will turn on common evidence. (Pls.' Moving Br. 38.) FieldTurf contends that to prove the implied warranties claims, individual issues will need to be addressed that predominate over any common ones. (Defs.' Opp'n Br. 49.)

Under New Jersey law, to state a claim for breach of the implied warranty of merchantability, "a plaintiff must allege (1) that a merchant sold goods, (2) which were not

41

A-63

'merchantable' at the time of sale, (3) injury and damages to the plaintiff or its property, (4) which was caused proximately and in fact by the defective nature of the goods, and (5) notice to the seller of injury." *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2008 WL 4126264, at *19 (D.N.J. Sept. 2, 2008).

In New York, an implied warranty claim requires proof of the following elements: "(1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) that the defect is the proximate cause of the accident." *Plemmons v. Steelcase Inc.*, No. 04-4023, 2007 WL 950137, at *3 (S.D.N.Y. Mar. 29, 2007) (internal quotation marks and citations omitted). The implied warranty has been breached when the product is not "fit for the ordinary purposes for which such goods are used." *See* N.Y. U.C.C. § 2-314(2)(c); *Plemmons*, 2007 WL 950137, at *3.

Pennsylvania imposes an implied warranty of merchantability that requires that goods must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." PA. Cons. Stat. § 2314(b). The Pennsylvania Supreme Court has held that

> [t]he concept of merchantability does not require that the goods be the best quality or the best obtainable but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used.

*Gall v. Allegheny Cnty., Health Dep't*, 555 A.2d 786, 789-90 (Pa. 1989) (internal citations omitted).

Under California law, the implied warranty of merchantability means that consumer goods: "(1) [p]ass without objection in the trade under the contract description; (2) [a]re fit for the ordinary

purposes for which such goods are used; (3) [a]re adequately contained, packaged, and labeled; [and] (4) [c]onform to the promises or affirmations of fact made on the container or label." Cal. Civ. Code § 1791.1; *see also Clark v. LG Elecs. U.S.A., Inc.*, No. 13-485, 2013 WL 5816410, at *8 (S.D. Cal. Oct. 29, 2013). A plaintiff claiming breach of an implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003).

Once again, the Court finds that Plaintiffs will be hard pressed to demonstrate that under each of these state's respective laws, the fields were not fit for their ordinary purpose when the majority of Plaintiffs utilized the fields for more than the eight-year warranty period. Here, although FieldTurf may have advertised that the fields would last for ten or more years, that alone is not enough to show that they were not fit for their ordinary purpose. *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011); s*ee also Hughes v. Panasonic Consumer Elecs. Co.*, No. 10-846, 2011 WL 2976839, at *23 (D.N.J. July 21, 2011) (dismissing implied warranty claims because "plaintiffs do not allege that the [t]elevisions are inoperable or otherwise are not in working condition.").

Moreover, Plaintiffs' claims encounter further impediments to certification state-to-state. For example, in New Jersey, the implied warranty is limited to the duration of the express warranty. *Nobile v. Ford Motor Co.*, No. 10-1890, 2011 WL 900119, at *4 (D.N.J. Mar. 14, 2011). Here, many class members used their fields for the entirety of the warranty period. Accordingly, the Court finds that Plaintiffs' implied warranty claims will also be subject to individual issues that predominate over common ones.

### vi.   *Unjust Enrichment*

FieldTurf argues that the unjust enrichment class should not be certified because key legal differences exist between each state's unjust enrichment claim and individual facts predominate.

43

A-65

The Court first determines that the unjust enrichment laws do not vary in any "substantive manner" between the states. *Fenwick v. Ranbaxy Pharms., Inc.*, 353 F. Supp. 3d 315, 331 (D.N.J. 2018). Accordingly, this Court applies New Jersey law to Plaintiffs' unjust enrichment claim. To state a claim for unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 723 (N.J. 2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519 (N.J. 1994)) (internal quotation marks omitted).

FieldTurf contends that this Court should not certify the unjust enrichment class because the following issues are necessary to adjudicate this claim: "(i) what representations they received, (ii) their independent knowledge about artificial turf fields, (iii) whether and to what degree their field exhibited any issue, and (iv) the actual value, i.e., the benefits and use . . . received from their Duraspine fields." (Defs.' Opp'n Br. 52.) According to Plaintffs, however, this Court must solely determine as follows: "(1) that FieldTurf was enriched at the expense of Plaintiffs; (2) that FieldTurf retained this benefit; and (3) that this retention is unfair." (Pls.' Reply Br. 19.)

