# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: FIELDTURF ARTIFICIAL TURF MARKETING AND SALES PRACTICES LITIGATION | Case No. 3:17-md-02779-MAS-TJB<br><br>Hon. Michael A. Shipp, U.S.D.J.<br><br>MOTION RETURN DATE: MARCH 4, 2024<br><br>Electronically Filed |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT

Diane P. Sullivan
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue
New York, New York 10153
Phone: (212) 310-8000

Reid Skibell
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas, 22nd Fl.
New York, NY 10036
Phone: (212) 970-1610

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION.............................................................................................1

FACTUAL BACKGROUND ..........................................................................3

LEGAL STANDARD .....................................................................................8

ARGUMENT...................................................................................................9

I.    WHETHER PLAINTIFFS CAN DEMONSTRATE A COMMON DESIGN DEFECT THROUGH ADMISSIBLE EVIDENCE IS RIPE FOR CONSIDERATION.................................................................9

II.   PLAINTIFFS CANNOT PROVE A COMMON DESIGN DEFECT IN DURASPINE FIBER AS A MATTER OF LAW .............11

CONCLUSION...............................................................................................20

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

## Cases

*Berrier v. Simplicity Mfg., Inc.*,
   563 F.3d 38 (3d Cir. 2009) ...............................................................8

*Butler v. Acme Mkts., Inc.*,
   445 A.2d 1141 (N.J. 1982) ...............................................................14

*Diebold, Inc. v. Cont'l Cas. Co.*,
   No. CIV.A. 07-1991JEI, 2008 WL 1372948 (D.N.J. Apr. 10, 2008) ...............11

*Dzielak v. Whirlpool Corp.*,
   No. CV 12-89 (KM) (JBC), 2019 WL 6607220 (D.N.J. Dec. 5,
   2019), *aff'd*, 83 F.4th 244 (3d Cir. 2023) ...................................................10, 12

*Ebenhoech v. Koppers Indus., Inc.*,
   239 F. Supp. 2d 455 (D.N.J. 2002) ....................................................14

*Florio v. Ryobi Techs., Inc.*,
   No. CV 17-5518, 2020 WL 5234924 (D.N.J. Sept. 2, 2020) ............................18

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*,
   No. CIV. A. 03-4558, 2010 WL 2813788 (D.N.J. July 9, 2010),
   *amended by* 2011 WL 601279 (D.N.J. Feb. 16, 2011)........................................8

*Greisberg v. Bos. Sci. Corp.*,
   No. CV 19-12646, 2021 WL 2349760 (D.N.J. June 9, 2021), *aff'd*,
   No. 21-2364, 2022 WL 1261318 (3d Cir. Apr. 28, 2022)...................................19

*Hindermyer v. B. Braun Med. Inc.*,
   419 F. Supp. 3d 809 (D.N.J. 2019) ....................................................19

*Lopez v. Borough of Sayreville*,
   No. A-0158-06T5, 2008 WL 2663423 (N.J. Super. Ct. App. Div.
   July 9, 2008)........................................................................16

*Mays v. Gen. Binding Corp.*,
   565 F. App'x 94 (3d Cir. 2014) ..................................................11, 19

*In re Mercedes-Benz Tele Aid Cont. Litig.*,
257 F.R.D. 46 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113
(D.N.J. 2010), *opinion modified on reconsideration*, 2010 WL
2976496 (D.N.J. July 22, 2010) ............................................................................... 11

*Milanowicz v. Raymond Corp*.,
148 F. Supp. 2d 525 (D.N.J. 2001) ............................................................... 13, 14

*Neale v. Volvo Cars of N. Am., LLC*,
No. 2:10-CV-4407 DMC MF, 2013 WL 785056 (D.N.J. Mar. 1,
2013) .......................................................................................................................... 9

*Ortiz v. Yale Materials Handling Corp.*,
No. CIV 03-3657FLW, 2005 WL 2044923 (D.N.J. Aug. 24, 2005) ................. 18

*P.C. Data Centers of Pa., Inc. v. Fed. Express Corp.*,
113 F. Supp. 2d 709 (M.D. Pa. 2000) ............................................................... 8

*Rapid Models & Prototypes, Inc. v. Innovated Sols.*,
No. CIV. 14-277 NLH/KMW, 2015 WL 4914477 (D.N.J. Aug. 18,
2015) ........................................................................................................................ 11