Considering the parties' contentions, the Court finds that individual issues predominate on the unjust enrichment claims. Most importantly, not all Plaintiffs in the proposed class have even experienced the defect. *Green*, 279 F.R.D. at 285 (denying certification of unjust enrichment claims because "[n]ot all members of the putative class have experienced a defect"). Plaintiffs attempt to distinguish *Green* by arguing they "demonstrate[d] that all Duraspine turf fields are defective." (Pls.' Reply Br. 19 n.26.) But that is not the question. Instead, this Court focuses on whether that defect has manifested such that a plaintiff did not experience the full value of the field. As examined above, the issue of whether Plaintiffs received the benefit of their bargain presents issues ripe for individual determinations.

44

A-66

Moreover, Plaintiffs have not proposed a measure of restitution damages that measures Plaintiffs losses instead of FieldTurf's gains. *Green*, 279 F.R.D. at 285.

### 2.    Superiority

Finally, Rule 23(b)(3) requires that the class representatives establish that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both predominance and superiority must be met to certify the classes. *Chin*, 182 F.R.D. at 462. In other words, if either of Rule 23(b)(3)'s predominance or superiority requirements are not met, the class may not be certified. To determine whether a class action is superior, courts consider the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s superiority requirement recognizes that "it is desirable to litigate similar, related claims in one forum." *Chin*, 182 F.R.D. at 462. But where the Court determines that class certification would "quickly devolve into an unmanageable morass of divergent legal and factual issues," the superiority requirement is not met. *Id.*

In light of the Court's determination above, it need not discuss superiority at length. At bottom, the Court casts doubt on the efficiency and manageability of certifying the classes. *Newton*, 259 F.3d at 192 ("In terms of efficiency, a class of this magnitude and complexity could not be tried. There are simply too many uncommon issues, and the number of class members is surely too large"). Primary among the Court's concerns are the difficulties in establishing (1) damages, (2) causation, and (3) where relevant, manifestation.

45

A-67

To begin, Plaintiffs argue that where there is an inherent design defect, damages can easily be calculated using classwide proof. (Pls.' Reply Br. 20.) But as demonstrated above, Plaintiffs have not so demonstrated that damages are easily calculable. Indeed, as Plaintiffs readily concede, "differences in individual damages may be significant." (Pls.' Moving Br. 52.) At this stage, Plaintiffs have not shown that damages are measurable class-wide on any consistent model, let alone presented evidence that they can calculate any individual differences. *E.g. Gordon v. Maxim Healthcare Servs., Inc.*, No. 13-7175, 2017 WL 3116153, at *13 (E.D. Pa. July 21, 2017) (finding that because of "the individual inquiries . . . managing this case as a class action would be untenable").

Next, the Court concludes that issues of causation may present severe manageability issues. In support of their argument that superiority weighs in favor of class certification, Plaintiffs submitted a trial plan delineating how they intend to satisfy each element of the claims. (Pls.' Reply Br. Ex. F ("Trial Plan") 3, ECF No. 247-7.) For claims where causation is an element, such as the NJCFA, Plaintiffs assert that the evidence will show they received less than what they paid for because FieldTurf did not disclose Duraspine's defects. However, as observed above, because of the subjective nature of Plaintiffs' injury, it is seemingly insurmountable that Plaintiffs will be able to prove that they *actually* did receive less than what they bargained for when purchasing the fields.

Finally, for the instances where manifestation is required, examined *supra*, the Court finds Plaintiffs would be hard-pressed to prevail on the issue of superiority. Most importantly, many of the Plaintiffs used the Duraspine fields for well over the general four to six years in which Plaintiffs assert that Duraspine would begin to fibrillate. *See Newton*, 259 F.3d at 192.

At bottom, the Court finds that the superiority requirement is not satisfied either. Although the Court certainly understands that class actions provide a vehicle for Plaintiffs to aggregate

46

A-68

claims for adjudication, at this stage, the Court gleans severe manageability issues such that the superiority requirement weighs against certification.

**IV.**   **CONCLUSION**

     For the reasons stated above, the Court denies Plaintiffs' motion for class certification, grants-in-part and denies-in-part FieldTurf's motion exclude the testimony of Dr. Gustaaf Schoukens, and grants FieldTurf's motion to exclude the testimony of Dr. Stephen Hamilton. An appropriate order will follow.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

47

A-69

In re:  FIELDTURF ARTIFICIAL TURF MARKETING AND SALES PRACTICES LITIGATION,
FIELDTURF USA, INC., FIELDTURF INC.,FIELDTURF TARKETT SAS, and TARKETT INC.,
     Petitioners

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏꜰ Aᴘᴘᴇᴀʟs

21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE

215-597-2995

August 1, 2023

Lara B. Bach
Weil Gotshal & Manges
1395 Brickell Avenue
Suite 1200
Miami, FL 33131