*Rocco v. N.J. Transit Rail Operations, Inc.*,
749 A.2d 868 (App. Div. 2000) .......................................................................... 14

*Sakolsky v. Genie Indus.*,
No. CV156893ESMAH, 2021 WL 3661398 (D.N.J. Aug. 18,
2021), *appeal dismissed*, No. 21-2755, 2021 WL 7617668 (3d Cir.
Nov. 2, 2021) .......................................................................................................... 18

*Seavey v. Globus Med., Inc.*,
No. CIV. 11-2240 RBK/JS, 2014 WL 1876957 (D.N.J. Mar. 11,
2014) ................................................................................................................... 12, 13

*Smith v. Keller Ladder Co.*,
645 A.2d 1269 (N.J. Super. Ct. App. Div. 1994) .............................................. 12

*Sonneveldt v. Mazda Motor of Am., Inc.*,
No. 819CV01298JLSKES, 2023 WL 2292600 (C.D. Cal. Feb. 23,
2023) ................................................................................................................... 10, 11

*Toms v. J.C. Penney Co.*,
304 F. App'x 121 (3d Cir. 2008) ........................................................................ 13

*Vicente v. DePuy Synthes Cos.*,
    570 F. Supp. 3d 232 (D.N.J. 2021) .............................................................12, 15

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ..............................................................................10

## Other Authorities

Fed. R. Civ. P. 56(a)...................................................................................................8

# INTRODUCTION

Plaintiffs have asserted claims under various legal theories, with the common allegation being that the Duraspine turf fields ("Duraspine Fields") Plaintiffs purchased from Defendants FieldTurf USA, Inc., FieldTurf, Inc., FieldTurf Tarkett SAS, and Tarkett, Inc. (collectively "FieldTurf") contained a common inherent defect (the "Defect Issue"). In its opinion certifying the Defect and Deception Issues for a class trial, this Court defined the Defect Issue to be consistent with Plaintiffs' theory of the alleged *design* defect inherent in Duraspine — that Duraspine's fiber design was supposedly: (i) flawed geometrically; and (ii) manufactured with an inappropriate polymer, thus making it unsuitable for use in athletic fields because of splitting and layover of the fiber. This is a highly technical issue that Plaintiffs have acknowledged requires expert testimony on fiber design and polymer science.

There is an established legal framework for demonstrating the existence of a design defect. To prove their design defect theory, Plaintiffs must show that either the risk of the product outweighed its utility, or that a feasible alternative design to the defective design could have been used instead. Because Plaintiffs do not claim that Duraspine's purported risks outweighed its utility, the only potential avenue for Plaintiffs to demonstrate the existence of a design defect is by offering proof of an alternative design.

Yet, Plaintiffs have not even attempted to show that any feasible alternative fiber design existed at the time Plaintiffs purchased their Duraspine Fields.  Plaintiffs do not – because they cannot – point to any design that could have prevented the Duraspine fiber from any splitting or layover after years of use.  ***None*** of Plaintiffs' experts offered any opinions about any feasible alternative design to Duraspine fiber that existed at the time Plaintiffs purchased their Duraspine Fields.  Plaintiffs' primary technical expert, Dr. Gustaaf Schoukens, conceded that he did not know of any commercially available monofilament fiber, as Plaintiffs claim with Duraspine, that would stay erect for longer than four years.  Tellingly, when Dr. Schoukens was asked if ***all monofilament fibers*** experience the issues that Plaintiffs allege make Duraspine defective, he acknowledged that this was the case.  As he put it: "nothing is perfect."  Certification of Counsel With Exhibits ("Sullivan Cert."), Sullivan Exhibit 10, (Transcript of Deposition of Dr. Gustaaf Schoukens ("Schoukens Dep. Tr.") 229:24-230:17).  Dr. Schoukens also "readily admitted that he could not identify any other monofilament, like Duraspine," existing during the relevant time period, "that would stay erect longer" than Duraspine.[1]  ECF No. 270 at 11 (citing to Sullivan Cert., Sullivan Exhibit 10, (Schoukens Dep. Tr. 228:11-16)).  Of course,

_____

[1] As this Court observed, in making such an admission, Dr. Schoukens arguably undermined "his ultimate conclusion concerning Duraspine's defect."  ECF No. 270 at 11.

invulnerability is not the standard in a defective product case.  Plaintiffs have not, and cannot, carry their burden of demonstrating that there was a reasonable alternative design for Duraspine, meaning: (1) a design that could have been manufactured in 2004 to 2010; (2) that would have been durable enough to stand erect for eight years with no splitting; (3) that would have been soft enough that athletes could effectively play football, soccer, and baseball on it; and (4) that was sufficiently affordable that municipalities and school districts would buy it.  Accordingly, FieldTurf is entitled to summary judgment as to the Defect Issue.