Lawrence E. Bathgate II
Bathgate Wegener & Wolf
One Airport Road
P.O. Box 2043
Lakewood, NJ 08701

Jeffrey A. Beer Jr.
Riker Danzig
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962

Daniel K. Bryson
Whitfield Bryson & Mason
900 W Morgan Street
Raleigh, NC 27603

James E. Cecchi
Carella Byrne Cecchi Olstein Brody & Agnello
5 Becker Farm Road
Roseland, NJ 07068

Michael D. Critchley
Critchley Kinum & Luria
75 Livingston Avenue
3rd Floor
Roseland, NJ 07068

Michael M. DiCicco
Maggs McDermott & DiCicco
3349 Highway 138
Building C, Suite D
Wall, NJ 07719

John J. Eeilly
Bathgate Wegener & Wolf
One Airport Road
P.O. Box 2043
Lakewood, NJ 08701

Jordan S. Elias
Girard Gibbs
601 California Street
14th Floor
San Francisco, CA 94108

Ryan M. Farrell
Bathgate Wegener & Wolf
One Airport Road
P.O. Box 2043
Lakewood, NJ 08701

Daniel C. Girard
Girard Gibbs
601 California Street
14th Floor
San Francisco, CA 94108

Lance J. Kalik
Riker Danzig
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962

Nicholas L. Leider
Bathgate Wegener & Wolf
One Airport Road
P.O. Box 2043
Lakewood, NJ 08701

Ryan S. Malc
Bathgate Wegener & Wolf
One Airport Road

P.O. Box 2043
Lakewood, NJ 08701

Angelica M. Ornelas
Girard Gibbs
601 California Street
14th Floor
San Francisco, CA 94108

Curtis M. Plaza
Riker Danzig
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962

Adam E. Polk
Girard Gibbs
601 California Street
14th Floor
San Francisco, CA 94108

D. Aaron Rihn
Robert Peirce & Associates
707 Grant Street
Suite 125
Pittsburgh, PA 15219

Alexander Robertson IV
Robertson & Associates
32121 Lindero Canyon Road
Suite 200
Westlake Village, CA 91361

Christopher A. Seeger
Seeger Weiss
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660

Allison H. Semaya
Weil Gotshal & Manges
767 Fifth Avenue
New York, NY 10153

L. Reid Skibell
Glenn Agre Bergman & Fuentes

1185 Avenue of the Americas
22nd Floor
New York, NY 10036

Diane P. Sullivan
Weil Gotshal & Manges
17 Hulfish Street
Suite 201
Princeton, NJ 08542

Patrick M. Wallace
Whitfield Bryson & Mason
900 W Morgan Street
Raleigh, NC 27603

RE: In re: FieldTurf Artificial Turf Marketing & Sales Practices Litigation, et al
Case Number: 23-8033
District Court Case Number: 3-17-md-02779

**PACER account holders are required to promptly inform the PACER Service Center of any contact information changes. In order to not delay providing notice to attorneys or pro se public filers, your information, including address, phone number and/or email address, may have been updated in the Third Circuit database. Changes at the local level will not be reflected at PACER. Public filers are encouraged to review their information on file with PACER and update if necessary.**

To All Parties:

The Clerk has received a petition for leave to appeal filed by **Tarkett Inc, Fieldturf USA Inc, FieldTurf Artificial Turf Marketing and Sales Practices Litigation, FieldTurf Tarkett SAS, FieldTurf Inc**, docketed at **No. 23-8033**. All inquiries should be directed to your Case Manager in writing or by calling the Clerk's Office at 215-597-2995. This Court's rules, forms, and case information are available on our website at http://www.ca3.uscourts.gov.

**Counsel for Petitioner**
As counsel for Petitioner(s), you must file:
1. Application for Admission (if applicable);
2. Appearance Form; and,
3. Disclosure Statement (except governmental entities), if not included in petition.
These forms must be filed within **fourteen (14) days of the date of this letter**.

Should the Court grant the petition for leave to appeal, additional forms and the appellate portion of the filing and docketing fee will be required.

Any response in opposition must be filed **within ten (10) days** of the date of this letter. **All responses must be accompanied by an Appearance Form and Disclosure Statement.** The petition and any response(s) will be forwarded to the Court for disposition. The parties will be advised when an order is entered by the Court.

Parties who do not intend to participate in the petition must notify the Court in writing.

Very truly yours,
Patricia S. Dodszuweit, Clerk


By: Timothy McIntyre
Timothy McIntyre, Case Manager
267-299-4953

cc: Melissa E. Rhoads
Honorable Michael A. Shipp