A finding that Plaintiffs cannot proffer adequate proof of a defect would also resolve the issue of whether FieldTurf omitted material information when selling to its customers (the Deception Issue, defined *infra*).  Simply put, without a defect, there would be nothing to disclose.  The Court should therefore grant summary judgment.

## FACTUAL BACKGROUND

The core theory of Plaintiffs' case is that the Duraspine fiber, a monofilament fiber, had a flawed geometric design (Defendants' Rule 56.1 Statement of Undisputed Material Facts ("SUF") at ¶¶ 3, 6); and was manufactured with an unsuitable plastic polymer.  SUF at ¶ 6.  Plaintiffs further claim that this alleged design defect caused Duraspine Fields to look less aesthetically pleasing over time due to premature splitting and layover.  SUF at ¶¶ 7, 8.  There is no claim that the

alleged design defect in Duraspine fibers created any safety hazard with the potential for injury or necessitated cancellation of any event. SUF at ¶ 9.

In support of these claims, Plaintiffs have offered the expert opinions of Dr. Gustaaf Schoukens. SUF at ¶ 14. Specifically, Dr. Schoukens opined that Duraspine is defective because of two purported flaws: first, Duraspine's geometry is defective because it contains "breaking points"; and, second, Duraspine was made with a "C-4" linear low-density polyethylene polymer (referring to the number of carbon atoms in the polymer molecule) produced with a Zieglar-Natta polymerization catalyst, which he claims was inherently weaker than other polymers. *Id*. Per Dr. Schoukens, Duraspine is supposedly defective due to the ***combined*** impact of these purported weaknesses. *Id*.

With respect to Duraspine's polymer, however, Dr. Schoukens has never articulated which type of polymer, if any, could have been incorporated into the design of Duraspine to prevent it from laying over or splitting.[2] SUF at ¶¶ 13, 17. In other words, he has not articulated how Duraspine could have been manufactured to ensure that the plastic fibers remained perfectly erect and did not split at the ends for the duration of a field's lifespan.

---

[2] As the Court previously found, Dr. Schoukens' longevity or durability opinion is inadmissible because it was not sufficiently reliable. ECF No. 270 at 9-13. This lack of reliability calls into question whether Dr. Schoukens could even offer an admissible expert opinion on an alternative to Duraspine.

For example, when asked during his deposition if the geometry of Duraspine was held constant and the fiber had been manufactured with a C-8 polymer instead of a C-4 polymer, Dr. Schoukens stated that Duraspine would "***behave[] in the same way***" and that it would be "***at least as bad or worse than the C4 Duraspine***." Sullivan Cert., Sullivan Exhibit 10, (Schoukens Dep. Tr.  352:7-11) (emphasis added); *see also id.* at 355:6-17 (opining that a C-8 version of Duraspine would last as long as a C-4 version because "[w]ith the defects, the inherent defects included into the geometry, it's [sic] comes to the same conclusions."); 365:10-20 (stating that a C-8 version of Duraspine would "probably come[] to the same conclusion" as a C-4 version).  Similarly, Dr. Schoukens has opined that Duraspine Pro, which had a similar geometry to Duraspine but was manufactured with a C-6 polymer, experienced "substantial degradation" in Lisport testing prior to what would be the equivalent of eight years on a soccer field.  SUF at ¶ 18.

Dr. Schoukens' failure to identify an alternative to the polymers used to manufacture Duraspine is particularly problematic because in his academic writing he has noted that there is a tradeoff between fiber durability and playability: "If the fibres are too hard . . . the risk of wounds due to abrasion of the skin or burning of the skin is increased.  Therefore a good balance of all of the properties of fibres or yarns is necessary for artificial turf applications."  Sullivan Cert., Sullivan Exhibit 9, (Schoukens, Developments in Textile Sports Surface (§ 6.4.1)).

As to Duraspine's shape, Dr. Schoukens testified that the other commercially available monofilament fibers had the same performance characteristics as Duraspine. On this point, when asked if **all monofilament fibers** experience "cracking, splitting and shearing," Dr. Schoukens acknowledged that this was the case. As he put it: "nothing is perfect." Sullivan Cert., Sullivan Exhibit 10 (Schoukens Dep. Tr. 229:24-230:17); *see also id.* at 229:6-9; 340:19-22 (testifying that all spined monofilament fibers are defective); 342:6-13. Likewise, in his academic writing Dr. Schoukens has expressed that **all artificial turf fibers** begin laying over a few months after installation:

> It is known from experience that these ball roll problems on artificial turf start within a few months of installation. Whereas the ball roll behavior on a newly installed artificial pitch is acceptable and even comparable to that on natural turf, this is no longer the case for an artificial field that has been played on for some months. A clear degradation in playing quality over time is noticed. This is often indicated as a lack of "resilience" of the field.

Sullivan Cert., Sullivan Exhibit 9 (Schoukens, Developments in Textile Sports Surface (§ 6.1)); *see also* Sullivan Cert., Sullivan Exhibit 10 (Schoukens Dep. Tr. 207:13-20) ("Q: And you're saying that lack of resilience on all artificial turf fields at this time begins a few months after installation; right? A: That's what's written in the paper."). In his academic writing, Schoukens further described the future of artificial turf fibers, including the use of different polymers and shapes, as unknown. He described the situation in 2009 as follows:

6

> As results of ongoing research continue, a better insight will be obtained in the relationships between the fiber structure and its resilience and resistance to fibrillation. This will lead to possible developments of polymers with better properties. . . . The fundamental question is . . . [i]s it possible to obtain a combination of all these properties in one polymer or in blends of polymers or is it necessary to use multilayered fiber?

Sullivan Cert., Sullivan Exhibit 9 (Schoukens, Developments in Textile Sports Surface (§ 6.6)); *see also id.* (§ 6.7.5) ("Much research is going on, in university and industry research facilities, and good solutions will be reached in the near future.").

Dr. Schoukens did testify that he conducted resiliency testing, at an unidentified time, on an unnamed fiber for a European manufacturer, Desso, that had a diamond shape and was manufactured with a medium-density polyethylene. However, Dr. Schoukens did not opine that this product was a feasible alternative to Duraspine. SUF at ¶ 19. Notably, Dr. Schoukens did not even opine that this unnamed fiber lacked the alleged common defect Plaintiffs claim was present in Duraspine. SUF at ¶ 20.

In short, Plaintiffs have not identified any feasible alternative design to Duraspine fiber that existed when FieldTurf sold its Duraspine Fields to Plaintiffs. SUF at ¶ 11. Nor have they pointed to any testing that would substantiate the feasibility of any alternative designs for Duraspine Fields. SUF at ¶ 12.

## LEGAL STANDARD

When a party moves for summary judgment on a specific issue, as here, "a court remains guided by the familiar standards governing summary judgment motions." *P.C. Data Ctr. of Pa., Inc. v. Fed. Express Corp.*, 113 F. Supp. 2d 709, 714 (M.D. Pa. 2000). "That is, a party is entitled to summary judgment on a particular issue only by showing that (a) there is no genuine issue as to any fact material to that issue, and (b) the movant is entitled to a judgment as a matter of law on that issue." *Id.* Accordingly, under Fed. R. Civ. P. 56(a), "[i]f the non-movant's evidence . . . is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. CIV. A. 03-4558, 2010 WL 2813788, at \*3 (D.N.J. July 9, 2010), *amended by* 2011 WL 601279 (D.N.J. Feb. 16, 2011). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* On this motion, the Court is to determine "whether there is a genuine issue for trial." *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45 (3d Cir. 2009).

# ARGUMENT

## I.   WHETHER PLAINTIFFS CAN DEMONSTRATE A COMMON DESIGN DEFECT THROUGH ADMISSIBLE EVIDENCE IS RIPE FOR CONSIDERATION

The Court previously found that the issue of whether Duraspine has a common defect is susceptible to class wide proof.  ECF No. 285 at 13.  The Court also determined that the issue of whether FieldTurf omitted its alleged knowledge of this putative defect from its sales and marketing can be determined on a class wide basis.  *Id.*, at 11.  What was not previously before the Court was the issue of whether Plaintiffs will actually be able to demonstrate the defect by proffering sufficient admissible evidence of a common defect to justify a jury trial.  *See Neale v. Volvo Cars of N. Am., LLC*, No. 2:10-CV-4407 DMC MF, 2013 WL 785056, at *4 (D.N.J. Mar. 1, 2013) (explaining that at the class certification stage all that needs to be shown is that "the existence of the [claimed defect] can be established through common proof").  For that reason, no determination has been made yet on whether the existence of Duraspine's alleged defect can be proven through admissible evidence, let alone whether Duraspine is in fact defective.  ECF No. 285 at 12 n.4 (specifically reserving consideration of whether Duraspine is defective); ECF 270 at 27 (same).

Now that an issue class has been certified, the issue of whether the Plaintiffs can establish the existence of an alleged defect (*i.e.*, the Defect Issue) is ripe for

consideration because any class members that have not opted out will be bound by the Court's decision.  ECF No. 285 at 15-16; *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) (explaining that "[b]y proving that the Duets are not defectively designed, . . . Whirlpool can obtain a judgment binding all class members who do not opt out of the class.").  Further, a finding that Plaintiffs cannot proffer adequate proof of a defect would also resolve the issue of whether FieldTurf omitted material information when selling to its customers (the "Deception Issue"[3]).  Simply put, without a provable defect, there would be nothing to disclose.  ECF No. 285 at 3 (defining the "Deception Issue" to cover "whether FieldTurf knowingly **omitted** the facts of **this common defect** from the proposed class in its marketing and sales presentations") (emphasis added).

For the reasons set forth below, FieldTurf is entitled to summary judgment on the Defect and Deception Issues because Plaintiffs cannot demonstrate through admissible evidence that the Duraspine fiber is defective.  *See, e.g., Dzielak v. Whirlpool Corp.*, No. CV 12-89 (KM) (JBC), 2019 WL 6607220, at *11 (D.N.J. Dec. 5, 2019), *aff'd*, 83 F.4th 244 (3d Cir. 2023) (granting summary judgment after certification of a class); *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 819CV01298JLSKES, 2023 WL 2292600, at *17 (C.D. Cal. Feb. 23, 2023)

---

[3] The term "Deception Issue" has the term ascribed to it in this Court's July 13, 2023, Memorandum Opinion (ECF No. 285).

(following certification of a class, granting defendant summary judgment and decertifying the class where "there is no evidence before the Court that a common actionable defect exists in the Class Vehicles").

## II. PLAINTIFFS CANNOT PROVE A COMMON DESIGN DEFECT IN DURASPINE FIBER AS A MATTER OF LAW

Plaintiffs contend that the Duraspine fiber is defective because it has a common design defect. Consistent with that theory, the Court defined the Defect Issue as relating to whether Duraspine's design suffered from a geometric flaw and the use of an inferior polymer. ECF No. 285 at 13.

Under New Jersey law, there is well-established case law on what is required to prove the existence of a design defect.[4] It is not enough to argue, as Plaintiffs do here, that the product's design is flawed. *See Mays v. Gen. Binding Corp.*, 565 F.

---

[4] In certifying the issue classes, this Court "has already concluded that the elements of fraudulent concealment are similar nationwide . . . and that the Court may apply New Jersey law to adjudicate the unjust enrichment claim" (ECF No. 285 at 17 (citations omitted)). And because the Defect and Deception Issues underlie those claims, New Jersey law likewise applies to consideration of the Issues. *See Diebold, Inc. v. Cont'l Cas. Co.*, No. CIV.A. 07-1991JEI, 2008 WL 1372948, at *3 (D.N.J. Apr. 10, 2008) (holding New Jersey law applied where the court found no material difference in state law on the issues presented); *see also Rapid Models & Prototypes, Inc. v. Innovated Sols.*, No. CIV. 14-277 NLH/KMW, 2015 WL 4914477, at *3 (D.N.J. Aug. 18, 2015) (holding New Jersey law applied where the court found no significant difference between state laws on express warranty); *see also In re Mercedes-Benz Tele Aid Cont. Litig.*, 257 F.R.D. 46, 57 (D.N.J. 2009), *opinion clarified*, 267 F.R.D. 113 (D.N.J. 2010), *opinion modified on reconsideration*, 2010 WL 2976496 (D.N.J. July 22, 2010).

App'x 94, 97 (3d Cir. 2014) ("An alternative design lacking in specificity or a factual basis cannot support a cause of action for damages because tort law is not designed to accommodate claims that would absolutely minimize accidents."); *Smith v. Keller Ladder Co.*, 645 A.2d 1269, 1271–72 (N.J. Super. Ct. App. Div. 1994) (upholding grant of summary judgment for failure to identify a "reasonably feasible alternative design"). The test for evaluating whether a product has a design defect for the purposes of non-strict liability claims under New Jersey law "is essentially the same as that required when the theory is strict tort liability under Section 402A of the Restatement (Second) of Torts."[5] *Dzielak*, 2019 WL 6607220, at *16. Under a strict liability framework, proving a common design defect requires showing either that the product's risks outweighed its utility, or that at the time of sale there was a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's alleged harm without substantially impairing the reasonably anticipated or intended function of the product. *See Vicente v. DePuy Synthes Cos.*, 570 F. Supp. 3d 232, 241 (D.N.J. 2021) (explaining that to state a claim for design defect "a plaintiff must plead either that the product's risk [of harm] outweighs its [utility], or that an alternate design exists"); *Seavey v. Globus Med., Inc.*, No. CIV.

---

[5] A product can be defective so as to sustain an implied warranty of merchantability or similar non-strict liability claims "without being 'unreasonably dangerous' as is generally required under strict tort." *Dzielak*, 2019 WL 6607220, at *16.

11-2240 RBK/JS, 2014 WL 1876957, at *12 (D.N.J. Mar. 11, 2014) (granting summary judgment in defendant's favor where "[p]laintiff has not shown a reasonable alternative design to the [product], as required under New Jersey law"). And as Plaintiffs concede, they must do so with expert testimony. ECF No. 278 at 13; *see also Toms v. J.C. Penney Co.*, 304 F. App'x 121, 124 (3d Cir. 2008) (affirming summary judgment because plaintiff failed to carry its burden and noting that "the existence of a design defect is frequently proven through the testimony of an expert who has examined the product and offers an opinion on its design.").

Because Plaintiffs do not and cannot show that Duraspine's purported risks outweighed its utility, the only potential avenue for Plaintiffs to demonstrate the existence of a design defect is by offering proof of a reasonable alternative design. The undisputed factual and expert evidence confirms that Plaintiffs cannot make that showing.

When evaluating whether a suitable alternative design exists, the determinative issue is "whether the proposed alternative design or modification is feasible and/or compatible with the underlying design." *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 535 (D.N.J. 2001). Answering this question is highly technical in nature and "may involve computer analyses and calculations and likely involves testing of the proposed modification." *Id.* Even if a party can establish that an alternative design is feasible, it must also establish that any modifications in the

13

alternative design do not interfere with the intended purpose of the product. *Id.* at 536. Given the difficulty of proving both feasibility and compatibility of product designs, expert evidence is typically required to show that a reasonable alternative exists.

In cases considering alleged defects under an alternative design theory involving products that are more technically complicated than a common layperson can understand, New Jersey courts consistently reject evidence of alternative designs that are not supported by expert testimony. *See Milanowicz*, 148 F. Supp. 2d at 535; *see also Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 468 (D.N.J. 2002) (explaining "[e]xpert testimony is generally needed as proof of an alternative warning and a reasonable alternative design" and dismissing design defect claim as plaintiff's expert failed to suggest modifications, alternative designs, or alternative warnings); *Rocco v. N.J. Transit Rail Operations, Inc.*, 749 A.2d 868, 879 (N.J. Super. Ct. App. Div. 2000) ("Expert testimony is required when the subject matter to be dealt with 'is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable.'" (quoting *Butler v. Acme Mkts., Inc.*, 445 A.2d 1141, 1147 (N.J. 1982))). "[I]n alternative design cases, merely conceptualizing possibilities is not alone sufficient. Testing of the proposed alternative is often required." *Milanowicz*, 148 F. Supp. 2d at 535.

This Court defined the Defect Issue consistent with Plaintiffs' theory of the alleged design defect inherent in Duraspine fiber, which is two-fold: (i) a flawed geometric design and (ii) use of an unsuitable C-4 polymer.  SUF at ¶ 6; ECF No. 285 at 13.  Plaintiffs admit — and this Court agreed — that Plaintiffs' theory of the alleged design defect that underlies the Defect Issue is "a complex dispute requiring sophisticated expert testimony on fiber design and polymer science."  ECF No. 278 at 13; *see also* ECF No. 274-1 at 11 (noting "expert evidence will be central to resolving" their design defect claim); *see also* ECF No. 285 at 13 (the Court noting "the same expert evidence will help resolve the Defect and Deception Issues"); *see also id.* at 16 (the Court recognizing that expert testimony is required in this case to prove Defect, noting "it would be difficult for any individual Class member to gather the requisite litigation resources, such as the experts to testify on any potential defect in the Duraspine turf fields.").  As the design and makeup of an alternative field fiber product is quite clearly "complex and outside the experience of an ordinary consumer,"[6] to demonstrate a feasible alternative design, Plaintiffs must present

---

[6] *Vicente*, 570 F. Supp. 3d at 242 ("An average consumer would not know how long surgical screws maintain their structure after nonunion of a fracture.  This is far from a lay person's common experience of, say, joining two pieces of wood with plates and screws.  The system is not akin to the bicycle whose brakes do not hold, the hypothetical 'common knowledge' case . . . soundness of the medical device at issue here is not within the ken of the average consumer . . . the average consumer would not know how long surgical screws maintain their structure after nonunion of a fracture . . . . Nor would the consumer be familiar with the avoidable or inevitable

15

expert evidence of an alternative design resolving ***both*** the alleged geometric and polymer alleged issues.  ECF No. 285 at 13 (explaining that "the same expert evidence will help resolve the Defect and Deception Issues on a class-wide basis."). The undisputed factual record, though, shows that Plaintiffs cannot show and have not even attempted to posit that any feasible alternative design to the Duraspine fiber existed at the time FieldTurf sold Plaintiffs their Duraspine Fields.  Stated another way, Plaintiffs have not proposed a reasonable alternative design that was known to the industry at the time the allegedly defective product was manufactured that could be submitted to a jury.  Thus, there is no triable issue.

Neither of Plaintiffs' technical expert witnesses — Dr. Schoukens and Dr. Gotro — offers any testimony or opinions about the availability of an alternative. SUF at ¶ 11.  "[A]n alternative design cannot be a mere hypothetical that a manufacturer could consider, develop, and refine over time."  *Lopez v. Borough of Sayreville*, No. A-0158-06T5, 2008 WL 2663423, at *26 (N.J. Super. Ct. App. Div. July 9, 2008).  Neither of Plaintiffs' experts identifies an artificial turf product available at the time of sale of the Duraspine Fields that did in fact avoid the alleged problem of "layover."  SUF at ¶ 13.  Although Plaintiffs' primary expert on product defect, Dr. Schoukens, speculated on other polymers that might have generally been

---

failure rate of such a medical procedure, the reducible or irreducible risks, and so on." (internal quotation marks omitted)).

better than the polymer used in Duraspine fibers, Dr. Schoukens opined that even if the Duraspine fiber had been made with one of these alternative polymers, it is his opinion that the design still would exhibit the same problems he alleges as defective. SUF at ¶ 16.  Nor does Dr. Schoukens offer any opinion as to an alternative geometric design that would have been a feasible alternative to that used in Duraspine fibers.  SUF at ¶¶ 16, 17.  The record is thus absent of any evidence of an alternative design that could have effectively eliminated the alleged defect in the Duraspine product.

Nor did either of Plaintiffs experts challenge the expert testimony of FieldTurf's artificial turf performance expert, Alastair Cox, that "[p]ile flattening is a common problem for many types of synthetic turf.  All surfaces will eventually suffer from this phenomenon, it is only a question of when."  Sullivan Cert., Sullivan Exhibit 11 (Expert Report of Alistair Cox at 16); *see also* SUF at ¶ 10.  Indeed, as the Court explained, Dr. Schoukens "readily admitted that he could not identify any other monofilament, like Duraspine, that would stay erect longer than four years."[7] ECF No. 270 at 11 (citing to Sullivan Cert., Sullivan Exhibit 10 (Schoukens Dep. Tr. 228:11-16)); *see also* SUF at ¶ 15.  Plaintiff's own evidence makes clear that ***all***

---

[7] As this Court observed, in making such an admission, Dr. Schoukens arguably undermined "his ultimate conclusion concerning Duraspine's defect."  ECF No. 270 at 11.

monofilament fields were expected to experience layover during their regular lifetime use as expected product wear, as opposed to a product "defect."

Even if Plaintiffs could identify a possible alternative design for Duraspine fiber based on the factual record — which they cannot — it is undisputed that neither of Plaintiffs' experts conducted any testing of such a hypothetical alternatively designed product. SUF at ¶ 12. Without evidence of such testing, Plaintiffs fail to meet their burden of demonstrating whether such an alternative design was feasible, a necessary element to establish a design defect as a matter of law. *See Ortiz v. Yale Materials Handling Corp.*, No. CIV 03-3657FLW, 2005 WL 2044923, at *6 (D.N.J. Aug. 24, 2005) ("[I]n the case of alternative designs, testing is crucial"); *see e.g., Sakolsky v. Genie Indus.*, No. CV156893ESMAH, 2021 WL 3661398, at *8 (D.N.J. Aug. 18, 2021) (excluding plaintiff's expert's opinion where the expert failed to test the reasonable alternatives and granting Defendant's summary judgment motion), *appeal dismissed*, No. 21-2755, 2021 WL 7617668 (3d Cir. Nov. 2, 2021); *Florio v. Ryobi Techs., Inc.*, No. CV 17-5518, 2020 WL 5234924, at *9 (D.N.J. Sept. 2, 2020) (same).

The only alternative designs Dr. Schoukens tested, an unidentified prototype for a diamond-shaped fiber for Desso, does not qualify as a genuine alternative. Dr. Schoukens declined to provide important details regarding the testing work he did for Desso, including when it took place and what polymers were used in the

products.  SUF at ¶ 21.  And the diamond-shaped fibers referenced in his report —

which Dr. Schoukens does not even claim to have tested — were not commercially

available during the relevant time period.  SUF at ¶¶ 1, 22, 23.  Thus, Dr. Schoukens

has not — and cannot — opine that such a design was capable of being made when

FieldTurf manufactured Duraspine.  *Hindermyer v. B. Braun Med. Inc.*, 419 F. Supp.

3d 809, 826 (D.N.J. 2019) (rejecting argument that a future design of a product was

a feasible alternative because plaintiff "has not alleged that those products were

capable of being made when Defendants manufactured the device in question"); *see*

*also Mays,* 565 F. App'x at 97 (rejecting alternative design where the expert failed

to opine "the suggested designed-in features were economically or practically

feasible"); *Greisberg v. Bos. Sci. Corp.*, No. CV 19-12646, 2021 WL 2349760, at

*6 (D.N.J. June 9, 2021) (dismissing a claim that a product was defective for failure

to show "that such a design currently exists, let alone that such a design existed at

the time the [product] was installed"), *aff'd*, No. 21-2364, 2022 WL 1261318 (3d

Cir. Apr. 28, 2022).

Because Plaintiffs have failed to produce any evidence establishing the

existence of a feasible alternative design for the Duraspine fiber that existed at the

time Plaintiffs purchased their Duraspine Fields, let alone evidence that would show

such alternative design would have reduced or prevented Plaintiffs' alleged harm (a

field that was less aesthetically pleasing), Plaintiffs are unable as a matter of law to

19

demonstrate the existence of an alleged design defect. The Court should grant FieldTurf summary judgment and rule in its favor on the Defect Issue, and by extension, the Deception Issue.

## CONCLUSION

Because Plaintiffs cannot demonstrate that any alleged risks associated with an alleged inherent defect in Duraspine fiber outweigh the Duraspine Fields' utility and Plaintiffs have no expert evidence showing that a feasible, alternative design to the Duraspine fiber existed when Plaintiffs purchased their respective Duraspine Fields, they cannot establish the existence of the common design defect in Duraspine fiber that this Court certified for class certification. The Court should grant FieldTurf summary judgment and rule in its favor on the Defect Issue. Further, as Plaintiffs cannot show the existence of an inherent design defect as a matter of law, FieldTurf could not have omitted information about this non-existent defect, and the Deception Issue should also be decided in FieldTurf's favor.

January 29, 2024

By:  *s/ Diane P. Sullivan*
Diane P. Sullivan
WEIL, GOTSHAL & MANGES
LLP
767 5th Avenue
New York, New York 10153
Phone: (212) 310-8000

Reid Skibell
GLENN AGRE BERGMAN &
FUENTES LLP
1185 Avenue of the Americas,
22nd Fl.
New York, NY 10036
Phone: (212) 970-1610

*Attorneys for Defendants*

21